UNITED STATES BANKRUPTCY COURT
DISTRICT OF MASSACHUSETTS
EASTERN DIVISION

_____

IN RE:
CHICAGO INVESTMENTS, LLC, et al.,[1]               Chapter 11
                DEBTORS.                            Case No. 10-23809-WCH

_____

**MEMORANDUM OF DECISION**

---

[1] The other debtors in these jointly-administered cases are: PF Group, LLC ("PF Group"), Case No. 10-23810-WCH; PF Bost, LLC ("PF Bost"), Case No. 10-23811-WCH; PF Chel, LLC ("PF Chel"), Case No. 10-23812-WCH; PF Mald, LLC ("PF Mald"), Case No. 10-23813-WCH; PF Matt, LLC ("PF Matt"), Case No. 10-23814-WCH; PF Port, LLC ("PF Port"), Case No. 10-23815-WCH; and PF Wobu, LLC ("PF Wobu"), Case No. 10-23816-WCH (collectively with Chicago Investments, LLC ("Chicago Investments"), the "Debtors").

# TABLE OF CONTENTS

I. INTRODUCTION ............................................................................................ 1

II. BACKGROUND ............................................................................................ 2

    *The Debtors* ................................................................................................ 3

    *The Franchise Agreements* ........................................................................ 8

    *The Area Development Agreement* ............................................................ 17

    *The Life Fitness Capital Leases* ................................................................ 18

    *The Haymarket Notes and Security Agreements* ...................................... 19

    *The Danversbank Note and Security Agreement* ...................................... 23

    *The Events Precipitating the Bankruptcy Filings* ..................................... 24

    *The Bankruptcy Filings and Travel of the Case* ....................................... 26

    *The Fourth Amended Plan* ........................................................................ 34

    *The Objection to Confirmation* ................................................................. 42

    *Pre-Trial Events* ........................................................................................ 44

    *The Contested Confirmation Hearing* ...................................................... 47

    *The Transition Agreements* ....................................................................... 60

III. POSITIONS OF THE PARTIES ................................................................ 61

    The Franchisor ........................................................................................... 61

    The Debtors ................................................................................................ 66

    Haymarket .................................................................................................. 71

IV. DISCUSSION .............................................................................................. 74

    A.  Enforceability of the Franchisor's Right of First Refusal ..................... 79

    B.  The Franchisor's Objection to Haymarket's Claim ............................... 87

    C.  The Haymarket Claim Settlement ......................................................... 90

    D.  Assumption of Franchisor Agreements .................................................. 95

        1.   Applicable Law .................................................................................. 95

        2.   Assumption of the ADA ..................................................................... 96

        3.   Assumption of the Franchise Agreements ......................................... 99

    E.  Estimation of the Franchisor's Claim .................................................... 105

    F.  Confirmation of the Fourth Amended Plan ........................................... 107

        1.   11 U.S.C. § 1129(a)(1) ...................................................................... 108

2.    11 U.S.C. § 1129(a)(2) ............................................................................. 108

3.    11 U.S.C. § 1129(a)(3) ............................................................................. 109

4.    11 U.S.C. § 1129(a)(4) ............................................................................. 110

5.    11 U.S.C. § 1129(a)(5) ............................................................................. 111

6.    11 U.S.C. § 1129(a)(6) ............................................................................. 111

7.    11 U.S.C. § 1129(a)(7) ............................................................................. 112

8.    11 U.S.C. § 1129(a)(8) ............................................................................. 112

9.    11 U.S.C. § 1129(a)(9) ............................................................................. 113

10.    11 U.S.C. § 1129(a)(10) ............................................................................. 114

11.    11 U.S.C. § 1129(a)(11) ............................................................................. 114

12.    11 U.S.C. § 1129(a)(12) ............................................................................. 116

13.    11 U.S.C. § 1129(d) ............................................................................. 116

V. CONCLUSION ............................................................................. 117

# I. **INTRODUCTION**

The matters before the Court are the "Motion by Debtors to Assume Executory Contracts (Franchise Agreements) with Pla-Fit, LLC" (the "Motion to Assume"), the Debtors' "Motion to Estimate Claim of Pla-Fit Franchise, LLC" (the "Motion to Estimate"), the "Franchisor's Objection to Haymarket Claims" filed by Pla-Fit Franchise, LLC (the "Franchisor"), "Pla-Fit Franchise, LLC's (i) Objection to Second Plan of Debtors Chicago Investments, LLC et al.; (ii) Objection to Debtors' Motion to Estimate Claim of Pla-Fit Franchise, LLC; (iii) Objection to Debtors' Motion to Assume Franchise Agreements and (iv) Withdrawal of Support for Debtors' First Plan" (the "Omnibus Objection"), the "Response of Haymarket Capital, LLC to Franchisor's Objection to Haymarket Claims" (the "Response to Objection") and the "Motion by Debtors to Strike Objection to Claim by Pla-Fit Franchise, LLC" (the "Motion to Strike"), all of which were heard in conjunction with an evidentiary hearing on the "Fourth Amended Joint Plan of Reorganization of Chicago Investments, LLC, PF Group, LLC, PF Bost LLC, PF Chel LLC, PF Mald LLC, PF Matt LLC, PF Port LLC and PF Wobu LLC as Modified" (the "Fourth Amended Plan") and the "Franchisor's Objection to the Debtors' Fourth Amended Joint Plan of Reorganization" (the "Objection to Confirmation").  The present matter, which is essentially a three party dispute marked by frequent position changes and shifting alliances, is an acrimonious battle to determine the future ownership of six fitness centers currently operating under the Planet Fitness name.  In sum, the Debtors plan to assume certain franchise agreements, allowing the fitness centers to remain open under the Planet Fitness name, transfer the equity ownership of four of the fitness centers to designated affiliates of Haymarket Capital, LLC ("Haymarket"), the Debtors' largest secured creditor, who will then assume the Debtors' obligation to Haymarket. As part of a global settlement with the Debtors, Haymarket, in turn, will release the non-

1

transferred Debtors and will subordinate its claim to those of other creditors, who will be paid in full with interest through the plan.  The Franchisor opposes confirmation on the basis that the franchise agreements in question are not assumable and, without them, the plan is unconfirmable. For the reasons set forth below, I will grant the Motion to Assume, grant the Motion to Strike, grant the Motion to Estimate, overrule the Omnibus Objection, overrule the Objection to Confirmation, and confirm the Fourth Amended Plan.

## II. <u>BACKGROUND</u>

Despite the inherent complexity occasioned by the number of Debtors involved, I have endeavored to maintain a coherent, if not always chronological, factual narrative by dividing this section into topic areas.  Unfortunately, this often requires me to mention facts in passing, such as the execution of various agreements, only to return later to discuss the matter in greater detail. Many of the uncontested background facts have been taken from the "Third Amended Chapter 11 Disclosure Statement for Fourth Amended Joint Plan of Reorganization of Chicago Investments, LLC, PF Group, LLC, PF Bost LLC, PF Chel LLC, PF Mald, LLC, PF Matt LLC, PF Port LLC and PF Wobu LLC, As Modified" (the "Disclosure Statement").[2]  Notwithstanding any lack of express reference below, I have reviewed the entire record, including the docket of this case and the related adversary proceeding,[3] all twenty-four exhibits in evidence, and the trial testimony each of the five witnesses.  Information that is ultimately irrelevant to my determination of these matters and would serve only to further complicate and confuse matters has been intentionally omitted and does not suggest a lack of consideration.  To the contrary,

---

[2] Disclosure Statement, Docket No. 533 at 1.

[3] *In re Hyde*, 334 B.R. 506, 508 n. 2 (Bankr. D. Mass. 2005) (a court may take judicial notice of its own records).

upon consideration of the entire record now before me, the following constitutes my findings of fact pursuant to Fed. R. Civ. P. 52(a)(1).[4]

*The Debtors*

To place the Debtors in context, Planet Fitness is a franchise of approximately 425 fitness centers throughout the United States which provide club members with access to treadmills, elliptical cross-trainers, bicycles, and weight lifting machines.[5] The Planet Fitness franchise model provides three different membership options.[6] The first, known as a "white card" membership, allows members access to a single facility for a $10 per month membership fee.[7] The second, known as a "black card" membership, costs $19.99 per month and includes amenities such as free tanning and use of massage chairs, discounted beverages, and use of other locations.[8] The third option is a paid in full membership costing $99 per year.[9] Both the white card and black card members are also charged an annual fee to lock in their existing monthly membership fee for future months.[10] Currently, the annual fees for the white card and black card memberships are $29 per year payable on October 1 and $39 per year payable on June 1, respectively.[11]

---

[4] Fed. R. Civ. P. 52(a)(1), made applicable to contested matters by Fed. R. Bankr. P. 7052 and Fed. R. Bankr. P. 9014(c).

[5] Disclosure Statement, Docket No. 533 at 9.

[6] *Id.*

[7] *Id.*

[8] *Id.*

[9] *Id.*

[10] *Id.*

[11] *Id.*

The Debtors are all Massachusetts limited liability companies.   Six of the Debtors, namely, PF Bost, PF Chel, PF Mald, PF Matt, PF Port, and PF Wobu (collectively, the "Operating Debtors"), operate fitness centers located in the Greater Boston area under the Planet Fitness name.[12]   PF Group is a holding company established to maintain 100% ownership interest in the Operating Debtors.[13]   In turn, Chicago Investments maintains a 99% ownership interest in PF Group, with the remaining 1% held by the similarly named non-debtor PF Group Corporation.[14]   The sole member of Chicago Investments is the Chicago Family Irrevocable Trust (the "Trust").[15]   David Laird ("Laird"), the Debtors' prepetition manager, and Stephen Rider ("Rider") are trustees of the Trust, with the relatives of Laird as its beneficiaries.[16]

According to his testimony at trial, Laird has been involved in the fitness industry since 1987.[17]   During his development of various fitness centers, he met Michael Grondahl ("Grondahl"), the CEO of the Franchisor, and helped him develop a low-cost $19.99 membership model.[18]   The model proved successful, and by 2002, they had opened approximately 12 fitness centers that were ultimately sold to Bally Total Fitness ("Bally").[19]

---

[12] *Id.* at 3.

[13] *Id.* at 10.

[14] *Id.*

[15] *Id.*

[16] *Id.*

[17] Trial Trans. January 17, 2012 at 17:13-14.

[18] *Id.* at 17:14-22.

[19] *Id.* at 17:22-24.

Laird worked at Bally for a time, but eventually left to develop other fitness centers.[20]   One located in Scarsdale, New York became Laird's first Planet Fitness franchise.[21]

In early 2007, Laird entered negotiations with Grondahl that resulted in a sale of the Scarsdale location to a group of New York developers and Chicago Investments' acquisition of Planet Fitness franchise development rights in the Greater Boston area.[22]   With an eye towards developing the first fitness center in Woburn, Massachusetts, Laird, along with Bob Bounoto and Tom Zaccagnino, formed Winged Foot, LLC ("Winged Foot").[23]   Winged Foot executed a franchise agreement with the Franchisor, but the agreement was later terminated because

> Haymarket found out that Bob [Buonoto] and Tom Zaccagnino could not be part of that franchise because their lending company, Haymarket Capital, had some type of an agreement that wouldn't allow them to be.[24]

As a result of the termination of Winged Foot's franchise rights, PF Wobu was founded in 2007 to operate a fitness center at 10 Micro Drive in Woburn, Massachusetts.[25]   The fitness center opened in June 2007, but later became a Planet Fitness location in late December 2007.[26]   Brandon Dunes, LLC, an affiliate of Haymarket, is the holder of the PF Wobu's real estate lease.[27]   Since the petition date, PF Wobu has had gross sales of $718,000 and currently has

---

[20] *Id.* at 18:1-19.

[21] *Id.* at 19-22.

[22] *Id.* at 22-24.  Admittedly, this is an oversimplification of the transaction, but this explanation is sufficient for purposes of this decision.

[23] *Id.* at 23:2-19.

[24] *Id.* at 24:19-25; 25:1-3.

[25] Disclosure Statement, Docket No. 533 at 9.

[26] Debtors' Ex. 4.

[27] Disclosure Statement, Docket No. 533 at 18.

approximately 5,200 members.[28]    As of August 30, 2011, it had total cash on hand of $106,256.74, receivables of approximately $84,219.36, and $103,000 worth of equipment.[29]

PF Mald was founded in 2007 to purchase an existing fitness center at 18 Jackson Street in Malden, Massachusetts operating under the Super Fitness name.[30]    The purchase was completed in January 2008, at which time the name was changed to Planet Fitness.[31]   PF Mald subsequently relocated its operations to a newly constructed facility at 795 Eastern Avenue in Malden.[32]   Winged Foot, the original Woburn franchisee and Haymarket affiliate, holds the real estate lease to the current Malden location.[33]   Since the petition date, PF Mald has had gross sales of $1,255,000 and currently has approximately 8,900 members.[34]   As of August 30, 2011, it had total cash on hand of $440,363.13, receivables of approximately $125,803.19, and $295,000 worth of equipment.[35]

Similarly, PF Bost was also founded in 2007 to purchase an existing Super Fitness location at One Washington Mall in Boston, Massachusetts.[36]   The purchase was also completed in January 2008.[37]   The real estate lease for the Boston location is held by Intercontinental Fund

---

[28] *Id.* at 9.

[29] Disclosure Statement, Docket No. 533 at Ex. C p. 8

[30] Disclosure Statement, Docket No. 533 at 10.

[31] *Id. See also* Debtors' Ex. 6.

[32] Disclosure Statement, Docket No. 533 at 10.

[33] *Id.* at 17.

[34] *Id.* at 10.

[35] Disclosure Statement, Docket No. 533 at Ex. C p. 5.

[36] Disclosure Statement, Docket No. 533 at 10.

[37] *Id. See also* Debtors' Ex. 2.

III.[38]   Since the petition date, PF Bost has had gross sales of $1,170,000 and currently has approximately 7,500 members.[39]   As of August 30, 2011, it had total cash on hand of $336,688.03, receivables of approximately $116,973.07, and $76,000 worth of equipment.[40]

PF Port was founded in 2007 to open a fitness center at One Porter Square in Cambridge, Massachusetts.[41]   This location opened in April 2009 as a Planet Fitness.[42]   Porter Square Equity Partners 2, LLC holds the real estate lease for this location.[43]   Since the petition date, PF Port has had gross sales of $1,076,000 and currently has approximately 7,300 members.[44]   As of August 30, 2011, it had total cash on hand of $85,307.12, receivables of approximately $129,720.47, and $390,000 worth of equipment.[45]

PF Matt was founded in 2008 to open a fitness center at 90 River Street in Mattapan, Massachusetts.[46]   This premises is leased from Trinity River Limited Partnership.[47]   This location opened in April 2010 as a Planet Fitness.[48]   Since the petition date, PF Port has had gross sales of $912,000 and currently has approximately 6,200 members.[49]   As of August 30,

---

[38] Disclosure Statement, Docket No. 533 at 17.

[39] *Id.* at 10.

[40] Disclosure Statement, Docket No. 533 at Ex. C p. 3.

[41] Disclosure Statement, Docket No. 533 at 10.

[42] *Id. See also* Debtors' Ex. 5.

[43] Disclosure Statement, Docket No. 533 at 17-18.

[44] *Id.* at 10.

[45] Disclosure Statement, Docket No. 533 at Ex. C p. 7.

[46] Disclosure Statement, Docket No. 533 at 10.

[47] *Id.* at 17.

[48] *Id. See also* Debtors' Ex. 3.

[49] Disclosure Statement, Docket No. 533 at 10.

2011, it had total cash on hand of $281,019.71, receivables of approximately $126,513.03, and

$445,000 worth of equipment.[50]

PF Chel was founded in 2009 to open a fitness center at 1020 Revere Beach Parkway in

Chelsea, Massachusetts.[51]   As will be discussed further below, unlike the other Operating

Debtors, the franchise agreement with respect to this location was executed by PF Group and not

PF Chel.[52]   At the trial, Laird explained that:

> We hadn't formed PF Chel yet and there was a rush to get this franchise
> agreement done.  So we had the LLC PF Group open and we put it into PF
> Group's name.[53]

This location opened in June 2010.[54]   The real estate is leased to PF Chel by FR Chelsea

Commons II, LLC.[55]   Since the petition date, PF Port has had gross sales of $1,067,000 and

currently has approximately 7,300 members.[56]   As of August 30, 2011, it had total cash on hand

of $326,358.48, receivables of approximately $95,148.99, and $510,000 worth of equipment.[57]

*The Franchise Agreements*

Between October 2007 and July 2009, PF Group and each of the Operating Debtors, save

PF Chel, (the "Franchisees") entered into substantially identical franchise agreements with the

Franchisor granting them the right to own and operate a Planet Fitness business at an agreed

---

[50] Disclosure Statement, Docket No. 533 at Ex. C p. 6.

[51] Disclosure Statement, Docket No. 533 at 10.

[52] Debtors' Ex. 7.

[53] Trial Trans. January 17, 2012 at 30:17-19.

[54] Disclosure Statement, Docket No. 533 at 10.

[55] *Id.* at 17.

[56] *Id.* at 10.

[57] Disclosure Statement, Docket No. 533 at Ex. C p. 4.

location.[58]   Under the franchise agreements, which are governed by New Hampshire law,[59] "owner" is defined broadly to include "[e]ach person or entity that has a direct or indirect legal or beneficial ownership interest in [the Franchisee]."[60]   While the franchise agreements permit the "owner" of the franchise to be business entity such as a limited liability company, paragraph 2.3 requires the owner entity to

> designate in Appendix A as the "Managing Owner" an individual approved by us who must own and control, or have the right to own and control (subject to terms and conditions reasonably acceptable to us), not less than a ten (10%) percent interest in your equity and voting rights; have authority to bind you regarding all operational decisions with respect to your PLANET FITNESS BUSINESS; and have completed our training program to our satisfaction. . . .   You must notify us of any proposed change of the Managing Owner and receive our written approval prior to such change. . . .[61]

Despite the express requirement that the Managing Owner be an individual, each franchisee designated Chicago Investments.[62]   Nevertheless, each Appendix A bears the signature of Grondahl, indicating the Franchisor's acceptance of this arrangement.[63]   Accordingly, David

---

[58] Debtors' Exs. 2-7 at ¶ 3.1.  To reiterate, because the franchise agreement with respect to the Chelsea location was executed by PF Group, not all the Operating Debtors are Franchisees.

[59] *Id.* at ¶ 20.13.

[60] *Id.* at ¶ 1.4.  I note that the Franchisees are referred to as "you" or "owner" in the franchise agreements.  *Id.* at ¶ 1.1.

[61] *Id.* at ¶ 2.3; *see also* ¶ 1.4 (defining "Managing Owner" as "[t]he individual you so designate in Appendix A and any replacement thereof approved by us.").

[62] *Id.* at Appx. A ("<u>MANAGING OWNER</u>. The name, home address and Federal Identification Number of the Managing Owner is: Chicago Investments, LLC, 4 Hastings Road, Weston, Massachusetts 02493 (FIN ##-###8318).").

[63] *Id.*  While the franchise agreements contain a mechanism that allows the Franchisor to "unilaterally waive or reduce any obligation of or restriction upon the other under this Agreement, effective upon delivery of a written notice thereof to the other," there is no evidence that the requirement that the Managing Owner be an individual was waived in this manner.  *Id.* at ¶ 20.4.

Laird, as manager of all of the Debtors, executed each franchise agreement on behalf both the Franchisee and the Managing Owner, Chicago Investments.[64]

As explained above, the designation of the Managing Owner is subject to the approval of the Franchisor upon satisfactory completion of its training program.[65]  It is undisputed that Laird completed the Franchisor's training program, but based upon his testimony, it appears he did so in relation to a prior Planet Fitness franchise in Scarsdale, New York.[66]  Owners are also required to have exclusive dealings with the Franchisor and may not have any direct or indirect interest in a competitive business, perform services for a competitive business, or divert or attempt to divert business from Planet Fitness to a competitor or do anything injurious or prejudicial to the its goodwill without the Franchisor's prior written consent.[67]  Similarly, owners are subject to confidentiality provisions mandating that they maintain the confidentiality of various information including, but not limited to, development plans, operating procedures, sales and marketing programs, and financial data.[68]  Although the franchise agreements impose numerous controls and restrictions on the owners, the franchise agreements expressly state that the Franchisees

> are solely responsible for all employment decisions with respect to your personnel, including hiring, firing, compensation, training, supervision and discipline, and regardless whether you receive advice from [the Franchisor] on any of these subjects.[69]

---

[64] *Id.* at p. 40.

[65] *Id.* at ¶ 2.3.

[66] Trial Trans. January 17, 2012 at 20-21.

[67] Debtors' Exs. 2-7 at ¶ 9.1.

[68] *Id.* at ¶¶ 8.1, 8.2, Appx. D.

[69] *Id.* at ¶ 10.8.

In exchange for the right to operate a Planet Fitness business, the Franchisees agreed to pay to the Franchisor an initial franchise fee of $25,000 upon execution of the agreement, a performance fee of $25,000 once the franchise's monthly membership billings exceed $50,000, and monthly royalties.[70]  The monthly royalties due under the franchise agreements are based upon the franchise's monthly membership fees that it collects through electronic funds transfers ("EFT"):[71]

| Total Monthly EFT Draft of Your Membership Dues | Royalty |
| --- | --- |
| $0 to $49,999 | $500 |
| $50,000 to $99,999 | $1,000 |
| $100,000 to $149,999 | $1,500 |
| $150,000 to $199,999 | $2,500 |
| $200,000 to $249,999 | $5,000 |
| $250,000 and above | $10,000 |

Any amounts due the Franchisor which are not timely paid bear interest after the due date at the lesser of "the highest contract rate of interest permitted by law; or eighteen (18%) percent per annum."[72]

In addition to royalties, Franchisees are required to expend funds on marketing the franchise.[73]  Specifically, the Franchisee must contribute a monthly amount to be determined by the Franchisor, but not to exceed 2% of the monthly EFT dues draft, to the National Advertising Fund.[74]  With respect to local advertising, the Franchisee must "spend . . . such amounts as we

---

[70] *Id.* at ¶¶ 5.1-5.3.

[71] *Id.* at ¶ 5.3.

[72] *Id.* at ¶ 5.5

[73] *Id.* at ¶ 11.

[74] *Id.* at ¶ 11.1.

establish from time to time, not to exceed five (5%) of the total EFT Dues Draft for any period consisting of four (4) of your consecutive fiscal quarters."[75]

Generally speaking, under the franchise agreements, the Franchisees must "comply with all mandatory specifications, standards and operating procedures . . . relating to the appearance, function, cleanliness or operation or a PLANET FITNESS business . . . . ."[76]  Among the standards enumerated in the franchise agreement is that a Franchisee must comply with "terms and conditions of the sale and delivery of, and terms and methods of payment for products, materials, supplies and services including direct labor, that you obtain from . . . others."[77]  In other words, the Franchisees cannot breach contracts with third parties.  There are also two separate provisions of the franchise agreements that require the Franchisees to abide by all applicable laws, including those relating to the health and sanitation of the business.[78]

The franchise agreements contain numerous provisions regarding the transfer of the franchise which, as will be discussed further, are at the heart of the Franchisor's Omnibus Objection.  First, they define "Transfer the Franchise – or similar words" as

> the voluntary, involuntary, direct or indirect sale, assignment, transfer, license, sublicense, sublease, collateral assignment, grant of a security, collateral or conditional interest, Inter-vivos transfer, testamentary disposition or other disposition of this Agreement, any interest in or right under this Agreement, or any form of ownership interest in you or the assets, revenues or income of your BUSINESS including: (1) any transfer, redemption or issuance of a legal or beneficial ownership interest in the capital stock of, or a partnership interest in, you or of any interest convertible to or exchangeable for capital stock of, or a partnership interest in, you; (2) any merger or consolidation between you and another entity, whether or not you are the surviving corporation; (3) any transfer in, or as a result of, a divorce, insolvency, corporate or partnership dissolution

---

[75] *Id.* at ¶ 11.5.

[76] *Id.* at ¶ 10.1.

[77] *Id.* at ¶ 10.1.5.

[78] *Id.* at ¶¶ 10.1.14; 10.7.

proceeding or otherwise by operation of law; (4) any transfer upon your death or the death of any of your Principal Owners by will, declaration of or transfer in trust or under the laws of interstate succession; or (5) any foreclosure upon your BUSINESS or the transfer, surrender or loss by you of possession, control or management of your BUSINESS.[79]

Next, the franchise agreements include the following restrictions against the transfer of the franchise:

    14.2   **BY YOU.** You understand and acknowledge that the rights and duties created by this Agreement are personal to you (or, if you are a corporation, partnership, or other entity, to your Owners) and that we have granted the Franchise to you in reliance upon our perceptions of your (or your Owners') individual or collective character, skill, aptitude, attitude, business ability, acumen and financial capacity. Accordingly, neither this Agreement (or any interest therein) nor any ownership or other interest in you or the BUSINESS may be transferred without our prior written approval. Any transfer without such approval constitutes a breach of this Agreement and is void and of no effect.

    14.3   **CONDITIONS FOR APPROVAL OF TRANSFER.** If you (and your Owners) are in full compliance with this Agreement, then subject to the other provisions of this Article, we will approve a transfer that meets all the applicable requirements of this Article. The proposed transferee and its direct and indirect owners must be individuals of good moral character and otherwise meet our then applicable standards for PLANET FITNESS business franchisees. A transfer of ownership, possession or control of the BUSINESS may be made only in conjunction with a transfer of this Agreement. If the transfer is of this Agreement or a controlling interest in you, or is one of a series of transfers which in the aggregate constitute the transfer of this Agreement or a controlling interest in you, all of the following conditions must be met prior to or concurrently with the effective date of the transfer:

        14.3.1 the transferee has the moral character, aptitude, attitude, experience, references, acumen and financial capacity to operate the BUSINESS, and the proposed transferee may not be an entity, or be affiliated with an entity, that is required to comply with reporting and information requirements of the Securities Exchange Act of 1934, as amended;

---

[79] *Id.* at ¶ 1.4.

14.3.2  you have paid all Royalties, Ad Fees, amounts owed for purchases from us and all other amounts owed to us or to third party creditors and have submitted all required reports and statements;

14.3.3  the transferee (or its Managing Owner) and its managers, shift supervisors and personnel must have completed our initial training program or must be currently certified by us to operate and/or manage a PLANET FITNESS business to our satisfaction prior to closing;

14.3.4  the transferee has agreed to be bound by all of the terms and conditions of this Agreement for the remainder of its Term or, at our option, must execute our then current standard form of franchise agreement and related documents used in the state in which your BUSINESS is located (which may provide for different royalties, advertising contributions and expenditures, duration and other rights and obligations than those provided in this Agreement);

14.3.5  you pay us a transfer fee equal to Ten Thousand ($10,000) Dollars to defray expenses we incur in connection with the transfer, including the costs of training the transferee (or its Managing Owner) and its other personnel, reasonable legal fees and administrative costs incurred, and our reasonable out-of-pocket expenses, including, without limitation, travel, meals, lodging and other investigative expenses involved in meeting with or qualifying the transferee. If the proposed transfer is among your Owners, Article 14.3.5. will not apply, although you are required to reimburse us for any reasonable legal and administrative costs we incur in connection with the transfer;

14.3.6  you (and your transferring Owners) have executed a general release, in form satisfactory to us, of any and all claims against us and our shareholders, officers, directors, employees and agents;

14.3.7  we have approved the material terms and conditions of such transfer and determined that the price and terms of payment will not adversely affect the transferee's operation of the BUSINESS;

14.3.8  if you or your Owners finance any part of the sale price of the transferred interest, you and/or your Owners have agreed that all of the transferee's obligations pursuant to any promissory notes, agreements or security interests that you or your Owners have reserved in the BUSINESS are subordinate to the transferee's obligation to pay Royalties, NAF contributions and other amounts due to us and otherwise to comply with this Agreement; and

14

14.3.9  you and your transferring Owners have executed an agreement in favor of us agreeing to be bound, commencing on the effective date of the transfer, by the restrictions contained in Articles 17.2, 17.3 and 17.4 hereof as if this Agreement had terminated.[80]

Moreover, any attempt to "sell, assign or transfer for consideration" is subject to the following

provision regarding *bona fide* offers:

***BONA FIDE* OFFERS.**  If you (or any of your Owners) at any time determine to sell, assign or transfer for consideration an interest in this Agreement and the BUSINESS or an ownership interest in you, you (or such Owner) agree to obtain a *bona fide*, executed written offer and earnest money deposit (in the amount of five (5%) percent or more of the offering price) and a complete franchise application from a fully disclosed offeror including lists of the owners of record and beneficially of any corporate or limited liability company offeror and all general and limited partners of any partnership and immediately submit to us a true and complete copy of such offer, which includes details of the payment terms of the proposed sale.  To be a valid, *bona fide* offer, the proposed purchase price must be denominated in a dollar amount.  The offer must apply only to an interest in you or in this Agreement and the BUSINESS and may not include an offer to purchase any of your (or your Owners') other property or rights.  However, if the offeror proposes to buy any other property or rights from you (or your Owners) under a separate, contemporaneous offer, such separate, contemporaneous offer must be disclosed to us, and the price and terms of purchase offered to you (or your Owners) for the interest in you or in this Agreement and the BUSINESS must reflect the *bona fide* price offered therefor and not reflect any value for any other property or rights.  Any transfer in violation of our right of first refusal is null and void.[81]

Finally, receipt of a *bona fide* offer entitles the Franchisor to exercise a right of first refusal to

purchase the franchise:

**OUR RIGHT OF FIRST REFUSAL.**  We have the right, exercisable by written notice delivered to you or your selling Owners within thirty (30) days from the date of the delivery to us of both an exact copy of such bona fide offer and all other information we request, to purchase such interest for the price and on the terms and conditions contained in such bona fide offer, provided that:

14.8.1  we may substitute cash for any form of payment proposed in such offer;

---

[80] *Id.* at ¶¶ 14.2-14.3.

[81] *Id.* at ¶ 14.7.

14.8.2  our credit will be deemed equal to the credit of any proposed purchaser;

14.8.3  we will have not less than sixty (60) days after giving notice of our election to purchase to prepare for closing; and

14.8.4  we are entitled to receive, and you and your Owners agree to make, all customary representations and warranties given by the seller of the assets of a business or the capital stock of an incorporated business, as applicable . . . .[82]

If the Franchisor does not exercise the right of first refusal, the Franchisee may complete the sale pursuant to the exact terms of the *bona fide* offer.[83]

The franchise agreements provide that in the event that the Franchisor incurs expenses in connection with the Franchisee's failure to comply with the franchise agreement, those costs and expenses, including, but not limited to, attorney's fees, must be reimbursed by the Franchisee.[84] Additionally, they contain an indemnification provision which provides that:

You . . . agree that you shall, at all times, indemnify, exculpate, defend and hold harmless, to the fullest extent permitted by law, us . . . from all losses and expenses incurred in connection with any action, suit, proceeding, claim, demand, investigation, or inquiry (formal or informal), or any settlement thereof, which arises out of or is based upon any of the following: . . . *the violation or breach by you . . . of any warranty, representation, agreement, or obligation of this Agreement or in any other agreement between you and us* . . . . For purposes of this indemnification, "claims" includes all obligations, damages (actual, consequential or otherwise) and costs incurred in the defense of any claim against [us], including, without limitation, reasonable accountants', arbitrators', attorneys' and expert witness fees, costs of investigation and proof of facts, court costs, other expenses of litigation, arbitration or alternative dispute resolution and travel and living expenses.  We have the right to defend any such claim against us at your expense. . . .[85]

---

[82] *Id.* at ¶ 14.8.

[83] *Id.* at ¶ 14.9.

[84] *Id.* at ¶ 20.9.

[85] *Id.* at ¶ 19.4 (emphasis added).

*The Area Development Agreement*

In addition to the franchise agreements, Chicago Investments, through Laird, as its manager, and the Franchisor entered into an Area Development Agreement (the "ADA") dated January 30, 2008.[86]  In exchange for consideration of $250,000, the Franchisor agreed that it would not operate a Planet Fitness business or franchise third parties to do so within a specified "development area"[87] so long as the Chicago Investments complied with the agreed upon development schedule.[88]  The development schedule requires Chicago Investments to open at least two new franchise locations each year of the five year term of the ADA so that by its expiration, Chicago Investments would be operating not less than ten locations within the development area.[89]  Failure to comply with the development schedule constitutes a material breach of the ADA.[90]  Additionally, the termination of a franchise agreement for a location within the development area results in the automatic termination of the ADA.[91]  Termination of the ADA, however, does not terminate the franchise agreements of any Planet Fitness businesses within the development area unless the Franchisor so elects.[92]  Indeed, upon termination, Chicago Investments only loses the right to open and operate a new Planet Fitness business that

---

[86] Debtors' Ex. 1.

[87] *Id.* at ¶ 1.  The "development area" consists of the following cities and towns in Massachusetts: Arlington; Belmont; Boston, including Allston/Brighton, Back Bay/Beacon Hill, Central, Charlestown, Fenway/Kenmore, Hyde Park, Jamaica Plain, Mattapan, Roslindale, Roxbury, South Boston, South End, and West Roxbury; Brookline, Cambridge, Everett, Lexington, Medford, Melrose, and Watertown.

[88] *Id.* at ¶ 2, 4.

[89] *Id.* at ¶ 2.

[90] *Id.*

[91] *Id.* at ¶ 6.

[92] *Id.* at ¶ 7.

17

was not previously authorized or a competitive business within the development area.[93]   The

ADA expressly states that it is the complete agreement between the parties and may only be

amended by a written instrument.[94]

*The Life Fitness Capital Leases*

Between May 2007 and June 2010, the Operating Debtors entered into eighteen

equipment leases (the "Capital Leases") with Life Fitness, a division of Brunswick Corporation,

for a total invoice amount of approximately $2,800,000.[95]   Notably, many of the Capital Leases

were guaranteed by some or all of the Debtors, as well as Laird.[96]   Typically, the terms of each

Capital Lease require the lessee make a "substantial down payment" and then installment

payments for a term of approximately forty-eight months.[97]   At the expiration of the lease term,

the lessee may exercise an option to purchase the equipment for nominal consideration.[98]

Although these transactions were characterized as leases, Life Fitness filed financing statements

under the Uniform Commercial Code asserting a lien upon the equipment.[99]   As of the petition

date, the aggregate monthly obligation under the Capital Leases for the Operating Debtors was

approximately $68,000, with a total remaining balance of about $1,688,000.[100]   Given the

---

[93] *Id.* at ¶¶ 10.2, 11.

[94] *Id.* at ¶¶ 19-20.

[95] Disclosure Statement, Docket No. 533 at 12; Fourth Amended Plan, Docket No. 532 at Ex. A.

[96] Disclosure Statement, Docket No. 533 at 13.

[97] *Id.* at 12.

[98] *Id.*

[99] *Id.*

[100] *Id.*

structure of the Capital Leases, the Debtors position throughout their bankruptcy filing is that the Capital Leases are not true leases and are more appropriately treated as secured claims.

*The Haymarket Notes and Security Agreements*

In order to acquire, fit-out, and procure working capital for the early operations of the fitness centers, the Debtors obtained financing from Haymarket.[101]  In total, the Debtors, through Laird, their common manager, executed six promissory notes, one for each franchise location, evidencing their respective obligations to Haymarket.[102]  Each Operating Debtor is a obligor of one note for funds loaned to their respective franchise, while Chicago Investments is a co-obligor with respect to all six.[103]   Additionally, PF Group is a co-obligor of three of the notes with respect to the obligations of PF Port, PF Matt, and PF Chel.[104]  The amounts of the notes are as follows:

---

[101] *Id.* at 10.

[102] *Id.* at 13-14.

[103] *Id.*

[104] *Id.*

| Date | Borrower | Amount |
|---|---|---|
| June 1, 2007 | PF Wobu and Chicago Investments | $1,100,000.00[105] |
| October 1, 2007 | PF Mald and Chicago Investments | $1,855,000.00[106] |
| January 31, 2008 | PF Bost and Chicago Investments | $2,880,000.00[107] |
| February 24, 2009 | PF Port, Chicago Investments, and PF Group | $1,500,000.00[108] |
| March 3, 2010 | PF Matt, Chicago Investments, and PF Group | $1,425,000.00[109] |
| May 1, 2010 | PF Chel, Chicago Investments, and PF Group | $1,250,000.00[110] |

As of the petition date, Haymarket asserted a claim in the aggregate amount of $8,518,448.59, inclusive of interest and legal fees.[111]

All six notes contain similar, though not identical, provisions.[112]  For example, each note has a term of ten years and the default rate of interest is 36%.[113]  The standard interest rate provisions, which are attached to each note as "Exhibit A," vary considerably.[114]  Exhibit A to the PF Wobu, PF Mald, and PF Bost notes provides that:

> The unpaid principal balance of this Note from time to time outstanding shall bear
> interest, payable as follows: in the first two years interest shall equal [a dollar

---

[105] Disclosure Statement, Docket No. 533 at 14; Claim 10-1, Exhibit B Part 2 at 15.  Citations to these documents shall use the CM/ECF exhibit, part, and page numbers.  In an effort to reduce complexity, I will provide citation to only one representative example when discussing provisions that several documents share.

[106] Disclosure Statement, Docket No. 533 at 14; Claim 10-1, Exhibit B Part 1 at 32.

[107] Disclosure Statement, Docket No. 533 at 13; Claim 10-1, Exhibit B Part 1 at 2.  I note that the PF Bost Note is inconsistent as to the amount loaned: "the sum of TWO MILLION EIGHT HUNDRED EIGHTY THOUSAND AND 00/100 DOLLARS ($2,800,000.00) . . . ."

[108] Disclosure Statement, Docket No. 533 at 14; Claim 10-1, Exhibit B Part 2 at 8.

[109] Disclosure Statement, Docket No. 533 at 13-14; Claim 10-1, Exhibit B Part 2 at 1.

[110] Disclosure Statement, Docket No. 533 at 13; Claim 10-1, Exhibit B Part 1 at 25.

[111] Claim 10-1, Exhibit A.

[112] *See* Claim 10-1, Exhibit B Parts 1 and 2 (Haymarket notes and security agreements).

[113] *See, e.g.,* Claim 10-1, Exhibit B Part 1 at 2.

[114] *Id.* at 8.

amount that is approximately 18% of the principal[115]] for each year, thereafter, the unpaid principal balance shall bear interest in arrears at a rate per month equal to:

(i)      Twenty-five (25%) if [the Operating Debtor's] gross revenue for the prior month is below $121,000.00; or

(ii)      Twenty-percent (20%) if [the Operating Debtor's] gross revenue for the prior month is between $121,000.00 and $140,000.00; or

(iii)      Twenty-five percent (25%) if [the Operating Debtor's] gross revenue for the prior month is between $141,000.00 and $160,000.00; or

(iv)      Thirty percent (30%) if [the Operating Debtor's] gross revenue for the prior month is between $161,000.00 and $180,000.00, or

(v)      Thirty-five percent (35%) if [the Operating Debtor's] gross revenue for the prior month is greater than or equal to $181,000.00.[116]

The language of Exhibit A to the PF Port note tracks the first half of the prior passage, but omits the performance based formula.[117]   Instead, it simply states that "the unpaid principal balance shall bear interest in arrears at a rate to be determined based on PORT's performance," without any explanation of how the performance rate would be determined.[118]   In further contrast, Exhibit A to the PF Matt and PF Chel notes provide that:

A minimum interest payment of [a dollar amount that is approximately 18% of the principal] per a [sic] year for the first two tears [sic].  There after [sic] the unpaid principal should bear interest in arrears at a rate to be determined based on [the Operating Debtor's] performance.[119]

Curiously, aside from the possible imposition of the default interest rate, there is no term in either note to suggest how the interest payment for the first two years could be greater than the "minimum" amount set forth in Exhibit A.

---

[115] Unlike the PF Mald and PF Bost notes, the interest payment for each of the first two years on the PF Wobu note is only 16% of the principal.  Claim 10-1, Exhibit B Part 2 at 21.

[116] *See, e.g.,* Claim 10-1, Exhibit B Part 1 at 8.

[117] Claim 10-1, Exhibit B Part 2 at 14.

[118] *Id.*

[119] Claim 10-1, Exhibit B Part 1 at 31.

Each note also contains language indicating that a "Prepayment Consideration," which is defined in "Exhibit B" to the note, is due in the event that the borrower prepays the principal balance before the maturity date.[120]  Exhibit B to the PF Wobu, PF Mald, and PF Bost notes each state that "[t]he 'Prepayment Consideration' shall equal to TWO times the Borrowers' Gross Sales for the trailing twelve month period."[121]  Despite the reference to Exhibit B in the PF Port, PF Matt, and PF Chel notes, no such exhibit was attached to the notes accompanying Haymarket's proof of claim.

Each note also contains the following introductory statement: "Secured by a First Lien on Specified Business Assets pursuant to a Security Agreement of even date."[122]  Nevertheless, Haymarket is only in possession of security agreements executed by PF Wobu, PF Mald, PF Bost, and their co-obligor, Chicago Investments.[123]  As with all previous documents, the security agreements were executed by Laird as the manager of the respective Debtors.  Specifically, the security agreements provide that:

> Each Debtor hereby grants to the Lender, to secure the payment and performance in full of all the Obligations, a security interest in and pledges and assigns to the Lender the following properties, assets and rights of each Debtor, wherever located, whether now owned or hereafter acquired or arising, and all proceeds and products thereof (collectively the "Collateral"): all personal and fixture property of every kind and nature including all goods (including inventory, equipment and any accessions thereto), instruments (including promissory notes), documents, (including, if applicable, electronic documents), accounts (including health-care-insurance receivables), chattel paper (whether tangible or electronic), deposit accounts, letter of credit rights (whether or not the letter of credit is evidenced by a writing), commercial tort claims, securities and all other investment property, supporting obligations, any other contract rights or rights to the payment of

---

[120] *See, e.g.,* Claim 10-1, Exhibit B Part 1 at 3.

[121] *See, e.g.,* Claim 10-1, Exhibit B Part 1 at 9.

[122] *See, e.g.,* Claim 10-1, Exhibit B Part 1 at 2.

[123] As will be addressed below, Haymarket maintains that security agreements were executed with respect to the remaining loans, but that the documents disappeared from its offices under suspicious circumstances.

money, insurance claims and proceeds, and all general intangibles (including all payments intangibles), <u>provided</u> <u>however</u>, the definition of Collateral does not include the specific property of Chicago listed on <u>Exhibit A</u> attached hereto.[124]

Exhibit A to each security agreement excepts from the definition of Collateral:

Any equipment subject to financing by Chicago from Life Fitness, a Division of Brunswick Corporation and/or The CIT Group/Equipment Financing, Inc. and/or each entity's successors or assigns as their interests may appear.[125]

*The Danversbank Note and Security Agreement*

On June 18, 2010, PF Mald obtained a commercial loan in the original amount of $600,000 from Danversbank.[126]   PF Mald executed both a promissory note evidencing the obligation and an security agreement with respect to all of its business assets.[127]   In conjunction with the same transaction, PF Group executed and delivered a guaranty and pledged PF Group's ownership in PF Mald to further secure the Danversbank loan.[128]   On the same date, Haymarket executed a subordination agreement by which Haymarket agreed to subordinate its claims to PF Mald's assets to that of Danversbank.[129]   The current outstanding balance owed to Danversbank is approximately $545,000.[130]

---

[124] *See, e.g.,* Claim 10-1, Exhibit B Part 1 at 10-11, ¶ 2 (underline in original).

[125] *See, e.g.,* Claim 10-1, Exhibit B Part 1 at 24.  Life Fitness had assigned their rights to the Capital Leases to either VGM Financial or CIT Group Equipment Financing, but upon the Debtors' prepetition default on the payment terms, Life Fitness repurchased the Capital Leases.  Disclosure Statement, Docket No. 533 at 12.

[126] Disclosure Statement, Docket No. 533 at 15; Claim 7-1.

[127] Disclosure Statement, Docket No. 533 at 15; Claim 7-1 at 3-15.

[128] Disclosure Statement, Docket No. 533 at 15; Claim 7-1 at 30-45.

[129] Disclosure Statement, Docket No. 533 at 15; Claim 7-1 at 17-21.

[130] Disclosure Statement, Docket No. 533 at 15.

*The Events Precipitating the Bankruptcy Filings*

The record is sparse with regard to precisely when and why things started to go wrong for the Debtors.  At trial, Laird testified that in the Spring of 2010, he came to question whether Haymarket could fund the opening of new locations.[131]   Because no admissible evidence was offered to explain his belief, I simply note it for what it is worth.   That said, the statement is somewhat curious as the PF Matt and PF Chel notes were executed on March 3, 2010 and May 1, 2010, respectively.   On the other hand, Danversbank provided financing to PF Mald on June 18, 2010, with Haymarket's blessing.

In any event, the record is clear that Chicago Investments failed to meet the development schedule set forth in the ADA.   Citing this default, the Franchisor sent Laird a Notice of Termination on March 23, 2010.[132]   Nevertheless, Laird testified that Grondahl had warned him in advance that such a notice would be forthcoming, but told him not to be upset as they would discuss the matter further at a meeting in February.[133]   Laird further testified that on February 11, 2010, he met with Grondahl at the Mohegan Sun casino in Connecticut.[134]   According to Laird:

> Michael Grondahl wanted to be the partner to Chicago Investments and he didn't want Haymarket to be a partner any longer. And he told me that he wanted a 51 percent stake in the area development for Chicago Investments whereby he would put up the build-out money, the start-up capital, and the equipment finance, which all had to be repaid. And in return, Chicago Investments would run the new facilities in the Boston area and receive 49 percent. Along with that would come what he quoted was a drag-along, meaning when he had any type of public offering that he would do, he would drag these franchises into it so that we would get a higher multiple than if we tried to sell them on our own.[135]

---

[131] Trial Trans. January 17, 2012 at 79:20-23.

[132] Debtors' Ex. 11.

[133] Trial Trans. January 17, 2012 at 54:2-11.

[134] *Id.* at 54:14-21.

[135] *Id.* at 55:3-14.

Laird testified that after having several conversations throughout 2010, he and Grondahl came to "a verbal agreement that [they] would move forward with the 51/49" that was not reduced to writing because Grondahl "wanted to squeeze Haymarket out of the deal, so Haymarket would have no say whatsoever to perform that deal by cancelling the Area Development Agreement."[136]

I have no further information about what occurred after the purported termination of the ADA or the alleged modification thereof between the spring and fall of 2010. The next event of note occurred in late 2010, when Haymarket declared a default under the promissory notes and, seeking to enforce its security interest, commenced an action against the Debtors in the Essex Superior Court in December 2010.[137] As a result of the litigation with Haymarket and some alleged delinquencies with respect to the Debtors' payment obligations under the franchise agreements, the Franchisor issued a notice of termination with respect to the franchise agreements. [138] The Debtors dispute that grounds existed to terminate the franchise agreements. Interestingly, the Franchisor sent Chicago Investments a second "Notice of Area Development Agreement Termination" on December 17, 2010. This time, the notice cited the termination of the PF Port, PF Bost, and PF Chel franchise agreements as grounds for the termination of the ADA.[139] On or about December 20, 2010, the Essex Superior Court entered a preliminary injunction against the Debtors and authorized the appointment of a receiver.[140]

---

[136] *Id.* at 56:1-8.

[137] Disclosure Statement, Docket No. 533 at 11.

[138] Disclosure Statement, Docket No. 533 at 11 n. 2.

[139] Debtors' Ex. 12.

[140] Disclosure Statement, Docket No. 533 at 11.

Laird was subsequently removed as manager of the Debtors.  He, however, has remained with the Debtors post-petition providing consulting services,[141] for which he was paid  In the Disclosure Statement, the Debtors indicated that Laird has been paid approximately $216,000 per year.[142]

### The Bankruptcy Filings and Travel of the Case

The Debtors each filed a voluntary Chapter 11 petition on December 22, 2010.  Joint administration of the Debtors cases was granted on December 28, 2010, with Chicago Investments being designated the lead case.

Despite the events that led to the filing of the petition, the Debtors' cases began in a fairly cooperative manner.  Indeed, while the Debtors questioned the degree to which Haymarket was perfected in the Debtors' cash, the Debtors, Haymarket, and Danversbank entered into a stipulation regarding the continued use of cash collateral on January 11, 2011.[143]  The stipulation provided for, among other things, use of cash collateral in accordance with a Court approved budget and the grant of replacements liens in favor Haymarket and Danversbank upon the same types of collateral that existed as of the petition date.[144]  As the cases have proceeded, the parties have filed, and I have approved, several more stipulations extending the use of cash collateral through the present.[145]

Similarly, on February 17, 2011, the Debtors entered into a stipulation with the Franchisor in an effort to resolve their dispute regarding the Franchisor's prepetition termination

---

[141] Trial Trans. January 18, 2012 at 39:8-19.

[142] Disclosure Statement, Docket No. 533 at 28 n. 6.

[143] *Id.* at 18.

[144] *Id.*

[145] *Id.*

of the franchise agreements.[146]   In substance, the stipulation provided for a maintenance of the status quo, whereby the Franchisor would forbear from enforcing its rights arising out of the alleged termination of the franchise agreements in exchange for the Debtors' promise to comply with all post-petition obligations under the franchise agreements.[147]   Notably, the stipulation does not reference the ADA or either of its purported terminations.

As stated above, the Debtor has taken the position that Life Fitness is not a lessor, but a secured creditor on account of the Capital Leases.   Consistent with this position, the Debtor entered into a stipulation with Life Fitness to provide adequate protection payments for the alleged diminution in value of the collateral fitness equipment due to the continued operation of the fitness centers.[148]   The original stipulation provided for payments totaling approximately $20,000 per month through April 2011.[149]   No parties objected and I approved it on March 18, 2011.

Things, however, did not remain amicable.   On April 7, 2011, Haymarket moved to dismiss the Debtors' cases, or in the alternative for abstention or the appointment of a trustee, asserting, *inter alia*, that the Debtors' bankruptcies were a bad faith attempt to relocate a two party dispute already moving forward in the state court.[150]   Shortly thereafter, the Debtors filed their first plan and disclosure statement.   Danversbank supported dismissal, while the Franchisor and the Debtors opposed on the basis that the plan could be confirmed.   The Debtors further argued that Haymarket's actions were "little more than a thinly veiled attempt by Haymarket to

---

[146] *Id.* at 19.

[147] *Id.*

[148] *Id.* at 18.

[149] *Id.*

[150] Haymarket later amended its motion on April 14, 2011.

gain control of the Debtors and their cash flow for its own benefit to the detriment of the Debtors' remaining creditors."[151]  I denied the motion to dismiss after oral argument from both parties on May 4, 2011.

On April 27, 2011, the same date the Debtors filed their opposition to dismissal, the Operating Debtors commenced an adversary proceeding against Haymarket.[152]  Through their complaint, the Operating Debtors sought a determination that the rate of interest assessed by Haymarket was usurious and, as a result of such a finding, recovery of all excessive interest paid and damages for violations of under Mass. Gen. Laws ch. 93A.  PF Wobu, PF Mald, and PF Bost also alleged that Haymarket was an insider and sought recovery of preferential payments aggregating approximately $1,127,765.60.  Haymarket subsequently filed an answer on May 27, 2011, in which it generally denied the Operating Debtors' allegations.

On April 28, 2011, the Franchisor filed ten proofs of claim in Debtors' case.[153]  Claim 11-2, which is premised on the termination of the franchise agreements, seeks allowance of a claim for lost future royalties and advertising contributions in a total amount of not less than $763,445.[154]  The Franchisor provided the following breakdown of minimum damages due under each franchise agreement:

---

[151] Opposition to Motion of Haymarket Capital, LLC For Entry of an Order Dismissing Cases under Section 1112; or an Order of Abstention Under Section 305 or 28 USC [sic] 1334(c)(1); or alternatively, (ii) For Appointment of a Chapter 11 Trustee Under Section 1104, Docket No. 184 at 1.

[152] *See PF Wobu, LLC et. al v. Haymarket Capital, LLC*, Adv. P. No. 11-1138.

[153] *See* Claims 11-2, 12-1, 13-1, 14-1, 15-1, 16-1, 17-1, 18-1, 19-1, 20-1.

[154] Claim 11-2 at Ex. A.

| | |
|---|---|
| Chicago Investments and PF Wobu | $78,110.00 |
| Chicago Investments and PF Port | $99,510.00 |
| Chicago Investments and PF Matt | $149,265.00 |
| Chicago Investments and PF Mald | $134,820.00 |
| Chicago Investments and PF Group | $165,315.00 |
| Chicago Investments and PF Bost | $136,425.00 |

Additionally, with respect to Claims 12-1 through 19-1, the Franchisor added an amount to each claim for "pre-petition invoices" for each location:[155]

| | |
|---|---|
| PF Wobu | $8,171.81 |
| PF Port | $24,459.70 |
| PF Matt | $8,947.80 |
| PF Mald | $14,636.53 |
| PF Group | --- |
| PF Chel | $3,690.47 |
| PF Bost | $11,954.92 |
| **TOTAL:** | **$71,861.23** |

The Franchisor's final claim seeks to reserve the right to assert damages on account of the prepetition termination of the ADA.[156]

On May 3, 2011, just prior to the hearing on Haymarket's motion to dismiss, the Debtors filed a motion to approve an amended stipulation with respect to Life Fitness's adequate protection. In addition to extending the term of the first Life Fitness stipulation, the stipulation set forth treatment of Life Fitness's claim that Life Fitness would accept in a plan of reorganization. Haymarket opposed the amended stipulation, arguing that the Debtors were essentially seeking to override the cash collateral stipulations by increasing expenditures to an entity with no interest in the cash collateral. It also took issue with the Debtors' attempt to

---

[155] Claim 12-1, 13-1, 14-1, 15-1, 16-1, 17-1, 18-1, 19-1.

[156] Claim 20-1.

establish impermissible plan treatment of a lessor as a secured party outside the confirmation process.

Both Haymarket and Danversbank objected to the Debtors' disclosure statement. Apparently unhappy with the progress of the Debtors' case, Haymarket then moved to terminate the exclusivity period pursuant to 11 U.S.C. § 1121(d) on May 25, 2011. The following day, I conducted a hearing on the adequacy of the Debtors' disclosure statement and the motion to amend the Life Fitness stipulation. At the conclusion of the May 26, 2011 hearing, I approved the Debtors' disclosure statement subject to several amendments[157] and scheduled a hearing on plan confirmation for July 6, 2011. By separate order, I granted the motion to approve the amendment to the Life Fitness stipulation. On June 9, 2011, Haymarket appealed that order to the United States District Court for the District of Massachusetts.

On June 8, 2011, both the Debtor and the Franchisor objected to Haymarket's motion to terminate exclusivity, noting the upcoming confirmation hearing and the likelihood that the plan would be confirmed. Haymarket, Danversbank, and the Franchisor all filed objections to confirmation of the first amended plan. Haymarket and Danversbank argued that the that plan was patently unconfirmable for a plethora of reasons, while the Franchisor's objection was limited, simply reserving its rights to a final determination of the amount of its claim at a later date and, in the event that the plan is not confirmed or consummated, to continue to assert that the franchise agreements were terminated prepetition. After several requests by the parties, I continued both the hearings on the motion to terminate exclusivity and confirmation to August 31, 2011.

---

[157] The Debtors filed their first amended plan and first amended disclosure statement shortly after the hearing.

During the summer, the Debtors and Haymarket entered into extensive settlement negotiations, the result of which was to drastically alter the trajectory of this case. The first indication of this change occurred on August 19, 2011, when the Debtors filed the Motion to Assume, seeking authorization pursuant to 11 U.S.C. § 365 to assume the franchise agreements. The filing of this motion, in and of itself, was significant because up to this point, the Debtor and the Franchisor had been more or less allied, with the Franchisor simply reserving its rights to assert a prepetition termination of the franchise agreements if the plan failed to be consummated. In the Motion to Assume, the Debtors represented that they had reached an agreement with Haymarket, by which a further amended plan would provide that Haymarket, or its assignee, would assume the equity ownership of four of the Operating Debtors and that all six would continue under the Planet fitness name.[158]   The Motion to Assume was also scheduled for hearing on August 31, 2011.

On August 24, 2011, less than a week before the scheduled hearing on confirmation, the Franchisor filed an expedited motion to continue the August 31, 2011 hearing, citing the Debtors' last minute course change that would essentially force an unknown franchisee on the Franchisor and the Debtors' stated intention to substantially modify the plan. In further support of the continuance, the Franchisor stated that the proposed treatment of Haymarket's claim would fall within the transfer provisions of the franchise agreements, triggering the requirement of a *bona fide* offer and granting the Franchisor a right of first refusal. Despite the fact that a second amended plan had yet to be filed, the Debtors filed an opposition to the continuance the same day. Recognizing that a hearing on confirmation was unlikely, I scheduled the motion to continue for hearing on August 31, 2011, to determine the status of the cases.

---

[158] Despite the representations to the contrary in the Motion to Assume, a second amended plan was not filed contemporaneously with the Motion to Assume. In fact, it was not filed until August 25, 2011.

On August 25, 2011, the Debtors filed their second amended plan, as well as the Motion to Estimate.  Through the Motion to Estimate, the Debtors requested that I enter an order estimating the Franchisor's claim at $0.00 and, consistent with the Motion to Assume, the amount of cure costs to reinstate the franchise agreements at $56,024.97 for purposes of plan confirmation.  In support of their calculation of the cure claim, which is $15,836.26 less than the figure reflected in the Franchisor's proofs of claims, the Debtors state that they "intend to demonstrate at confirmation that the Cure Claim as alleged by the Franchisor is accordingly overstated."[159]  This too was scheduled for hearing on August 31, 2011.

On August 29, 2011, the Franchisor filed the Omnibus Objection, objecting to the Motion to Assume, Motion to Estimate, and the second amended plan, as well as the Franchisor's Objection to Haymarket's Claims.  In broad strokes, the Franchisor contended that the franchise agreements were not executory because they were terminated prepetition, that it was necessary to determine both its own claims and Haymarket's prior to confirmation, and that the proposed transfer implicates a number of provisions of the franchise agreements, most notably, its right of first refusal.  In the Franchisor's Objection to Haymarket's Claims, the Franchisor incorporated the Operating Debtors' complaint by reference, and asserted that the Debtors' proposed abandonment of their claims against Haymarket would impact the Franchisor most and lacked any oversight.  Concurrent with these objections, the Franchisor filed motions seeking to compel discovery from Haymarket.

I heard all these matters on August 31, 2011, and subsequently continued them all to September 26, 2011, for an evidentiary hearing.  In conjunction with a motion to continue the September 26, 2011 hearing filed on September 19, 2011, the Franchisor stipulated that the

---

[159] Motion to Estimate, Docket No. 354 at 14.

prepetition termination of the franchise agreements had been ineffective and that they remained executory.   That evidentiary hearing was continued to November 9, 2011, and then finally to January 17 and 18, 2012.   In the interim, Haymarket filed the Response to Objection and the Debtors filed the Motion to Strike, both asserting, among other things, that Franchisor's Objection to Haymarket's Claims was procedurally improper, with the Debtors further suggesting that the Franchisor lacks standing to object to Haymarket's claim.   Moreover, during the months of October and November of 2011, the Debtors proposed two further amended plans and disclosure statements.   A hearing on the third amended disclosure statement was scheduled for December 7, 2011.

Dissatisfied with the progress of the Debtors' cases, on November 10, 2011, the Franchisor filed a motion for the appointment of a Chapter 11 trustee or an examiner to investigate the affairs of each debtor and the feasibility of any plan of reorganization.   On the same day, the Franchisor filed a motion for relief from stay to terminate the PF Bost franchise agreement based on customer complaints that the fitness center was unsanitary and that exercise equipment was not functional.   These matters were also scheduled for December 7, 2011.

At the December 7, 2011 hearing, I approved the third amended disclosure statement, subject to certain amendments, over the objection of the Franchisor and denied the Franchisor's motion for the appointment of a trustee or examiner and Haymarket's motion to terminate exclusivity.   The motion for relief from stay was continued and ultimately withdrawn.   On December 9, 2011, the Debtors filed the Disclosure Statement and the Fourth Amended Plan, both of which comported with the oral modifications approved in open Court.

*The Fourth Amended Plan*

In summary, the Fourth Amended Plan provides that PF Bost and PF Port will continue to be owned by Chicago Investments (collectively, the "Retained Entities"), while the ownership of the remaining four of the Operating Debtors, namely, PF Wobu, PF Mald, PF Matt, and PF Chel (collectively, the "Acquired Entities"), shall be transferred to the designee of Haymarket (the "Acquirer").[160]   In exchange, Haymarket will assume all of the obligations of the Acquired Entities under the Fourth Amended Plan and will release any claims against the Retained Entities.[161]   PF Group, the intermediary holding company, will be dissolved.[162]   As will be explained in greater detail below, the creditors will then be paid in full through cash generated from the continued operation of the Operating Debtors.[163]   The Fourth Amended Plan further provides that the real estate leases held by Winged Foot and Brandon Dunes, LLC, the only two real estate leases not to have been previously assumed by the Debtors, will be assumed.[164]

The Operating Debtors intend to assume their respective franchise agreements, with PF Group's franchise agreement assumed by PF Chel.[165]   Accordingly, the franchise agreements and the ADA will be deemed assumed as of the effective date of the Fourth Amended Plan (the "Effective Date").[166]   The Franchisor's Cure Claim, which the Debtors estimate to be less than

---

[160] Disclosure Statement, Docket No. 533 at 3; Fourth Amended Plan, Docket No. 532 at 17, 19-20.

[161] Disclosure Statement, Docket No. 533 at 34-35; Fourth Amended Plan, Docket No. 532 at 17, 27-29.

[162] Disclosure Statement, Docket No. 533 at 28; Fourth Amended Plan, Docket No. 532 at 20.

[163] Fourth Amended Plan, Docket No. 532 at 20.

[164] *Id.* at 26.

[165] Disclosure Statement, Docket No. 533 at 3; Fourth Amended Plan, Docket No. 532 at 17, 26.

[166] Disclosure Statement, Docket No. 533 at 17.  The Fourth Amended Plan defines the "Effective Date" as  the later of (1) the fifteenth business day following entry of an order confirming the Fourth Amended Plan, provided that no stay pending appeal of the confirmation order is granted, or (2) the date that all conditions precedent to the effectiveness of the Plan have been satisfied or waived by the Debtors. Fourth Amended Plan, Docket No. 532 at 6.

$100,000, will be paid on the Effective Date from Debtors' available cash.[167]  The net available cash will then be aggregated and distributed on the Effective Date, with $600,000 to be distributed to the Retained Entities and $1,000,000 to be distributed to the Acquired Entities.[168] If any additional cash remains, 37.5% shall be allocated to the Retained Entities and 62.5% allocated to the Acquired Entities.[169]  The specific allocation of cash among the Retained Entities is in the discretion of Chicago Investments.

In the event that I find that some or all of franchise agreements are not capable of assumption, the equity interests of the rejecting entities will be extinguished and their assets will be transferred to either the Acquirer or Chicago Investments.[170]  This is discussed in greater detail below.   Any rejection damage claim shall be classified and treated under Class 6 as described below.[171]

Bruce Erickson ("Erickson") of PCS, LLC, an experienced turnaround professional, will be installed as the managing director of the Retained Entities at a rate of $375 per hour and shall appoint other personnel as necessary.[172]  Aaron West ("West") will remain as the manager of the Retained Entities.[173]  Laird will continue as a consultant to the Retained Entities on an interim basis, but will leave their employ within six months following the Effective Date.[174]  Neither

---

[167] Fourth Amended Plan, Docket No. 532 at 23.

[168] Disclosure Statement, Docket No. 533 at 3; Fourth Amended Plan, Docket No. 532 at 22.

[169] Disclosure Statement, Docket No. 533 at 3; Fourth Amended Plan, Docket No. 532 at 22.

[170] Disclosure Statement, Docket No. 533 at 26; Fourth Amended Plan, Docket No. 532 at 19-20, 22.

[171] Fourth Amended Plan, Docket No. 532 at 23.

[172] Disclosure Statement, Docket No. 533 at 29-30.

[173] *Id.* at 30.

[174] *Id.*

Erickson nor West have, or will, execute noncompetition agreements.[175]  With respect to the franchise agreements, Chicago Investments will remain Managing Owner of the Retained Entities.[176]

Any outstanding non-classified administrative expense claims, consisting of United States Trustee operating fees and Professional Fee Claims, will be paid in full on the Effective Date.  Two-thirds of accrued and unpaid professional fee claims as of the Effective Date, as well as two-thirds incurred thereafter in furtherance of closing the Chapter 11 cases, will be paid by Acquirer or the Acquired Entities, while the remaining one-third of each will be paid by the Retained Entities.[177]  United States Trustee operating fees incurred after the Effective Date shall be  similarly allocated between the Acquired Entities or Acquirer and the Retained Entities.[178]

The Fourth Amended Plan provides for three alternatives for the payment of priority tax claims.[179]  First, the claim may be paid upon terms agreed upon by the Debtors and the holder of the claim.[180]  Second, the Debtors may elect to pay the claim in full in cash on the later of the Effective Date or the date when such a claim would have become due if the cases had not been commenced.[181]  Third, the Debtors may elect to pay the value of the claim on the Effective Date in cash installments over five years.[182]

---

[175] *Id.*

[176] *Id.*

[177] Disclosure Statement, Docket No. 533 at 3; Fourth Amended Plan, Docket No. 532 at 11.

[178] *Id.*

[179] Disclosure Statement, Docket No. 533 at 20; Fourth Amended Plan, Docket No. 532 at 12.

[180] *Id.*

[181] *Id.*

[182] *Id.*

With respect to all the other claims, the Fourth Amended Plan classifies claims and equity interests into nine classes, with a sub-classification indicating the which Debtor is the obligor.[183]   Class 1 is priority claims consisting primarily of unpaid wages and employee benefits arising prior to the commencement of these cases.[184]   Class 1 claims are unimpaired and the holder of such a claim will be deemed to have accepted the Fourth Amended Plan.[185]   These claims will be paid in full in cash on the later of the Effective date or the date such claim becomes an allowed claim.[186]

Class 2 consists of the Life Fitness Capital Leases, which the Debtors will treat as secured claims.[187]   Class 2 is impaired under the Fourth Amended Plan and the holder of such a claim is entitled to vote to accept or reject.[188]   Class 2 is further divided into eight subclasses (2A through 2G) based on which Debtor is the primary obligor.[189]   Life Fitness will receive monthly payments in accordance with Exhibit A to the Fourth Amended Plan and will retain its existing liens until paid in full.[190]   Payments with respect to subclasses 2A through 2D will be made by the Acquirer or the Acquired Entities, while subclasses 2E through 2G will be paid by the Retained Entities.[191]   The current guarantees will be extinguished and the Acquirer or Acquired

---

[183] Disclosure Statement, Docket No. 533 at 5-6; Fourth Amended Plan, Docket No. 532 at 12-14.

[184] Disclosure Statement, Docket No. 533 at 16, 21; Fourth Amended Plan, Docket No. 532 at 15.

[185] Disclosure Statement, Docket No. 533 at 21; Fourth Amended Plan, Docket No. 532 at 15.

[186] *Id.*

[187] *Id.*

[188] *Id.*

[189] *Id.*

[190] *Id.*  Because the Capital Leases are being treated as secured claims, the Debtor has calculated the outstanding balance to accrue interest at a rate of 9.9% per annum.  Disclosure Statement, Docket No. 533 at 12.

[191] Disclosure Statement, Docket No. 533 at 21; Fourth Amended Plan, Docket No. 532 at 15.

Entities and the Retained Entities shall execute new guarantees in a form acceptable to Life Fitness.[192]   The Capital Leases shall remain in effect except as modified by the Fourth Amended Plan.[193]

Class 3 consists of Danversbank's secured claim.[194]   Class 3 is impaired under the Fourth Amended Plan and Danversbank is entitled to vote.[195]   Under the Fourth Amended Plan, Danversbank will have a finally allowed secured claim equal to the outstanding balance of the claim due on the Effective Date, including attorney's fees and expenses.[196]   On the Effective Date, Danversbank will receive a cash payment from PF Mald or Acquirer in an amount equal to: its attorney's fees and expenses, whether as agreed or as allowed by the Court; all accrued but unpaid interest; the amount of principal that became due and went unpaid; the amount of late fee charges that came due but went unpaid.[197]   The remaining balance will be paid by either the Acquirer or PF Mald in monthly installments of $10,000 plus interest at the nondefault rate, with the outstanding balance paid on June 17, 2015.[198]   Danversbank will retain its lien until paid in full.[199]   Moreover, the Acquirer will execute a guarantee of the obligation and Haymarket will

---

[192] Disclosure Statement, Docket No. 533 at 13, 22; Fourth Amended Plan, Docket No. 532 at 15-16.

[193] *Id.*

[194] Disclosure Statement, Docket No. 533 at 23; Fourth Amended Plan, Docket No. 532 at 17.

[195] *Id.*

[196] Fourth Amended Plan, Docket No. 532 at 4.

[197] *Id.*

[198] *Id.* at 5.

[199] *Id.*

execute and deliver a replacement subordination agreement to reflect the changes to the original created by the plan.[200]

Classes 4 and 5 are Haymarket's secured and general unsecured claims, respectively.[201] Both classes are impaired under the Fourth Amended Plan and may vote.[202]  In full satisfaction of both classes of claims, Haymarket shall have a single allowed claim in the amount of $8,500,000 that will accrue interest a rate of 17.5% per annum, for which the Acquirer and each Acquired Entity shall be jointly and severally liable.[203]  Haymarket will receive monthly installment payments in the lesser of: (1) the interest then accrued from and after the Effective Date; or (2) the available cash flow of the Acquired Entities after satisfaction of all other then due obligations, whether pursuant to the Fourth Amended Plan or then current expenses and obligations.[204]  In the event that the payments are insufficient to fully satisfy the interest only payments, any unpaid amount will be deferred and added to the principal.[205]  Payment in full shall occur upon the one-hundred twentieth month following the Effective Date, a sale of one or more of the Acquired Entities or its assets, or default under the terms of the obligation.[206] Haymarket will be secured by a first priority lien on substantially all assets of the Acquired Entities, but subordinate to Life Fitness and Danversbank.[207]

---

[200] Id.

[201] Disclosure Statement, Docket No. 533 at 23-24; Fourth Amended Plan, Docket No. 532 at 17-18.

[202] Id.

[203] Fourth Amended Plan, Docket No. 532 at 7.

[204] Id.

[205] Id.

[206] Id.

[207] Id.

Class 6 is comprised of general unsecured claims.[208] This class is impaired under the Fourth Amended Plan and the holder of such a claim may vote.[209] General unsecured claims will be paid in full by over a term of sixty-months with interest calculated and based upon an amortization term of fifteen years and accruing at 5.5% per annum.[210]

Class 7 is made up of "convenience claims," which the plan defines as general unsecured claims allowed in the amount of $2,500 or less.[211] Class 7 claims are impaired under the Fourth Amended Plan and the holder of such a claim may vote to accept or reject it.[212] Claims in this class will receive the lesser of either 100% of the allowed claim or $2,500.[213]

Class 8 consists of the allowed claim of Edward H. Marchant Co., Inc. ("Marchant").[214] Marchant performed plumbing services in connection with tenant improvements at the PF Chel's facility.[215] Marchant alleges that $44,500 remains unpaid and has perfected a mechanic's lien against the leasehold.[216] Class 8 is impaired under the Fourth Amended Plan and is entitled to cast a vote to either accept or reject it.[217] In full satisfaction of its claim, Marchant shall receive

---

[208] Disclosure Statement, Docket No. 533 at 24-25; Fourth Amended Plan, Docket No. 532 at 18.

[209] *Id.*

[210] *Id.*

[211] Fourth Amended Plan, Docket No. 532 at 4, 18.

[212] Disclosure Statement, Docket No. 533 at 25; Fourth Amended Plan, Docket No. 532 at 19.

[213] *Id.*

[214] Disclosure Statement, Docket No. 533 at 25; Fourth Amended Plan, Docket No. 532 at 19.

[215] Disclosure Statement, Docket No. 533 at 15.

[216] *Id.*

[217] Disclosure Statement, Docket No. 533 at 25; Fourth Amended Plan, Docket No. 532 at 19.

a single payment in the amount of $33,375 from PF Chel on the Effective Date.[218]  Upon receipt,

Marchant will execute a release in favor of the Debtors and discharge any mechanic's lien.[219]

Finally, Class 9 are equity interests which are unimpaired under the Fourth Amended

Plan and deemed to have accepted it.[220]  As explained above, if I grant the Motion to Assume,

the equity interests in the Acquired Entities shall be transferred to the Acquirer on the Effective

Date.[221]  If not, they will be extinguished on the Effective Date and the assets of the those entities

will be transferred to the Acquirer.[222]  Similarly, if the franchise agreements are assumed,

Chicago Investments shall receive 99% of the equity interests in PF Bost and PF Port, with the

remaining 1% to be transferred to PF Group Corporation.[223]  If the franchise agreements cannot

be assumed, then the equity interests of PF Bost and PF Port will also be extinguished and their

assets transferred to Chicago Investments.[224]  Notably, the Fourth Amended Plan does not

require uniformity between the Acquired Entities and Retained Entities, meaning that either

could remain Planet Fitness franchisees while the other is de-branded.[225]  In any event, PF Group

will be dissolved.[226]

---

[218] *Id.*

[219] *Id.*

[220] Fourth Amended Plan, Docket No. 532 at 19.

[221] *Id.*

[222] *Id.* at 19-20.

[223] *Id.*

[224] *Id.*

[225] *Id.* at 19-20.

[226] *Id.*

As briefly mentioned above, the Fourth Amended Plan provides for certain releases among the parties. First, Haymarket and its related parties, namely, the Acquirer, Robert Buonoto, Wellesley Capital, Wellesley Building Company, LLC, Brandon Dunes, LLC, and Winged Foot, will release all claims arising from events occurring on or before the Effective Date against the Retained Entities, Laird, and his wife, Deborah.[227] In return, the Retained Entities and the Lairds will release all such claims against Haymarket and its related parties.[228] Notwithstanding the releases, nothing in the Fourth Amended Plan shall be deemed to release or otherwise affect any rights that John J. Aquino, in his capacity as Chapter 7 trustee of the estate of Laird, may have with respect to the Trust, including the right to assert any legal or equitable ownership or beneficial interest in the Trust, but only to the extent of the Retained Entities.[229]

*The Objection to Confirmation*

On January 10, 2012, the Franchisor filed the Objection to Confirmation. The Franchisor asserts that the Fourth Amended Plan is unfeasible because it is predicated on the assumption of the franchise agreements without providing adequate assurance of the Retained Entities' future performance. Indeed, the Franchisor contends, several non-monetary defaults will exist immediately upon assumption of the franchise agreements, preventing confirmation.

First, the Franchisor voices several complaints about the management of the Retained Entities. It argues that Erickson suffers from an irremediable conflict of interest because his company, PCS LLC, currently works for another fitness center that Erickson has refused to identify. Citing customer complaints, health code violations, unsanitary conditions, broken or

---

[227] *Id.* at 9 (defining "Related Parties"), 28 ("Releases Among the Debtors, the Acquirers, and Related Parties").

[228] *Id.* at 28-29.

[229] *Id.* at 29.

ill-maintained equipment, and poor upkeep of the facilities, the Franchisor urges that West, who has managed the Operating Debtors post-petition, is not qualified to manage the Retained Entities.  Next, the Franchisor takes issue with the fact that the Fourth Amended Plan does not identify the manager of the Managing Owner, depriving the Franchisor of its right to approve such a manager.

With respect to the financial feasibility of the Fourth Amended Plan, the Franchisor maintains that the Debtors' projections are unrealistic and that there are insufficient assets to fund continued operations.  The Franchisor insists that the Fourth Amended Plan fails to provide for its claim of attorney's fees totaling over $412,228.46 incurred in these cases, which must be reimbursed pursuant to the indemnification clauses of the franchise agreements.  Moreover, by failing to take into account the Franchisor's full claim, or in the event that the franchise agreements are rejected, its claim for rejection damages totaling over $1,500,000, the Franchisor contends that the Fourth Amended Plan is inequitable under 11 U.S.C. § 1123(a)(4).

The Franchisor also notes that the Fourth Amended Plan proposes to assume the ADA despite its valid prepetition termination based upon non-monetary defaults.  Nevertheless, even if the ADA were executory, the Franchisor questions the Debtors' ability to cure the non-monetary defaults; namely, the failure to open new franchise locations pursuant to the development schedule.  To the contrary, the Franchisor reasons that the Debtors have no intention of opening new locations, as evidenced by the lack of reference in the Fourth Amended Plan.

In its closing salvo, the Franchisor raises several issues regarding the Fourth Amended Plan's alleged impermissible encroachment on its rights under the franchise agreements, asserting that they are indicative of the Debtors unwillingness to comply with the terms of the franchise agreements.  For example, the Franchisor avers that PF Chel cannot be substituted as a

counterparty under the PF Group franchise agreement simply because it is administratively convenient for the Debtors.  Next, the Franchisor urges that Chicago Investments is bound by covenants not to compete and seeks to enforce that right against the Debtors' officers, employees, or other agents.  As such, it requests a finding that its rights under the investor covenants regarding confidentiality and non-competition are not altered by confirmation of any plan.  Finally, with no discussion, the Franchisor states that the releases contained in paragraph 9.4 of the Fourth Amended Plan are overbroad and do not satisfy the standard set forth in *In re Quincy Med. Ctr., Inc.*[230]

Notably, the Objection to Confirmation expressly does not address "potential issues inherent in the assumption by the Acquired Entities" because, at the time, the Franchisor was in negotiations with Haymarket (or its affiliates) regarding an agreement by which Acquirer would provide the Franchisor with adequate assurance of their ability to comply with the franchise agreements.[231]  Nevertheless, the Franchisor did seek "a finding that the transfer of the Acquired Entities constitutes a transfer pursuant to Section 14 of the Franchise Agreements and that the Franchisor's rights thereunder are preserved."[232]

*Pre-Trial Events*

On January 16, 2012, the Debtor filed the Report of Plan Voting, indicating that the Franchisor was the sole creditor to cast a vote to reject the Fourth Amended Plan.  The Debtors noted, however, that the Court's rulings with respect to the various outstanding motions could disqualify the Franchisor, thus impacting the vote.  In conjunction with the Report of Plan

---

[230] *In re Quincy Med. Ctr., Inc.*, No. 11-16394-MSH, 2011 WL 5592907 (Bankr. D. Mass. Nov. 16, 2011).

[231] Objection to Confirmation, Docket No. 568 at 2.

[232] *Id.* at 11.

Voting, the Debtors filed an affidavit of Stephen Rider (the "Rider Affidavit"), the post-petition

manager of Chicago Investments, in which he attests that if he were called upon to testify, based

upon his personal knowledge of the Debtors and after reviewing the provisions of the Fourth

Amended Plan with counsel, he would aver that the Fourth Amended Plan meets the elements of

11 U.S.C. § 1129.

On that same day, which I note note was the Martin Luther King Day holiday and not a

business day, the Franchisor filed a unsigned, unilateral "Pretrial Statement Concerning: (i)

Limited Agreement Between Franchisor and Haymarket, (ii) Issues to be Tried, and (iii)

Adequate Assurance Which Would be Acceptable to Franchisor" (the "Pretrial Statement").   In

the Pretrial Statement, the Franchisor represented that

> the Franchisor and the Haymarket parties have agreed to enter into four transition
> and subordination agreements (the "<u>Transition Agreements</u>") that provide for the
> Haymarket entities to:
>
> - subordinate all of Haymarket's debt to the franchisees' obligations to the
>   Franchisor;
>
> - maintain certain cash reserves;
>
> - employ management acceptable to the Franchisor; and
>
> - have key representatives of the Haymarket entities execute the Franchise
>   Agreements and become bound by the personal covenants concerning
>   confidential information and noncompetition agreements thereunder.
>
> Accordingly, for purposes of <u>this</u> confirmation trial, the Franchisor will not
> contest the ability of PF Chel, PF Mald, PF Matt, and PF Wobu to provide the
> Franchisor with adequate assurance of future performance, so long as the
> Transition Agreements are executed and certain provisions thereof are
> implemented through the Plan.[233]

The Franchisor went on to state:

---

[233] Pretrial Statement, Docket No. 578 at 2 (underline in original).

> Notwithstanding the foregoing, the Franchisor maintains that the Plan may not be confirmed for all the reasons outlined in its objection (Docket No. 568) *and because the proposed equity transfers under the Plan trigger the Franchisor's right of first refusal to purchase the Acquired Entities under the Franchise Agreements*. Franchise Agreements, § 14.8. The Franchisor has not waived those rights.[234]

The Pretrial Statement also contains a list of "proposed confirmation language" which, if I included in any confirmation order, would substantially reduce the Franchisor's objections.[235]

Prior to the hearing on confirmation, the Debtors filed two motions in limine and the Franchisor filed one as well. The first, captioned "Debtors [sic] Motion in Limine to Exclude or Limit Pla-Fit Franchise, LLC's Testimony at Trial" (the "Corporate Motion"), sought to prevent the Franchisor from producing witnesses from its organization other than those previously designated under Fed. R. Civ. P. 30(b)(6) to testify regarding the topics designated in the prior deposition notices. The second, captioned "Debtors [sic] Motion in Limine to Exclude All Expert Evidence and Testimony on Behalf of Pla-Fit Franchise, LLC at Trial" (the "Expert Motion"), sought to prevent the Franchisor from presenting any expert witnesses due to their failure to identify them in response to the Debtors' interrogatories. Lastly, through the "Franchisor's Motion in Limine to Exclude Evidence of the Continuing Validity of the Terminated and Non-Scheduled Area Development Agreement, With Pre-Trial Brief RE: Debtors' Inability to Assume that Agreement" (the "Franchisor's Motion in Limine"), the Franchisor moved to exclude any evidence that the ADA was executory in light of the Debtors' failure to schedule it.

---

[234] *Id.* at 3 (emphasis added).

[235] At the commencement of the second day of trial, Debtors' counsel went through the Franchisor's list and indicated that the Debtors could only agree that: (1) following the Effective Date, all Debtors will comply with all terms of the franchise agreements to be assumed, Trial Trans. January 18, 2012 at 5:18-21; and (2) that Erickson would sign a confidentiality agreement, *Id.* at 6:19-25. Because the Debtors either could not, or would not, agree to the remainder of the proposed language, it does not merit further discussion. *See Id.* at 5-12.

Concurrent with the Franchisor's Motion in Limine, the Franchisor filed an objection to the Debtors' motions.  In it, the Franchisor urged that

> while it may be appropriate to prevent corporate representatives from providing testimony regarding corporate knowledge that extends beyond information disclosed in discovery, no grounds exist to prevent the Franchisor's counsel from eliciting testimony from any other witness, especially the Debtors' witnesses.[236]

With respect to the Expert Motion, the Franchisor responded that it did not anticipate calling an expert to testify, but reserved the right to call one to do so in rebuttal.

*The Contested Confirmation Hearing*

I conducted an evidentiary hearing on all outstanding matters on January 17 and 18, 2012.  At the commencement of the trial, I heard oral argument with respect to the three motions in limine filed by the parties.  At the conclusion of their arguments, I denied the Franchisor's Motion in Limine, stating that I was not prepared to find that the ADA had, in fact, terminated absent evidence.[237]  In light of the Franchisor's representation that it did not intend to call an expert witness, I deferred ruling on the Expert Motion.[238]  As the Franchisor ultimately did not attempt to call one, I now find that it is moot.  Lastly, though I agreed that it was not appropriate to limit the Franchisor's ability to cross-examine other witnesses, I granted the Corporate Motion, reasoning that the Franchisor could not designate witnesses that lacked information on the specified topics and then require the Debtors to chase down other more knowledgeable witnesses.[239]

---

[236] Objection to (I) Debtors' Motion in Limine to Exclude or Limit PlaFit Franchise, LLC's Testimony at Trial and (II) Debtors' Motion in Limine to Exclude All Expert Evidence and Testimony on Behalf of Pla-Fit Franchise, LLC at Trial, Docket No. 576 at 2.

[237] Trial Trans. January 17, 2012 at 11:18-22.

[238] *Id.* at 15:8-12.

[239] *Id.* at 16:3-14.

During the trial, five witness testified and twenty-four exhibits were admitted into evidence. The Debtors also made Rider available in the courtroom for cross-examination, but the Franchisor declined to question him. Laird testified first, describing the formation of the Debtors, the events precipitating the bankruptcy filings, and, in particular, the purported agreement with Grondahl to modify the ADA.[240] The substance of this testimony has been included above and need not be repeated.

Laird also testified about the rate of membership cancellations for both PF Bost and PF Port during the pendency of the bankruptcy.[241] Four Membership Profile Reports, two for each franchise, were admitted into evidence.[242] The PF Port Membership Profile Report dated December 22, 2010, reflects that since its opening, the franchise has had a total of 4,844 membership cancellations.[243] This number jumped to 8,729 cancellations on the Membership Profile Report dated January 9, 2012, indicating that 3,885 memberships at PF Port were cancelled during the Debtors' cases.[244] Similarly, the PF Bost Membership Profile Reports for the same period reflect a jump from 8,504 membership cancellations to 13,515, showing that 5,011 PF Bost members cancelled their memberships during the same period.[245]

Next, Lawton Bloom ("Bloom"), an expert retained by the Debtors, testified regarding the feasibility of the Fourth Amended Plan.[246] Bloom is a principal of Argus Management

---

[240] Trial Trans. January 17, 2012 at 15-85.

[241] *Id.* at 63-65.

[242] Debtors' Exs. 8-9.

[243] Debtors' Ex. 8; *see also* Trial Trans. January 17, 2012 at 63:10-25; 64:1-6.

[244] Debtors' Ex. 8; *see also* Trial Trans. January 17, 2012 at 64:7-13.

[245] Debtors' Ex. 9; *see also* Trial Trans. January 17, 2012 at 65.

[246] *Id.* at 88:3-17.

48

Corporation ("Argus"), which is a financial advisory and consulting firm specializing in financially distressed companies both in and out of bankruptcy.[247]  He began working at Argus in early 2000, but briefly left its employ from 2003 to 2005.[248]  Bloom testified that in the last five years, he has worked with "quite a few" clients, advising them on operations, but has also "gotten involved in a lot of financing transactions, asset ventures."[249]  As part of virtually every engagement, Argus prepares "some sort of financial and cash flow forecasting," which he has personally prepared on several occasions.[250]  Bloom has also been qualified to testify as an expert witness on other occasions, most recently for the SW Boston Hotel Venture, LLC case now pending before Judge Feeney,[251] where he prepared financial forecasts for that debtor and testified to their reasonableness and feasibility.[252]

As part of a report prepared regarding the feasibility of the Fourth Amended Plan and an analysis of the interest rate that would be charged by Haymarket, Bloom prepared financial forecasts for a five year period.[253]  Bloom explained his process for preparing such a forecast as follows:

> We reviewed the historical financial information that we received from the debtor. Looked at, you know, EFT levels, membership counts, things of that nature, and worked closely with Verdalino [sic] & Lowey, financial advisor to the debtor, with David Laird, and with people on his finance staff of the debtor to come up with the projects and we based the forward projections on the historical trends that we observed and costs and membership.

---

[247] *Id.* at 86:9-25; 87:1-4

[248] *Id.* at 86:16-21.

[249] *Id.* at 87:5-9.

[250] *Id.* at 87:9-16.

[251] *In re SW Boston Hotel Venture, LLC, et al.*, Case No. 10-14535-JNF (Jointly Administered).

[252] Trial Trans. January 17, 2012 at 87:16-25; 88:1-2.

[253] *Id.* at 88:3-21.  *See also* Debtors' Ex. 13.

* * *

> Well, we looked back at the -- you know, the different line items of expense the
> debtor had been incurring historically and forecasted the future to reflect the past
> expense level. We looked at revenue levels, you know, membership recurring
> monthly and black and white fees. A lot of that was knowable based on the
> membership counts and projected forward membership growths based on what we
> had seen in the past and on how new or old or mature a center was. It was our
> understanding that centers have a two or three-year period while they're growing
> more quickly and then they steady out and most of these were in that -- past that
> level of maturity or would be past it soon.[254]

His initial forecast was revised just prior to the filing of the Fourth Amended Plan to reflect the

proposed settlement with Haymarket and more up to date knowledge.[255]   Among the changes

made were an increased advertising "spin" for all six fitness centers "to seven percent of the EFT

plus about $1,500 a month," and a corresponding increase in revenue to reflect an expectation

that with increased advertising there would be an increase in revenue growth rate.[256]   While

Bloom admitted that this was his first fitness industry client, he nonetheless believes, based upon

his experience with other companies, that spending money on marketing will increase revenue.[257]

With respect to the reorganization costs factored into his projections, Bloom testified that

the forecasts include reorganization expenses of a little over $30,000 for January and February of

2012.[258]   He conceded that he did not know how much the Debtors incurred in reorganization

expenses in December of 2011.[259]   Moreover, when estimating the amount of maintenance costs,

---

[254] Trial Trans. January 17, 2012 at 88:22-25;89:1-21.

[255] *Id.* at 90:14-24; 91:2-8.

[256] *Id.* at 91:9-24; 92:2-13.

[257] *Id.* at 100:20-25; 101:1-13; 102:1-11.

[258] *Id.* at 100:7-14.

[259] *Id.* at 100:17-19.

Bloom did not review customer complaints or personally examine equipment, but instead relied on historical maintenance costs and discussed the matter with management.[260]

The revised forecast, which was admitted into evidence as Debtors' Exhibit 13, projects positive operational cash flow for both PF Bost and PF Port.[261]  The following table reflects the projected December cash balances of both PF Bost and PF Port for the next five years:[262]

| Year | PF Bost | PF Port |
|------|---------|---------|
| 2012 | $623,696 | $101,949 |
| 2013 | $545,432 | $149,064 |
| 2014 | $733,871 | $168,329 |
| 2015 | $858,936 | $188,013 |
| 2016 | $977,204 | $221,492 |

Bloom further testified that both PF Bost and PF Port should exit bankruptcy with sufficient working capital because the forecasts show a positive cash balance that increases in time.[263] Specifically, PF Bost is projected to have more than $363,000 in cash, which he explained is approximately three and a half times their monthly expenses.[264]  PF Port will exit bankruptcy with approximately $27,000 and have only $1,389 in cash on hand by the end of May, which Bloom admitted was "a little wider than I think it should have be[en]," but emphasizes that the projections remain positive.[265]

---

[260] *Id.* at 101:12-24.

[261] *Id.* at 94:10-21; 99:16-21.

[262] Debtors' Ex. 13 at 13-22.

[263] Trial Trans. January 17, 2012 at 97:1-18; 99:16-21.

[264] *Id.* at 98:1-17.

[265] *Id.* at 98:23-25; 99:1; 99:1-21; 100:3-6.

Bloom testified that he believes the projections are reasonable and achievable.[266]   He explained:

> Well, I think that just based on our analysis and looking at historical trends and expense and revenue rates we have not departed significantly from what the businesses have done in the past with the expectation of a little bit of a revenue bump in 2012, which I think is justified by the almost doubling of the advertising revenue.[267]

Based upon his projections in relation to the obligations of the Debtors,[268] Bloom concluded that the Fourth Amended Plan is feasible:

> I believe the plan is feasible. The cash flow has been significant historically. We're forecasting less cash flow going forward based on some of the expense adjustments that I mentioned, but still significantly in excess of the obligations.[269]

Nevertheless, he conceded that his analysis is based upon the current branding of the Debtors, and that while "the cost structure would be essentially the same," it would be "very, very difficult to say" what impact de-branding the fitness centers would have on their potential revenue.[270]

Craig Jalbert ("Jalbert") of Verdolino & Lowey, P.C. ("V&L") also testified as to the reasonableness of the Debtors' projections and the feasibility of the Fourth Amended Plan.  V&L is a financial consulting firm that specializes in under-performing and insolvent businesses, both inside and outside of bankruptcy.[271]  For the last twenty-five years, Jalbert has been involved in over 300 Chapter 11 bankruptcy cases, and numerous other Chapter 7 cases, receiverships, and

---

[266] Trial Trans. January 17, 2012 at 92:14-16.

[267] *Id.* at 92:17-24.

[268] *Id.* at 93:23-25;94:1.

[269] *Id.* at 94:5-9.

[270] *Id.* at 112:9-21.

[271] *Id.* at 114:4-11.

workouts.[272]    Although he could not remember the exact number, Jalbert testified that he has

qualified as an expert witness on more twenty-five occasions.[273]

Jalbert and V&L were retained by the Debtors to assist in accounting and provide

oversight.[274]    As part of those services, V&L reviewed operating reports, made the first pass at

the budget and projections for the plan, and generally provided advice to counsel regarding

various matters, including taxes.[275]    V&L was also involved with the preparation of the budgets

in connection with the Debtors' use of cash collateral.[276]    V&L also created the first iteration of

the forward-looking projections with management in July or August of 2011, but then handed it

off to Bloom, who completed them.[277]

Jalbert testified regarding several analyses he performed regarding the Debtors'

projections.    First, in anticipation of trial, Jalbert prepared a comparison of the cash collateral

budgets to the actual reconciliations for PF Bost and PF Port to demonstrate the reliability and

credibility of the projections.[278]    With respect to the comparison, Jalbert explained:

> Well, the debtor did actually a pretty good job. When you think this budget was
> created initially in January of 2011, originally it had six stores. We cut aside the
> four, got down to the two and very rarely in the cases I work in do you exceed
> cash flow.  In this particular instance, the cash flow was actually exceeded by
> $84,000 more than they had anticipated. It's an 11-month period. That's a fairly
> long period in bankruptcy.  These stores have been around I think one to two
> years prior to this date so it gave the professionals creating the forward looking

---

[272] *Id.*

[273] *Id.* at 114:12-15.

[274] *Id.* at 114:24-25.

[275] *Id.* at 115:1-7.

[276] *Id.* at 115:8-18.

[277] *Id.* at 121:1-13.

[278] *Id.* at 15-16.  *See* Debtors' Ex. 14.

projections some very good basis with which to make -- to meet with management and make some decisions.[279]

Next, Jalbert performed a "sensitivity analysis" with respect to the projections versus historical, comparing the figures from 2011 and 2012.[280]  Based on this analysis, he stated that

> you can see from an income perspective that for Boston the revenues are anticipated to be up approximately 6.2 percent between 2011 and 2012. Expenses are predicated [sic] to increase by 20 percent over the -- between the two years and similar numbers for Porter Square are 6.7 percent roughly and increase in income and a 16 percent increase in expenses and both of them are projected to have cash flow in 2012.[281]

Finally, Jalbert completed a liquidation analysis to determine whether creditors would be better off under the Fourth Amended Plan than they would in a Chapter 7 liquidation.[282]  Describing his methodology and conclusions, he testified that

> I looked at the plan. I talked to management. This is a very simple business. It is -- it's got an enormous secured creditor. Its only assets are its equipment. The equipment is subject to a separate set of liens and while I've not myself had a lot of fitness cases I know enough about them that fitness businesses of this nature are location. There's a lot of them. There's a lot of competition. I don't think this could be sold as if to the extent that plan were to fail. There's no sale -- no prospect of a sale where -- would get beyond the enormous claim of the secured creditor and of the creditors with the equipment. This is akin to a restaurant, Your Honor. The build-out is not a saleable asset. It's probably where they spent the most amount of money. These types of industries spend a lot of money in marketing to build up their local product and to get -- to draw the customers. I can't see any way whatsoever in this particular instance in this industry in this case that there would be -- to give to unsecured creditors with these claims.[283]

---

[279] Trial Trans. January 17, 2012 at 120:2-13.

[280] *Id.* at 121:14-17.  *See* Debtors' Ex. 15.

[281] Trial Trans. January 17, 2012 at 124:11-18.

[282] *Id.* at 125:20-23.

[283] *Id.* at 125:25; 126:1-17.

In sum, Jalbert testified that the PF Bost's and PF Port's current cash flow is sufficient to maintain their operations at a minimum through the projection period.[284]  He further stated that he did not believe that the Retained Entities required $500,000 of liquidity to continue operations because the businesses have been around for several years and have thousands of clients which are producing a positive cash flow.[285]  On cross-examination, however, Jalbert conceded that if PF Port were required to make an unforecasted expenditure of $12,000 between then and the end of May, there would not be enough money to pay it.[286]  That question apparently relates to the fact that on the morning of the first day of trial, the Internal Revenue Service filed an amended proof of claim seeking payment of $13,488.66 from PF Port.[287]  The following morning, Debtors' counsel responded to the claim as follows:

> I can make . . . an offer of proof to the Court. I have a witness -- witnesses that can testify. The tax claim is for payroll taxes for the year 2008 for the Porter Square facility. Porter did not open the facility till 2009 and had no employees in 2008, so we have a high degree of confidence that since we had no employees we have no tax liability for that year and that claim will go away. In fact, at one time the Government actually amended the claim to zero and then amended it back, so that's the answer to that claim, Your Honor.[288]

To date, the claim has not been further amended or withdrawn.

Erickson, the proposed managing director of the Retained Entities, testified with respect to his qualifications and his understanding of the proposed engagement.  He is currently a partner at PCS, LLC, a financial advisory, crisis management, and turnaround firm specializing in

---

[284] *Id.* at 127:22-25.

[285] *Id.* at 127:6-22.

[286] *Id.* at 131-133.

[287] *See* Claim 4-3, Case No. 10-23815-WCH.

[288] Trial Trans. January 18, 2012 at 16:7-17.

helping companies in varying degrees of financial distress.[289]   Erickson has been a partner at PCS, LLC for about sixteen months, but worked for its predecessor company, CRG Partners, LLC, which did similar work, for fifteen years.[290]   His services vary depending on the specific engagement, but generally speaking, he assesses the company's current performance and looks at ways to improve performance and cut costs in an effort to maximize value and profit.[291]   Often, Erickson's role is transitory employment, meaning that he is taking over for existing management to help fix the company in anticipation of a buyer or new management.[292]

Because Chicago Investments has approached him to be its manager, he envisions his role in PF Bost and PF Port as making sure they are operating efficiently and maximizing value, to the extent that they are underlying assets of Chicago Investments.[293]   Erickson understands that he will effectively be the President or CEO, having full authority in all aspects of the operation, including hiring, firing, and decision making regarding capital improvements and distributions.[294]   At trial, he was unaware of the terms upon which he could be terminated, but Debtors' counsel represented that the retention letter, which is still being drafted, will place restrictions on the ability to terminate PCS, LLC within one year.[295]

---

[289] *Id.* at 17:3-18.

[290] *Id.* at 17:19-25; 18:1-6.

[291] *Id.* at 18:10-15.

[292] *Id.* at 18:16-19.

[293] *Id.* at 19:2-5; 20:20-25; 21:1-6.

[294] *Id.* at 21:21-25; 22:1-20.

[295] *Id.* at 26:15-24.

Erickson further testified that he is presently engaged by another fitness company, but could not disclose the identity of the company due to a confidentiality agreement.[296] Nonetheless, he stated that he was willing to sign a confidentiality agreement if employed by the Debtors and would not disclose any information to his other clients.[297]   On cross-examination, Erickson admitted that his only understanding of the Planet Fitness model is from a brief review of the website and a 45 second visit to a facility in Portsmouth, New Hampshire.[298]

The final witness was West, the manager of the Operating Debtors, regarding his management of the Debtors' post-petition operations.  The first topic of inquiry related to West having moved equipment subject to Life Fitness's Capital Leases from one of the Acquired Entities to PF Bost.[299]   Indeed, West admitted that in September of 2011, he moved approximately eight pieces of equipment without first seeking the permission of Rider, Life Fitness, or Haymarket.[300]   Nor did he keep any written records of what equipment was moved, reasoning that it could all be tracked by the serial numbers.[301]   West also concedes that the equipment in question was of better quality than most of the existing equipment at the Boston location.[302]   He explained that he did so because it is a common business practice in the health club industry to take things from one facility to improve the quality of another.[303]   Additionally,

---

[296] *Id.* at 23:12-15.

[297] *Id.* at 25:14-24.

[298] *Id.* at 27:13-23.

[299] *Id.* at 29:16-25.

[300] *Id.* at 29:16-25; 30:11-19.

[301] *Id.* at 30:1-10.

[302] *Id.* at 30:20-23.

[303] *Id.* at 31:1-4.

West testified that it was his personal belief that the Boston location is in need of improvements and that all the clubs need more equipment.[304]

A good portion of West's examination focused on customer complaints in which the Boston facility was described using various colorful metaphors.[305]   West testified that the Franchisor regularly, if not timely, forwards customer complaints, which he keeps in a file on his computer.[306]   He reviews them and then takes action that he deems appropriate.[307]   The Franchisor sought to have a number of these complaints admitted into evidence, but I excluded them on the basis that they were hearsay and could not be used to establish the truth of the assertion contained therein.[308]   At the Franchisor's insistence, however, I admitted several of these documents for the limited and dubious purpose of establishing West's state of mind.[309] Ultimately, I find that these exhibits are irrelevant as they are not evidence that there was a condition in need of remediation nor do they demonstrate anything about West's state of mind.[310] Interestingly, West also testified that there have been numerous instances where he has been forwarded complaints that have turned out to be fictitious or planted by other franchisors.[311]

Nevertheless, there is evidence in the record that PF Matt was cited by Boston Inspectional Services Health Division on December 28, 2011, with health code violations

---

[304] *Id.* at 32:11-12.

[305] *See, e.g.*, Trial Trans. January 18, 2012 at 37-46.

[306] Trial Trans. January 18, 2012 at 34:10-19.

[307] *See, e.g.*, Trial Trans. January 18, 2012 at 46.

[308] *See* Fed. R. Evid. 801, 802.

[309] See Fed. R. Evid. 803(3).

[310] Franchisor's Exs. 5-6.

[311] Trial Trans. January 18, 2012 at 58:10-13.

relating to its bath facilities and food services.[312]   I further note that the food services inspection

citation indicates that the two violations, regarding the sufficient elevation of beverages from the

floor and the need for proper shelving in the storage room, are "non-critical violations."[313]   West

admitted that he never reviewed the state regulations governing either bath facilities or food

services.[314]   Nor has he ever received training concerning the appropriate food service

regulations.[315]

On re-direct examination, West explained the maintenance procedures employed by the

Operating Debtors to ensure a clean and sanitary facility:

> Well, we do daily inspections at -- David CiChiara does a weekly inspection.
> Every day the staff is required to go every half-hour to do what we call a walk-
> through. They'll go through the whole entire facility, make sure everything is
> clean, go through the locker room basically five or six times a day mopping the
> floors. We mop the whole entire gym twice a day.[316]

Moreover, he hired a cleaning service that cleans the facility 365 days a year, including holidays

when the fitness center is closed for business.[317]

Curiously, neither the Debtors nor the Franchisor proffered any evidence regarding their

respective estimations as to the amount of the Franchisor's claim.

At the conclusion of the evidentiary hearing, I took all outstanding matters under

advisement.  The Debtors, the Franchisor, and Haymarket each filed a post-trial memorandum on

---

[312] Franchisor's Exs. 7-8.

[313] Franchisor's Ex. 8.

[314] Trial Trans. January 18, 2012 at 31:1-4; 56:21-24.

[315] *Id.* at 57:1-9

[316] *Id.* at 57:18-25; 58:1.

[317] *Id.* at 58:2-9.

January 30, 2012.  Reply briefs followed from the Franchisor on February 1, 2012, the Debtor on February 2, 2012, and Haymarket on February 10, 2012.

*The Transition Agreements*

Haymarket did not actively participate in the trial.  At the close of evidence, however, counsel to Haymarket represented that the Transition Agreements had been finalized, but that neither counsel had a signed copy to put in the record.[318]  Haymarket later attached copies of the Transition Agreements to its reply brief.

In light of the Franchisor's assertion of its right of first refusal, the Transition Agreements have become particularly relevant post-trial.  They are all substantively identical and contain the following recitals:

> 6.    Franchisor has objected to confirmation of the Plan and opposes the assignment.  In its objection, Franchisor opposed the assumption by [the Acquired Entity] of the Franchise Agreement.  *Franchisor retains the right to object to confirmation of the Plan on any ground not inconsistent with its undertakings herein.*
>
> 7.    Franchisor enters into this Transition and Subordination Agreement (the "Agreement") solely to mitigate its damages in the event that the Plan is confirmed over its objection.  *Notwithstanding its entry into the Agreement, Franchisor retains all rights to object to any aspect of the Plan.*  Notwithstanding the foregoing, Franchisor agrees that as part of its opposition to the Plan, it will not object to the ability of the Haymarket Parties to provide adequate assurance of future performance in connection with the currently proposed Plan.
>
> * * *
>
> 11.  In consideration of the mutual promises set forth herein, and other good and valuable consideration, Franchisor consents to [Acquired Entity's] assumption of the Franchise Agreement, Blake Road's ownership of the Membership Interest and [Acquired Entity's] operation of the Location as a Planet Fitness business in accordance with the terms of the Franchise Agreement and as represented, warranted, supplemented and modified herein.[319]

---

[318] *Id.* at 60-62.

[319] Transition Agreement, Docket No. 595 at Exhibit p. 1-2 (emphasis added).

The Transition Agreements further provide that upon the Effective Date, the franchise agreements shall be assumed by the Haymarket Parties and Laird's signature on the franchise agreements will be deemed Robert Buonoto's on behalf of Blake Road.[320]  Additionally, each Acquired Entity agrees to pay the Franchisor a cure amount of $58,336.25, for a total of $233,345.[321]

## III. POSITIONS OF THE PARTIES

In light of my summary of the Fourth Amended Plan and exhaustive recitation of the procedural history of these cases that includes the parties' initial arguments with respect to each individual matter under advisement, the following recapitulation of their respective positions will be limited to the arguments raised in their post-trial memoranda and reply briefs.[322]  Moreover, while the Debtors are the moving parties with respect to the various motions now before me and are the proponents of Fourth Amended Plan, for the sake of clarity, I will address the Franchisor's arguments first.

The Franchisor

In opposition to the assumption of the franchise agreements, and in turn, confirmation of the Fourth Amended Plan, the Franchisor argues that there are irremediable non-monetary defaults under the PF Bost franchise agreement and that, in any event, the Retained Entities have failed to prove they can provide adequate assurance of future performance under the franchise

---

[320] *Id.* at p. 3.

[321] *Id.* at p. 4.

[322] I note that because many of these matters have been dragged along for months leading up to the confirmation hearing and pre-date the Fourth Amended Plan, some of the initial arguments have ultimately been abandoned or rendered moot.  For example, the Omnibus Objection is premised in part on the now repudiated assertion that the franchise agreements were validly terminated prepetition.  As such, the post-trial arguments better articulate and are more reflective of the parties' current positions.  That said, I recognize that there is a distinction between a pre-trial argument having been rendered moot and the assertion of a new argument post-trial.

agreements.  Moreover, the Franchisor asserts that the proposed equity transfer of the Acquired

Entities violates its right of first refusal, triggering a default under the franchise agreement and

precluding assumption.

First, the Franchisor urges me to find that there are "historic—and incurable—non-

monetary defaults" with respect to the PF Bost franchise agreement.[323]  Citing the customer

complaints, the Franchisor contends that:

> [a] reasonable inference may be drawn that 5011 Planet Fitness members who
> cancelled their memberships at PF Bost and 3885 who cancelled their
> memberships at PF Port during these Bankruptcy Cases deserted the Planet
> Fitness franchise in response to perpetually broken fitness machines, unsanitary
> bathrooms, and generally poor maintenance.[324]

The Franchisor goes on to explain that "[t]he harm from these desertions, and the ill will

stemming from the stories these dissatisfied customers tell, is incurable."[325]

Next, the Franchisor insists that the evidence adduced at trial shows both managerial and

financial concerns with respect to the Retained Entities, suggesting that, if assumed, they would

not perform their obligations under the franchise agreements.  The Franchisor declares that West

is unfit to manage the Retained Entities in light of his ignorance of the relevant health

regulations, which it contends resulted in citations against the Mattapan location, and his

disregard of Life Fitness's Capital Leases by transferring property between Debtors without

authorization, which breaches both the Capital Leases and the franchise agreements.

Additionally, the Franchisor maintains that West's tenure as post-petition manager of the

---

[323] Franchisor's Post-Trial Brief, Docket No. 593 at 5.

[324] *Id.* at 6.

[325] *Id.*

Operating Debtors has been marked by severe operational deficiencies as evidenced by the customer complaints and the "massive flood of cancellations."[326]

With respect to PF Port, the Franchisor asserts that there is insufficient evidence that PF Port will remain viable after the Effective Date. The Franchisor argues that PF Port would "teeter on the brink of insolvency following confirmation," because it will only have about $27,000 in cash on hand, which Bloom testified is light, and will only have $1,389 cash on hand by the end of May.[327] Moreover, Jalbert testified at trial that if PF Port were required to pay an additional $12,000 claim, it would go cash flow negative. The Franchisor also contests the financial projections offered by the Debtors because: (1) Bloom has no experience in the fitness industry to predict a relationship between advertising and revenue; (2) Bloom estimated the maintenance figures without knowing how many machines were located at PF Port nor what expenditure was appropriate for annual maintenance; (3) Bloom's estimates of the reorganization costs were not revised since last summer and in the interim the Franchisor has incurred substantial legal fees which must be added to its cure claim in the event that the Debtors can assume the franchise agreements; and (4) Bloom did not update his estimated reorganization costs in light of the protracted litigation throughout the fall and winter. The Franchisor also contends that PF Port's financial uncertainty is an independent ground for denying confirmation under 11 U.S.C. § 1129(a)(11), because the Debtors failed to show that the Fourth Amended Plan is not likely to be followed by either a liquidation or further reorganization.

The Franchisor also takes issue with the Debtors' proposed retention of Erickson as managing director of the Retained Entities and complains that the Debtors have not designated a

---

[326] *Id.* at 9.

[327] *Id.* at 11.

manager of the Managing Owner.  Erickson, who will not own any equity in the Retained Entities, has not completed the Franchisor's managerial training program, is currently employed by another fitness company, and does not satisfy any of the requirements contained within the franchise agreement.  Furthermore, the Franchisor suggests that the Debtors' failure to disclose information regarding the nature of Erickson's concurrent engagement must result in an inference that the other company is a direct competitor of Planet Fitness.

Turning to the ADA, the Franchisor professes that its pre-petition termination is valid, as evidenced by the Debtors' failure to schedule it or object to its claim for damages.  Although Laird testified that he and Grondahl had discussions related to the ADA, his testimony was vague and insufficient to support a finding that the ADA was modified.  In any event, the Franchisor continues, the ADA expressly requires such a modification to be reduced to a writing signed by both parties.  Moreover, because it is a contract that is not performable within one year, the statute of frauds requires it to be memorialized in a writing.  Nevertheless, if I were to find that the ADA was executory on the petition date, the Franchisor argues that the Debtors' failure to meet the development schedule, and inability to do so now, precludes assumption.

Raising an issue not contained within the Objection to Confirmation, the Franchisor asserts that the equity transfer of the Acquired Entities through the Fourth Amended Plan violates its right of first refusal, triggering a default under the franchise agreements and barring assumption.  The Franchisor maintains that this argument was not waived by the Transition Agreements, which expressly state that they were executed "solely to mitigate [the Franchisor's] damages in the event that the Plan is confirmed over its objection.  Notwithstanding its entry into the Agreement, Franchisor retains all rights to object to any aspect of the Plan."[328]   Indeed, in

---

[328] Transition Agreement, Docket No. 595 at Exhibit p. 1.

reply to Haymarket's arguments to the contrary, the Franchisor vehemently declares that "[f]ar from being 'consensual' . . . this proposed equity assignment provides specific grounds for the Franchisor's objection to Plan confirmation.  This objection was not waived."[329]

Apart from its prior objections, the Franchisor insists that the Debtors have failed to meet their burden for confirmation.  While noting the submission of the Rider Affidavit in support of confirmation, the Franchisor points out that such evidence was not offered at trial.  It dismisses the Debtors' contention that a negative inference should be drawn against the Franchisor for not cross-examining him because the burden is on the Debtors to prove the Fourth Amended Plan is confirmable.  The Franchisor asserts that the Debtor did not prove that their settlement with Haymarket is in their business judgment.  Additionally, because the Debtors offered no evidence regarding the amount of Haymarket's claim, it remains pending and undetermined.  Relying on *Jacksonville Airport, Inc. v. Michkeldel, Inc.*,[330] the Franchisor argues that under such circumstances, Haymarket should not be permitted to vote.

Finally, in response to the Debtors' assertion that the Franchisor failed to offer evidence concerning its legal fees at the trial, it maintains that it was under no burden to do so.  The legal fees are part of its cure claim, it argues, and will continue to accrue.

Alternatively, the Franchisor urges me to deny confirmation to the Fourth Amended Plan based solely on basis of "the Debtors' discovery abuses."[331]  In any event, the Franchisor contends that the next step is to appoint a trustee who will promptly sell the locations in

---

[329] Franchisor's Post-Trial Reply Brief, Docket No. 596 at 3-4.

[330] *Jacksonville Airport, Inc. v. Michkeldel, Inc.*, 434 F.3d 729 (4th Cir. 2006).

[331] Franchisor's Post-Trial Brief, Docket No. 593 at 7 n.13, 8, 15 n. 20, 15 n. 30.

accordance with "the plain, clear terms of the Franchise Agreements," undoubtedly referring to its right of first refusal.[332]

<u>The Debtors</u>

The Debtors aver that the Fourth Amended Plan satisfies all the elements of 11 U.S.C. § 1129 and should therefore be confirmed.  In support, the Debtors cite the Rider Affidavit and suggest that his statements are uncontested in light of the Franchisor having chosen not to cross-examine him, noting that such is the usual and customary procedure before this Court.  Although the Debtors have the burden to demonstrate that each of these elements have been met, in the interests of efficiency, I will reserve recitation of their proof for analysis below and focus this summary solely on the Debtors' responses to the Objection to Confirmation.  With this posture, the Debtors argue that the Objection to Confirmation is without merit and should overruled for the following reasons.

The Debtors submit that Erickson is well-qualified to manage Chicago Investments in light of his 20 years of professional experience managing and operating distressed entities. Moreover, they note he has agreed to abide by the franchise agreements and maintain confidential information received by him in the course of his employment, which should alleviate the Franchisor's concerns.   In any event, the Debtors assert that the franchise agreements only require the franchisee to designate a Managing Owner and that the Franchisor is clearly misstating the franchise agreements by requiring the designation of a manager of the Managing Owner.  Here, the Managing Owner was, and remains, Chicago Investments.  As such, they conclude, there simply there is no provision of the franchise agreements requiring the Franchisor's approval of Erickson's engagement on behalf of Chicago Investments.

---

[332] *Id.* at 22.

Similarly, the Debtors contend that the Franchisor's objections to West's qualifications are equally without merit. The Debtors point out that West, who is the current manager of the Operating Debtors, was not questioned as to his substantial experience in the fitness industry. In any case, they argue, the franchise agreements do not give the Franchisor the right to approve internal managers of the franchisees.

The Debtors also stress that there is no evidence of mismanagement or noncompliance with the franchise agreements. To the contrary, the Debtors point to the fact that the Debtors have operated with positive cash flow while under West's management and that Jalbert testified that the Debtors' post-petition operational performance was largely in line with the budgeted amounts. To the extent that the Franchisor relies on customer complaints, the Debtors affirm that they are inadmissible as hearsay and are not substantive evidence of any noncompliance with the franchise agreements. The Debtors maintain that the only substantive evidence offered indicates that West has systems in place for the regular cleaning of each fitness center and that he routinely reviews customer complaints and, if necessary, takes action to resolve any issues. In light of the Franchisor's failure to call any witnesses to rebut West's testimony, they ask that I infer that such a failure indicates witnesses would not support the Franchisor's claims.

The Debtors maintain that they provided substantial expert testimony establishing the feasibility of the Fourth Amended Plan. In support of their assertion, they direct my attention to the following testimony: (1) Bloom testified that, in his expert opinion, the projections were reasonable and included adequate provisions for professional fees, plan payments, and capital expenditures, and therefore was able to conclude that PF Port and PF Bost would have sufficient working capital upon emerging from bankruptcy to continue operations; (2) Jalbert testified that he performed a comparison of the Debtors' budgets to actual performance that revealed the

67

Debtors had a higher cash flow and lower expenses than were budgeted; (3) Jalbert also testified

that he completed a sensitivity analysis on the projections and, like Bloom, opined that PF Port

and PF Bost would have sufficient working capital post-bankruptcy; and (4) Jalbert further

testified that he performed a liquidation analysis and concluded that the creditors would receive

more under the Fourth Amended Plan than they would if the cases were converted to Chapter 7.

In sum, the Debtors urge me to find that in light of these opinions, the projections are reasonable

and the Fourth Amended Plan is feasible.

        In response to the Franchisor's contentions, the Debtors maintain that the Fourth

Amended Plan adequately addresses its claims.  While the Franchisor has repeatedly asserted

that it has a claim for attorney's fees in excess of $400,000 and complains that the Fourth

Amended Plan does not provide for it, the Debtors respond that the Franchisor has offered no

evidence of such expenses, nor has it filed a proof of claim seeking reimbursement of legal fees.

The Debtors emphasize that the only claims filed by the Franchisor are for damages stemming

from the rejection of the franchise agreements, which are not recoverable in light of the Debtors'

intention to assume them.  Moreover, the Debtor assert that attorney's fees would not in any

event be recoverable under the franchise agreements because they only allow for the recovery of

legal fees "in defense of any claim" or associated with the Debtors' "failure to pay or otherwise

comply" with the franchise agreements, neither of which are applicable here.  Because the only

cure costs claimed by the Franchisor are the prepetition fees owed by the individual Debtors in

the amount of $71,556.67, they contend that the Retained Entities portion should be no more

than $36,414.62.

        For roughly the same reasons, the Debtors argue that the Fourth Amended Plan does not

improperly classify the claims of creditors and the Franchisor's allegation is unfounded.  Again,

the Debtors repeat their objection to the legal fee component of the Franchisor's cure claim, both because it is unwarranted and because it is unsupported, and assert that the aggregate cure amount is only $56,024, which will be paid on the Effective Date.  In the event that the franchise agreements are rejected, the Franchisor will have a Class 6 nonpriority unsecured claim for rejection damages.  Additionally, the Debtors contend that in the event that rejection occurs and generates member claims, such claims would be minimal and not materially impact confirmation.

Turning to the proposed releases, the Debtors explain that the release provisions are limited to: (1) a release of claims against the Debtors by their creditors, other than to enforce the terms of the Fourth Amended Plan; (2) a specific release by Haymarket and its related parties of their claims against the Retained Entities and their principals arising from or related to their operations, the Chapter 11 cases, or any cause of action generally; and (3) a release by the Retained Entities and their related parties of claims against Haymarket and its related parties.  Citing *In re Mahoney Hawkes, LLP*,[333] the Debtors contend that these are not the type of third-party, non-debtor releases that have been proscribed by bankruptcy courts.  They further note that the United States Trustee has not objected to the Fourth Amended Plan's release provisions.

With respect to the ADA, the Debtors dispute that it was terminated prepetition, and insist that it is subject to assumption on modified terms.  Citing New Hampshire law, they contend that an express provision in a written contract stating that no rescission or variation shall be valid unless it too is in writing is ineffective to invalidate a subsequent oral agreement to the contrary.[334]  The Debtors rely on Laird's unrebutted testimony regarding his discussions and

---

[333] *In re Mahoney Hawkes, LLP*, 289 B.R. 285 (Bankr. D. Mass. 2002).

[334] *Cin-Doo, Inc. v. 7-Eleven, Inc.*, No. Civ.04-CV-50-SM, 2005 WL 768592 *4 (D.N.H. April 6, 2005) (*citing Prime Fin. Group, Inc. v. Masters*, 141 N.H. 33, 37, 676 A.2d 528 (1996)).

alleged oral agreement with Grondahl to evince that the defaults under the ADA development schedule were waived by the Franchisor and the agreement modified.  Again, the Debtors request that I draw a negative inference based upon the Franchisor's failure to call Grondahl to testify. In any event, the Debtors aver that the December notice of termination is objective evidence that the Franchisor waived the prior default and/or believed that the ADA was still in effect.  With that in mind, they contend that the December notice was ineffective to terminate the ADA because it was based on an alleged termination of the franchise agreements that the Franchisor has since acknowledged to have been invalid.

Because the Franchisor has conceded that the franchise agreements were not validly terminated prepetition, the Debtors posit that they are executory and may be assumed pursuant to 11 U.S.C. § 365(b).  Indeed, they note that all that is required under that section is for the debtor to cure all defaults under the contract, compensate the counterparty for actual pecuniary losses resulting from the defaults, and provide adequate assurance of future performance.  Moreover, the Debtors explain that 11 U.S.C. § 365(f) renders unenforceable provisions that would otherwise prevent the estate from maximizing value.  They further assert that the franchise agreements are neither a special category of executory contracts nor personal service contracts that are exempt from the anti-assignment provisions.  The Debtors rely on *In re Mr. Grocer, Inc.*[335] for the proposition that rights of first refusal are precisely the type of restriction that 11 U.S.C. § 365(f)(1) renders unenforceable because "it would preclude the bankruptcy estate from realizing the intrinsic value of its assets."[336]  Even if the right of first refusal is enforceable, the Debtors argue that the Franchisor has failed to exercise it.  Nevertheless, if I find that such a right

---

[335] *In re Mr. Grocer, Inc.*, 77 B.R. 349 (Bankr. D.N.H. 1987).

[336] *Id.* at 354.

has been preserved, the Debtors invite the Franchisor to step into the shoes of the Haymarket designee.

In the event that I find that the franchise agreements cannot be assumed, the Debtors affirm that the Fourth Amended Plan can nevertheless be confirmed based upon its alternate asset transfer provisions.

<u>Haymarket</u>

Haymarket generally supports confirmation of the Fourth Amended Plan.  In its initial brief, Haymarket stated:

> As to the four plans calling for a transfer to Haymarket, there is no controversy as to confirmation, the sole objection to confirmation filed by [the Franchisor] having been resolved in accordance with the terms of the Transition and Subordination Agreements.  Therefore, Haymarket submits that the plans of reorganization of PF Mald, PF Matt, PF Chel and PF Wobu should be confirmed, no matter what the disposition as to the other four debtors.[337]

In support, Haymarket noted that the assumption provisions of the Fourth Amended Plan do not require uniformity between the Acquired Entities and the Retained Entities, such that "the Acquired Entities could remain Planet Fitness operations while the Retained Entities switch," or vice versa.[338]  Moreover, Haymarket contended that the Objection to Confirmation was primarily aimed at the Retained Entities' ability to provide adequate assurance of future performance, which is not an issue with respect to the Acquired Entities in light of the Transition Agreements.

Although Haymarket believed there to be no assertion that the Acquired Entities have not satisfied the requirements of 11 U.S.C. § 1129, out of an abundance of caution, it addressed certain points relating to the compliance of the Acquired Entities that were resolved by the

---

[337] Post-Trial Brief of Haymarket Capital in Support of Confirmation of Fourth Amended Joint Plan of Reorganization of Chicago Investments, LLC, PF Group, LLC, PF Bost, LLC, PF Chel, LLC, PF Mald, LLC, PF Matt, LLC, PF Port, LLC and PF Wobu, LLC ("Haymarket's Post-Trial Brief"), Docket No. 595 at 1-2.

[338] *Id.* at 4.

Transition Agreements.[339]    Two points, however, were not resolved by the Transition

Agreements and bear mention.  First, with respect to the best interests of creditors requirement of

11 U.S.C. § 1129(a)(7), Haymarket averred that the evidence adduced at trial indicated that, as to

the Acquired Entities, the conversion of Haymarket's $9,500,000 claims, which are asserted to

be senior secured claims, to cash flow only obligations subordinated in payment right to all other

debt in addition to a $300,000 capital reserve provided under the Transition Agreements is

undoubtedly better for creditors than a liquidation.  Second, Haymarket argued that the releases

provided for in the Fourth Amended Plan are well within the scope of the *In re Quincy Med.*

*Ctr., Inc.* decision because they only apply to the Acquired Entities, their post-confirmation

principals, the Retained Entities, and their principals.

   After the filing of the Franchisor's Post-Trial Brief in which it asserts that its right of first

refusal precludes assumption of the franchise agreements and, in turn, confirmation, Haymarket

filed a reply brief remonstrating the Franchisor's position as untenable for several reasons.  To

start, Haymarket insists that the Transition Agreement bars the assertion of the Franchisor's right

of first refusal.   While the Transition Agreement provides that the "Franchisor retains all rights

to object to any aspect of the Plan," as the Franchisor argues, Haymarket retorts that such rights

are expressly qualified by stating the "Franchisor retains the right to object to confirmation of the

Plan on any ground not inconsistent with its undertakings herein."[340]  Haymarket asserts that a

right of first refusal cannot be reconciled with the provisions of the Transition Agreement

because the Franchisor expressly consented to the Acquired Entities' assumption of the franchise

agreements.  Moreover, even if there were an inconsistency between the reservation of rights and

---

[339] Because these issues have been resolved, I will reserve discussion of them for my confirmation analysis.

[340] Transition Agreement, Docket No. 595 at Exhibit p. 1.

the Franchisor's express consent, Haymarket rejoins that the more general reservation of rights

cannot override the more specific provisions expressly granting consent.

Haymarket further posits that even if the right of first refusal is otherwise enforceable, it

does not trump the fiduciary obligation of the estate to its creditors.  Relying on *In re Mr.*

*Grocer, Inc.*[341] and *In re Adelphia Commc'ns Corp.*,[342] Haymarket stresses that I should not give

effect to such a restrictive provision where doing so would materially impair the ability of the

estate to maximize value for its creditors when marketing its assets, including the executory

contract.  To do so, it argues, would be the ultimate value deprivation mechanism, effectively

preventing the Acquired Entities from realizing any value from their assets.  Indeed, Haymarket

takes great issue with the fact that the Franchisor has not even asserted that it is exercising its

right of first refusal, but only that its unexercised right is enough to preclude confirmation.

Nevertheless, to the extent that Franchisor's right of first refusal is enforceable

notwithstanding 11 U.S.C. § 365(f), Haymarket urges that all it has is a right to match, not veto,

the terms of the transfer.  Additionally, because the franchise agreements require the Franchisor

to exercise the right within thirty days of receiving a copy of the offer, Haymarket contends its

duty to express interest was triggered by the Fourth Amended Plan, which contains the terms of

the transaction in question.  As such, the Franchisor should have indicated that it intended to

exercise its right of first refusal before the confirmation hearing.

In conclusion, Haymarket states:

> The expiration of the applicable time notwithstanding, if the Franchisor would
> like to match Haymarket's agreement to acquire the Acquired Entities for
> approximately $11,000,000.00, Haymarket will stand aside.

---

[341] *In re Mr. Grocer, Inc.*, 77 B.R. at 355.

[342] *In re Adelphia Commc'ns Corp.*, 359 B.R. 65, 86-87 (Bankr. S.D.N.Y. 2007).

Under the Plan, all creditors are to receive full payment. The Acquired Entities take on the responsibility of satisfying all of the Haymarket debt, no matter by which of the Debtors that debt was incurred. That claim is approximately $9.5 million. In addition, were the Franchisor to step into the role of acquirer, it must also satisfy (i) the DanversBank debt, stated in the Disclosure Statement to be $545,000 plus accrued legal fees, (ii) in excess of $300,000 in arrearages due to Life Fitness, (iii) approximately $33,375 to the Class 8 creditor, (iv) approximately $225,000 in general unsecured claims, and (v) an estimated $100,000 in unsatisfied administrative claims. If the Franchisor would like to step into the position of acquirer and match the offer, including paying Haymarket in full, Haymarket will gladly accommodate that request.[343]

Haymarket notes, however, that it "has undertaken to finance the repayment of its debt under the Plan," but "[i]t has not undertaken to provide that financing to anybody else."[344]

## IV. DISCUSSION

In the introductory paragraph to this decision, I characterized the present dispute as "an acrimonious battle" for the future of six fitness centers.  While the Debtors have never been afraid to jump into the fray, and indeed, have by necessity fought longer and harder than any other party, the true combatants, despite periods of relative détente, are the Franchisor and Haymarket.  Based upon Laird's testimony, it appears that both have been vying for greater control of the Operating Debtors in one way or another since the inception of the franchise agreements.[345]  It is also not lost on me that the proposed settlement between the Debtors and Haymarket mirrors the structure of the original Winged Foot arrangement that the Franchisor rejected prior to the opening of the Woburn franchise.[346]

---

[343] Post-Trial Reply Brief of Haymarket Capital in Further Support of Confirmation of Fourth Amended Joint Plan of Reorganization of Chicago Investments, LLC, PF Group, LLC, PF Bost, LLC, PF Chel, LLC, PF Mald, LLC, PF Matt, LLC, PF Port, LLC and PF Wobu, LLC ("Haymarket's Reply"),  Docket No. 610 at 12.

[344] *Id.* at n. 10.

[345] Trial Trans. January 17, 2012 at 23-25; 36; 56.

[346] *Id.* at 40:1-14.

From the outset, I recognize that there is a recurring theme in the Franchisor's papers, namely, that confirmation should be denied solely based on the Debtors' alleged discovery abuses.[347]  This reprises a chorus that I repeatedly rejected during the course of trial.  By August 2011, the parties were well aware that an evidentiary hearing was likely necessary and, by the Franchisor's own admission, began serving discovery.[348]  Indeed, the ultimate trial dates were scheduled on September 26, 2011, nearly four months in advance.  Nonetheless, the Franchisor professes that the Debtors' compliance with the discovery rules "has been nonexistent."[349]  Rather than "burdening this court with motions to compel discovery," the Franchisor made the conscious decision to reserve its complaints for trial.[350]  To be clear, this was not an appropriate strategy.[351]  Over 3,000 cases are pending before me and I cannot countenance the clear indifference to my busy calendar represented by a last minute assertion of alleged discovery violations that would essentially prevent a two-day trial on plan confirmation that was scheduled four months earlier from moving forward, particularly in light of the possible prejudice to both the Debtors and other creditors occasioned by the delay of its reorganization.  The Franchisor recognized its proper remedy and declined to exercise it.  Therefore, any discovery abuses were waived.[352]

---

[347] *See* Franchisor's Post-Trial Brief, Docket No. 593 at 7 n.13, 8, 15 n. 20, 15 n. 30.

[348] Trial Trans. January 17, 2012 at 12:8-10.

[349] *Id.* at 12:21.

[350] *Id.* at 12:23-25; 13:1-8.

[351] *See,e.g., Joy Global, Inc. v. Wisconsin Dep't of Workforce Dev. (In re Joy Global, Inc.)*, 423 B.R. 445, 453-454 (D. Del. 2010) ("These are discovery disputes that should have been (and to some extent were) raised and resolved during discovery. The Court will not devote the time reserved for trial on the merits of the tortious interference claim to discovery disputes.").

[352] I am further reminded of the now famous plea made by Judge Wayne E. Alley of the United States District Court for the Western District of Oklahoma over twenty-three years ago:

Returning to more deserving matters, I note that despite how complex and convoluted the matters now before me are, everything boils down to some fairly simple facts that help guide my analysis. First, even before addressing the merits of the Debtors' proposed settlement with Haymarket, it is beyond question that there is no Fourth Amended Plan without it.[353]  Second, the unrebutted expert testimony reflects that the creditors are better off under the Fourth Amended Plan, where they would receive payment in full, than they would be in a Chapter 7 liquidation.[354]  Nevertheless, it is the Franchisor's stated desire to have a trustee appointed and the assets sold. To understand the logic of the Franchisor's position, one must consider how the various issues overlap, with a particular focus on the Franchisor's assertion of a right of first refusal, the Franchisor's Objection to Haymarket Claims, and the Debtors' proposed settlement with Haymarket.

Fundamentally, the Franchisor has an unsecured claim, the value of which is somewhat dependent on the Franchisor's ability to assert its right of first refusal. If the right of first refusal is unenforceable, as both the Debtors and Haymarket assert, the Franchisor's claim is limited to its cure costs. If, however, the right of first refusal is enforceable, it would have the following collateral effects on the Debtors' reorganization.

First, if the Debtors are failing to honor the right of first refusal, the franchise agreements cannot be assumed, entitling the Franchisor to rejection damages. While the Debtors contend

---

If there is a hell to which disputatious, uncivil, vituperative lawyers go, let it be one in which the damned are eternally locked in discovery disputes with other lawyers of equally repugnant attributes.

*Dahl v. City of Huntington Beach*, 84 F.3d 363, 364 (9th Cir. 1996) (*quoting Krueger v. Pelican Prod. Corp.*, No. CIV-87-2385-A (W.D. Okla. Feb. 24, 1989)).

[353] Based upon the record before me, one could reasonably argue any effective reorganization without Haymarket's cooperation is doubtful.

[354] Trial Trans. January 17, 2012 at 125:25; 126:1-17.

that such rejection damages would be *de minimis*, it nonetheless represents a notable increase to the Franchisor's claim.

Second, the Franchisor has taken the position that without the franchise agreements, the Fourth Amended Plan is unconfirmable, and I am forced to agree. While the Debtors have done a yeoman's job developing a "Plan B," whereby some or all of the Operating Debtors would be de-branded and continue as fitness centers that are unaffiliated with Planet Fitness, I find that the expert testimony does not demonstrate that such an alternative satisfies the feasibility requirement of 11 U.S.C. § 1129(a)(11).[355] Bloom testified that the Debtors' financial projections are based upon the present branding of the fitness centers and that roughly the same cost structure would apply once de-branded, but he could not form an opinion regarding the impact to their potential revenue.[356] Admittedly, the Debtors "are not required to guarantee the success of their plans,"[357] but the Fourth Amended Plan is dependent on their cash stream. The Debtors simply have not carried their burden with respect to this alternative. Accordingly, the reorganization would be jeopardized by the added delay and, if the Franchisor had its way, the increased expense of a trustee.

Third, if the Franchisor is able to exercise its right of first refusal, it will be able to match the deal offered by Haymarket. Arguably, this could, as will be discussed further below, enable the Franchisor to object to Haymarket's claim because its rights, specifically, the right of first

---

[355] Section 1129(a)(11) provides that "[t]he court shall confirm a plan only if . . . [c]onfirmation of the plan is not likely to be followed by the liquidation, or the need for further financial reorganization, of the debtor or any successor to the debtor under the plan, unless such liquidation or reorganization is proposed in the plan." 11 U.S.C. § 1129(a)(11).

[356] Trial Trans. January 17, 2012 at 112:9-21

[357] *In re SW Boston Hotel Venture, LLC*, 460 B.R. 38, 65 (Bankr. D. Mass. 2011) (*citing Gen. Elec. Credit Equities, Inc. v. Brice Road Devs., LLC (In re Brice Road Devs., LLC)*, 392 B.R. 274, 283 (B.A.P. 6th Cir. 2008)).

refusal, would be directly impacted by the amount of Haymarket's claim.[358]   Indeed, the

Franchisor has a greater interest in the possible reduction of Haymarket's claim than any other

creditor because the claim's value would ultimately affect the value of the offer the Franchisor

would need to match under the proposed settlement.   The downside is that, given the parties'

attitudes throughout the history of this case, litigating Haymarket's claim would substantially

increase costs.   Also, let us not forget that both Haymarket and the Franchisor, at least allegedly,

are litigating on the Debtors' dime.   If Haymarket's claim increases, it might no longer be

inclined to offer the same deal to the Debtors.   On the other hand, if Haymarket's claim is not

worth at least $8,500,000, as it is valued in the Fourth Amended Plan, the proposed settlement is

likely not in the best interests of the estate and, again, the reorganization as contemplated is dead.

I further note that in light of the potential for increased claims, either the Franchisor or

Haymarket, but not both, are likely the only parties who would benefit from such litigation.

   With that all in mind, it is easy to see how the Franchisor's right of first refusal could be

conclusive to both the Fourth Amended Plan and the Debtors' prospects for an effective

reorganization.   For that reason, I will begin my analysis with whether such a right is

enforceable.[359]

---

[358] *See In re Micro-Precision Technologies, Inc.*, 303 B.R. 238, 244 (Bankr. D.N.H. 2003) (creditor in Chapter 11 case could object to the claim of another creditor where its rights were directly implicated by the claim); *but see In re Dow Corning Corp.*, 244 B.R. 721, 751 (Bankr. E.D. Mich. 1999), *rev'd on other grounds*, 255 B.R. 445 (E.D. Mich. 2000), *aff'd*, 280 F.3d 648 (6th Cir. 2002) (finding no useful purpose served by allowing a creditor to pursue objection after the Chapter 11 debtor has already objected).

[359] Although I have endeavored to unravel the intertwined issues raised by the Franchisor's assertion of a right of first refusal, the Franchisor's Objection to Haymarket Claims, and the Debtors' proposed settlement with Haymarket so that I might present a clear and coherent analysis, I note standards for each of these issues, as will be discussed below, all come down to some variation on the same question—what course of action maximizes value for the estate and is in the best interests of creditors?  Therefore, even if I were to consider the issues simultaneously, or in a different order, the result would be the same.

A.  Enforceability of the Franchisor's Right of First Refusal[360]

The first step in determining whether the Franchisor has an enforceable right of first refusal is to look to the franchise agreements.  The parties do not dispute that the proposed equity transfer to the Acquirer constitutes a "transfer" within the meaning of the franchise agreements.[361]  Section 14.8 of the franchise agreements provides that any *bona fide* offer to transfer the franchise entitles the Franchisor "to purchase such interest for the price and on the terms and conditions contained in such *bona fide* offer" if "exercise[ed] by written notice . . . within thirty (30) days" of receiving notice of the offer.[362]  In light of these provisions, the Franchisor takes the position that it "must be granted the opportunity to exercise its right of first refusal to purchase the [Acquired Entities] before the Debtors may affect such a transfer."[363]

While I do not entirely agree with Haymarket that this is a "newly minted position,"[364] I will concede that the Franchisor has been less than crystal clear.  In the Objection to Confirmation, the Franchisor did not object to the transfer on the grounds that it violated its right of first refusal, but did request "a finding that the transfer of the Acquired Entities constitutes a transfer pursuant to Section 14 of the Franchise Agreements and that the Franchisor's rights thereunder are preserved."[365]  Indeed, it was not until after the trial that the Franchisor expressly opposed the transfer on this basis.  To the extent that the Objection to Confirmation was filed

---

[360] This section addresses only whether the Franchisor has an enforceable right of first refusal under the franchise agreements.  Whether the franchise agreements are capable of assumption will be discussed below.

[361] Debtors' Exs. 2-7 at ¶ 1.4.

[362] *Id.* at ¶ 14.8.

[363] Franchisor's Post-Trial Brief, Docket No. 593 at 20.

[364] Haymarket's Reply, Docket No. 610 at 2.

[365] Objection to Confirmation, Docket No. 568 at 11.

exactly one week before the trial and three days before the Transition Agreements were

executed, the Franchisor's lack of forthrightness is suspect.   Regardless, both the Debtors and

Haymarket oppose the enforcement of the right of first refusal on three grounds: (1) it was

waived under the Transition Agreements;[366] (2) its enforcement is legally barred under 11 U.S.C.

§ 365(f)(1); and (3) the Franchisor never exercised it.

The Franchisor maintains that its objection to confirmation on the basis that it violates its

right of first refusal was preserved under the Transition Agreements.   In support, it cites

paragraph 7, which provides:

> Franchisor enters into this Transition and Subordination Agreement (the
> "Agreement") *solely to mitigate its damages in the event that the Plan is
> confirmed over its objection.   Notwithstanding its entry into the Agreement,
> Franchisor retains all rights to object to any aspect of the Plan.*   Notwithstanding
> the foregoing, Franchisor agrees that as part of its opposition to the Plan, it will
> not object to the ability of the Haymarket Parties to provide adequate assurance of
> future performance in connection with the currently proposed Plan.[367]

In contrast, Haymarket asserts that the preceding paragraph expressly qualifies the Franchisor's

reservation of rights:

> Franchisor has objected to confirmation of the Plan and opposes the assignment.
> In its objection, Franchisor opposed the assumption by [the Acquired Entity] of
> the Franchise Agreement.   *Franchisor retains the right to object to confirmation
> of the Plan on any ground not inconsistent with its undertakings herein*.[368]

Accordingly, Haymarket argues that the Franchisor's assertion of its right of first refusal is

inconsistent with the express consent to transfers contained in paragraph 11 of each Transition

Agreement:

---

[366] This, of course, only applies to the Acquired Entities.

[367] Transition Agreement, Docket No. 595 at Exhibit p. 1-2 (emphasis added).

[368] *Id.* at 1 (emphasis added).

In consideration of the mutual promises set forth herein, and other good and valuable consideration, *Franchisor consents to [Acquired Entity's] assumption of the Franchise Agreement, Blake Road's ownership of the Membership Interest* and [Acquired Entity's] operation of the Location as a Planet Fitness business in accordance with the terms of the Franchise Agreement and as represented, warranted, supplemented and modified herein.[369]

My first impression of the Transition Agreements is that if the Franchisor had intended to reserve the right it now seeks to assert, I would have expected the reservation of rights provisions to more expressly reference the right of first refusal or the grounds upon which the Franchisor could oppose the transfer.  I concur with Haymarket that the broad reservation of rights in paragraph 7, namely, the right to object to *any* aspect of the Plan, is certainly qualified by paragraph 6, which limits the reservation to "any ground not inconsistent with [the Franchisor's] undertakings herein."[370]   Therefore, the question is whether the Franchisor's objection is truly inconsistent with the Transition Agreements.

Ultimately, I think yes.  To be sure, the question is a close one, but the Franchisor's position, though hardly articulated with any specificity in its briefs, cannot be reconciled with the unconditional grant of consent to the transfer to the Acquirer and to assumption of the franchise agreements by the Acquired Entities contained in paragraph 11.[371]   The last sentence of paragraph 7 seems to try to limit the Franchisor's waiver to "the ability of the Haymarket Parties to provide adequate assurance of future performance in connection with the currently proposed Plan,"[372]  but, as I have said, paragraph 6 is much broader than that.  Moreover, the first sentence

---

[369] *Id.* at 2 (emphasis added).

[370] *Id.* at 1.

[371] Surprisingly, the Franchisor does not even address paragraphs 6 and 11, but simply relies on paragraph 7.  As such, it offers no explanation how its opposition to the transfer can be reconciled with the unconditional grant of consent.

[372] Transition Agreement, Docket No. 595 at Exhibit p. 2.

of paragraph 7 only prefaces that the Franchisor is entering into the Transition Agreements to mitigate its damages in the event that the Fourth Amended Plan is confirmed over its objection, but does not place a condition on the agreement. In contrast, the remainder of the operative provisions of the Transition Agreements are expressly conditioned by the fact they take effect on the Effective Date. Therefore, I find that the Franchisor has waived his objection with respect to the Acquired Entities.

That, of course, does not help the Debtors, who are not a party to the Transition Agreements. As such, I turn to the question of whether there is a legal impediment to the Franchisor's assertion of a right of first refusal. Section 365(f)(1) of the Bankruptcy Code provides in relevant part:

> [N]otwithstanding a provision in an executory contract or unexpired lease of the debtor, or in applicable law, that prohibits, restricts, or conditions the assignment of such contract or lease, the trustee may assign such contract or lease under paragraph (2) of this subsection.[373]

Notably, the statutory language is disjunctive, indicating that a contract provision that restricts or conditions assignment, even if it falls short of prohibiting it, is nonetheless unenforceable.[374]

> As recognized by Judge Gerber in *In re Adelphia Commc'ns Corp.*:

> The seminal case invalidating rights of first refusal under section 365(f)(1) is *Mr. Grocer*, where Judge Yacos invalidated a landlord's right of first refusal in connection with the proposed sale of a supermarket business, and the associated assignment of a supermarket lease.[375]

In *In re Mr. Grocer*, Judge Yacos, relying on the plain language of the statute, concluded that:

> It is hard to imagine any restriction or condition upon assignment of a lease more clearly within the legislative language than a lease provision which not only

---

[373] 11 U.S.C. § 365(f)(1).

[374] *In re Mr. Grocer*, 77 B.R. at 352.

[375] *In re Adelphia Commc'n Corp.*, 359 B.R. at 86.

directly refers to assignment of the lease, but also further provides that any
assignment is conditioned upon the landlord first having a right of first refusal to
take the leasehold interest away from the prospective assignee.[376]

Nevertheless, Judge Yacos went on to analyze the practical effect such provisions.[377]   He first

considered the chilling effect that a right of first refusal would have on obtaining bids, noting

that a landlord's ability to take away an assignment at the same price would discourage

prospective assignees from making the effort to place an initial bid in the first place.[378]   Judge

Yacos then addressed the complexity involved in measuring the purchase price when the lease is

but a portion of the "package sale," thus requiring additional proceedings to determine the proper

allocation of consideration.[379]   Indeed, he reasoned:

> To require prospective bidders to engage in such additional litigation, or to re-cast
> their offers in a form convenient to the landlord but perhaps undesirable to them
> for tax or other reasons, will simply add to the obstacles trustees and debtors face
> in getting competitive bidding for their assets.[380]

In closing, Judge Yacos held that:

> [A]part from the plain statutory language determination above, I would conclude
> that the case law interpreting § 365(f)(1) of the Bankruptcy Code establishes that
> the court does retain some discretion in determining that lease provisions, which
> are not themselves *ipso facto* anti-assignment clauses, may still be refused
> enforcement in a bankruptcy context in which there is no substantial economic
> detriment to the landlord shown, and in which *enforcement would preclude the
> bankruptcy estate from realizing the intrinsic value of its assets*.[381]

---

[376] *In re Mr. Grocer*, 77 B.R. at 352.

[377] *Id.* at 353.

[378] *Id.*

[379] *Id.*

[380] *Id.*

[381] *Id.* at 354 (emphasis added).

83

Although most courts have rejected a *per se* rule against the enforcement of contract provisions which simply restrict or condition assignment in favor of a "facts and circumstances" test, Judge Yacos's observations and, in particular, his closing words, have become the standard by which rights of first refusal are gauged.[382]   As succinctly articulated by the court in *In re E-Z Serve Convenience Stores, Inc.*:

> A court must examine the particular facts and circumstances of the transaction to determine whether a lease clause restricts or conditions assignment including the extent to which the provision hampers a debtor's ability to assign, whether the provision would prevent the bankruptcy estate from realizing the full value of its assets, and the economic detriment to the non-debtor party.[383]

Because the test is a discretionary one based on the facts and circumstances, it is appropriate to consider the Debtors' and Haymarket's final point, namely, that the Franchisor failed to exercise the right of first refusal, in conjunction with my analysis of whether there is a legal impediment to its enforcement.

It is undisputed that the Franchisor has not exercised, or otherwise given notice of its intent to exercise, its right of first refusal.  Both the Debtor and Haymarket opine that the Fourth Amended Plan, which contains the terms of the transfer, triggered the Franchisor's obligation to give notice of its intent within thirty days.[384]   While the Franchisor has not addressed this point, I suspect that its position is that it has yet to receive a copy of a "*bona fide* offer" that complies with the provisions of the franchise agreements, which requires, among other things, the purchase price to be denominated in a dollar amount and be separate from any contemporaneous

---

[382] *See In re Adelphia Commc'ns Corp.*, 359 B.R. at 86; *Hannaford Bros. Co. v. In re Ames Dept. Stores, Inc. (In re Ames Dept. Stores, Inc.)*, 316 B.R. 772, 794-795 (Bankr. S.D.N.Y. 2004); *Northrop Grumman Tech. Servs., Inc. v. The Shaw Group Inc. (In re IT Group, Inc., Co.)*, 302 B.R. 483, 488 (D. Del. 2003); *In re E-Z Serve Convenience Stores, Inc.*, 289 B.R. 45 (Bankr. M.D.N.C. 2003).

[383] *In re E-Z Serve Convenience Stores, Inc.*, 289 B.R. at 50. *See In re Adelphia Commc'ns Corp.*, 359 B.R. at 86; *In re Ames Dept. Stores, Inc.*, 316 B.R. at 795.

[384] *See* Debtors' Exs. 2-7 at ¶ 14.8.

offers for other interests.[385]  If so, this runs straight into one of the problems identified by Judge Yacos: "[t]o require prospective bidders . . . to re-cast their offers in a form convenient to the [counterparty] . . . will simply add to the obstacles . . . debtors face in getting competitive bidding for their assets."[386]

More troubling is the fact that the Franchisor is merely *asserting* its right of first refusal to prevent assumption of the franchise agreements and confirmation of the Fourth Amended Plan without any clear indication that it actually wants to step into the shoes of the Acquirer.  What is worse is that the right was not even unambiguously asserted in the Objection to Confirmation. Indeed, it is apparent that Haymarket was particularly caught off guard, believing the Franchisor's opposition to the transfer had been resolved by the Transition Agreements.  Such a late assertion of the right of first refusal weighs strongly against enforcement, as it not only interferes with the Debtors' ability to assign its interests, but now threatens to derail the reorganization as a whole.

Moreover, the Franchisor almost certainly does not want to consummate the Fourth Amended Plan in the Acquirer's place—it wants to renegotiate the deal.  This is evidenced by the Franchisor's Objection to Haymarket's Claims.  Essentially, the Franchisor seeks to assert its right of first refusal to establish a personal stake in the resolution of the Haymarket claim, allowing it to object in hopes of reducing the price so that it may later exercise the right.  This, however, is not the right that the Franchisor holds.  It has, at best, the right to match the current offer.  Again, the manner in which the Franchisor asserts its right of first refusal militates against enforcement.

---

[385] *Id.* at ¶ 14.7

[386] *In re Mr. Grocer*, 77 B.R. at 353.

While the proposed settlement is not a bid in the traditional sense, I do find that the assertion of the Franchisor's right of first refusal would likely "chill" the prospects of a consensual resolution of Haymarket's claim. That, of course, is precisely what the Franchisor is seeking to accomplish. As discussed above, given the costs involved, it is difficult to imagine how litigating Haymarket's claim would benefit anyone. In this way, the Franchisor's assertion of the right of first refusal is aimed at preventing the estate from realizing the full value of the proposed settlement with the Debtors' largest secured creditor.

Finally, I find that the Franchisor would suffer no economic detriment if I declined to enforce its right of first refusal. The Franchisor, like all other creditors under the Fourth Amended Plan, will be paid in full and because the franchise agreements will be assumed, the Franchisor will continue to receive royalties and marketing contributions. Granted, the Franchisor could, at least theoretically, increase the value of its claim if the right of first refusal were enforced, but this missed opportunity does not amount to a detriment. Indeed, I am reminded of the old adage that "pigs get fat, but hogs get slaughtered."[387]

Nevertheless, I recognize that Haymarket has stated that it "gladly accommodate" the Franchisor if it wishes to step into the position of the Acquirer on the same terms.[388] To the extent that Haymarket consents, all these concerns are rendered moot because confirmation can move forward. Therefore, I find that the Franchisor's right of first refusal is unenforceable pursuant to 11 U.S.C. § 365(f)(1) unless the Franchisor consummates the Fourth Amended Plan on the Effective Date in Acquirer's place and on the same terms.[389]

---

[387] *See, e.g., In re Mains*, 451 B.R. 428, 436 (Bankr. W.D. Mich. 2011); *In re Spruch*, 410 B.R. 839, 844 (Bankr. S.D. Ind. 2008); *In re Williams*, 394 B.R. 550, 573 (Bankr. D. Colo. 2008).

[388] Haymarket's Reply, Docket No. 310 at 12.

[389] This includes the responsibility of satisfying all the Haymarket debt.

B.  The Franchisor's Objection to Haymarket's Claim

Generally, 11 U.S.C. § 502(a) provides that "[a] claim . . . is deemed allowed, unless a party in interest . . . objects."[390]  Section 1109(b) expressly provides that a creditor is a party in interest.[391]  That, however, does not end the inquiry.

Pursuant to 11 U.S.C. § 1107(a), a Chapter 11 debtor-in-possession has, subject to certain exceptions not relevant here, the powers and duties of a Chapter 11 trustee.[392]  Section 1106(a)(1) states that a Chapter 11 "trustee shall--perform the duties of the trustee, as specified in . . . [11 U.S.C. § 704(a)(5)],"[393] which in turn directs a Chapter 7 trustee to, "if a purpose would be served, examine proofs of claims and object to the allowance of any claim that is improper."[394]  With respect to creditors filing claim objections in Chapter 7 cases, the United States Court of Appeals for the First Circuit has held:

Nevertheless,

"the needs of orderly and expeditious administration do not permit the full and unfettered exercise of [a creditor's] right to object to the allowance of another creditor's claim. The most important qualification attached to the right of a creditor to object is that it is the trustee who acts as the spokesman for all the creditors in

---

[390] 11 U.S.C. § 502(a).

[391] 11 U.S.C. § 1129(b).

[392] Section 1107(a) provides:

Subject to any limitations on a trustee serving in a case under this chapter, and to such limitations or conditions as the court prescribes, a debtor in possession shall have all the rights, other than the right to compensation under section 330 of this title, and powers, and shall perform all the functions and duties, except the duties specified in sections 1106(a)(2), (3), and (4) of this title, of a trustee serving in a case under this chapter.

11 U.S.C. § 1107(a).

[393] 11 U.S.C. § 1106(a)(1).

[394] 11 U.S.C. § 704(a)(5).

> discharge of the trustee's duty unless the trustee *refuses to take action*."

*In re Morrison*, 69 B.R. 586, 589 n. 6 (Bankr. E.D. Pa.1987) (emphasis added) . . . .

> As a general rule, absent leave of court, the chapter 7 trustee alone may interpose objections to proofs of claim. Leave to object is not generally accorded an individual creditor unless the chapter 7 trustee refuses to object, notwithstanding a request to do so, and the bankruptcy court permits the creditor to object in the trustee's stead.[395]

In addition to the requirement of having to make a demand upon the trustee, courts in this district have recognized that "the objecting creditor must also establish that if the proof of claim were sustained, there would be some benefit to the estate.[396]

Nonetheless, courts have been reluctant to give a Chapter 11 debtor-in-possession the same deference, noting "the distinction between a trustee and a debtor, 'evidenced by the potential for divergence of interest between a debtor in possession and a trustee in representing creditors.'"[397]  As explained by the court in *In re Charter Co.*:

> To require a creditor in a chapter 11 proceeding to first request the debtor-in-possession to take action would be an act in futility in most instances. If the debtor-in-possession has not already taken the action it may be because it has entered into a compromise agreement with the non-objecting creditor which is beneficial to the debtor but may or may not be beneficial to the general creditors. Objecting to the allowance of the non-objecting creditor's proof of claim is one of the most viable means by which a creditor can show that the compromise is not in the best interests of the general creditors. Since the law does not impose a duty on the debtor-in-possession to act in the best interest of all general creditors, the Court will not disregard the plain language of § 502(a) and limit the right of

---

[395] *Kowal v. Malkemus (In re Thompson)*, 965 F.2d 1136, 1147 (1st Cir. 1992) (quotation marks in original).

[396] *In re Simon*, 179 B.R. 1, 7 (Bankr. D. Mass. 1995) (*citing In re Sinclair's Suncoast Seafood, Inc.*, 140 B.R. 588, 592 (Bankr. M.D. Fla. 1992)).

[397] *Algonquin Power Income Fund v. Ridgewood Heights, Inc. (In re Franklin Indus. Complex, Inc.)*, No. 06-80254, 2007 WL 2509709 (Bankr. N.D.N.Y. 2007) (*quoting Panelized Tech., Inc. v. Tesoro Sav. & Loan Assoc. (In re Fargo Fin., Inc.)*, 80 B.R. 247, 252 (Bankr. N.D. Ga. 1987)). *See In re Micro-Precision Techs., Inc.*, 303 B.R. at 244 (in a Chapter 11 case a creditor has the right to object to another creditor's claim where his or her rights are directly implicated by that claim).

general creditors to object to the allowance of a proof of claim in a chapter 11 proceeding.[398]

Still, at least one court has held that a creditor may not object to a claim after the Chapter 11 debtor-in-possession has already done so.[399]   That court reasoned that once the Chapter 11 debtor-in-possession filed an objection to the creditor's claim,

> no useful purpose would be served in allowing [another creditor] to pursue its own objections to these claims. Conversely, allowing such a course of action would waste judicial resources and delay administration of the bankruptcy estate to its and its creditors' detriment with no corresponding benefit to the estate. This would undermine the articulated policy concern of an orderly and efficacious administration of the bankruptcy estate.[400]

These concerns echo those raised by the First Circuit in the context of Chapter 7.

Here, the Franchisor's Objection to Haymarket's Claims is almost entirely duplicative of the Debtors' adversary proceeding against Haymarket.   Because the Debtors now seek to settle their dispute with Haymarket through the Fourth Amended Plan, the Franchisor's Objection to Haymarket's Claims is procedurally improper as it seeks to undermine the value of that settlement.   Even before addressing the merits of the proposed settlement, it is obvious that the concern raised by the court in *In re Charter Co.*, namely, that the compromise is not in the best interests of creditors, is inapposite because the creditors are already receiving more than they could hope for—payment in full with interest ahead of Haymarket from the Debtors' cash proceeds.   If the proposed settlement nonetheless fails to satisfy the requirements of Fed. R. Bankr. P. 9019, the Debtors' will be free to pursue the objection themselves.   Thus, no rights are

---

[398] *In re Charter Co.*, 68 B.R. 225, 228 (Bankr. M.D. Fla. 1986).

[399] *In re Dow Corning Corp.*, 244 B.R. 721, 751 (Bankr. E.D. Mich. 1999), *rev'd on other grounds*, 255 B.R. 445 (E.D. Mich. 2000), *aff'd*, 280 F.3d 648 (6th Cir. 2002).

[400] *Id.*

lost and no parties are prejudiced. Therefore, I will overrule the Franchisor's Objection to Haymarket's Claims and grant the Motion to Strike.

    C.  <u>The Haymarket Claim Settlement</u>

    Pursuant to 11 U.S.C. § 1123(b)(3)(A), "a plan may . . . provide for . . . the settlement or adjustment of any claim or interest belonging to the debtor or to the estate."[401] The First Circuit has instructed that when determining whether to approve a compromise, "[t]he bankruptcy court essentially is expected to 'assess [ ] and balance the value of the claim[s] . . . being compromised against the value . . . of the compromise proposal.'"[402] The First Circuit has further explained that the bankruptcy court should consider the following factors when making this determination:

> (i) the probability of success in the litigation being compromised; (ii) the difficulties, if any, to be encountered in the matter of collection; (iii) the complexity of the litigation involved, and the expense, inconvenience and delay attending it; and, (iv) the paramount interest of the creditors and a proper deference to their reasonable views in the premise.[403]

I must keep in mind that "compromises are favored in bankruptcy,"[404] and that my task is to determine whether the settlement meets the "lowest point in the range of reasonableness."[405] That said, because the settlement was not proposed "by a fiduciary having authority and

---

[401] 11 U.S.C. § 1123(b)(3)(A).

[402] *Hicks, Muse & Co. v. Brandt (In re Healthco Int'l, Inc.)*, 136 F.3d 45, 50 (1st Cir.1998) (*quoting Jeffrey v. Desmond*, 70 F.3d 183, 185 (1st Cir.1995)). See *In re High Voltage Engineering Corp.*, 397 B.R. 579, 601-602 (Bankr. D. Mass. 2008); *In re Fibercore, Inc.*, 391 B.R. 647, 655 (Bankr. D. Mass. 2008).

[403] *Jeffrey v. Desmond*, 70 F.3d at 185 (*citing In re Anolik*, 107 B.R. 426, 429 (D. Mass. 1989)).

[404] *In re Healthco Int'l, Inc.*, 136 F.3d at 50 n. 5 (*quoting* 9 Collier on Bankruptcy ¶ 9019.01, at 9019-2 (15th ed. 1995)).

[405] *In re Healthco Int'l*, 136 F.3d at 51.

responsibility to act for the estate and who negotiated it in an arm's length transaction, . . . there is no cause for deference in the matter."[406]

As described above, the parties propose to settle the following matters: (1) the adversary proceeding commenced by the Debtors against Haymarket seeking a declaratory judgment regarding the validity, priority, and extent of Haymarket's secured and unsecured claims; (2) the pending appeal by Haymarket of my order approving the adequate protection stipulation between the Debtors and Life Fitness; (3) the pending state court action commenced by Haymarket against the Debtors; and (4) the pending adversary proceeding filed by Haymarket against Laird, the Debtors' principal, in his individual Chapter 7 case.  The terms, which are to be effectuated through the Fourth Amended Plan, may be briefly summarized as follows.

All of the equity interests in four of the Operating Debtors, namely, the Acquired Entities, will be transferred to the Acquirer, a designee of Haymarket.  In exchange, the Acquirer will assume all of the obligations of the Acquired Entities.  Haymarket shall have a single allowed secured claim in the amount of $8,500,000 that will accrue interest a rate of 17.5% per annum, for which the Acquirer and each Acquired Entity shall be jointly and severally liable. Haymarket will receive monthly installment payments in the lesser of: (1) the interest then accrued from and after the Effective Date; or (2) the available surplus cash flow of the Acquired Entities after satisfaction of all other then-due obligations.  If there is insufficient cash flow to pay the interest only installment, the balance will be added to Haymarket's principal. Haymarket's claim will be secured by lien in the Acquired Entities' assets which will be subordinate to both Life Fitness and Danversbank.  As a result of this claim treatment, all other creditors will be paid in full with interest within five years.  In further consideration of this

---

[406] *Whispering Pines Estates, Inc. v. Flash Island, Inc. (In re Whispering Pines Estates, Inc.)*, 370 B.R. 452, 461 (B.A.P. 1st Cir. 2007) (declining "to opine the parameters of the correct standard.").

agreement, Haymarket and its related entities and the Retained Entities and their principals will

exchange mutual releases.

A reasonable starting point is to recognize that:

[a] proof of claim which comports with the requirements of Bankruptcy Rule
3001(f) constitutes *prima facie* evidence of the validity and amount of the claim.
The interposition of an objection does not deprive the proof of claim of
presumptive validity unless the objection is supported by substantial evidence.[407]

I note this to stress that Haymarket's claim is not any less valid simply because the Debtors have

commenced an adversary proceeding objecting to various components of it. I also recognize that

even though Haymarket is not in possession of security agreements for the PF Port, PF Matt, and

PF Chel notes, it is likely irrelevant because it received a pledge from Chicago Investments, the

parent company of those entities. I further note that in the Disclosure Statement, the Debtor

represented that, as of December 9, 2011, Haymarket's claim totaled over $9,500,000.

It is immediately apparent that this settlement is in the best interests of the creditors.

First and foremost, all creditors are being paid in full with interest from Haymarket's cash

collateral. Essentially, Haymarket is voluntarily reducing its claim by $1,000,000 and financing

the Debtors' reorganization. Indeed, there is no Fourth Amended Plan without the settlement

and there is no ready alternative to the Fourth Amended Plan. In fact, the Franchisor has

repeatedly suggested that, in the absence of this plan being confirmed, the next step would likely

be a sale, with or without a trustee. Needless to say, such an alternative is no guarantee of this

result for the creditors and, in any event, would likely be months away. In the bankruptcy court,

added delay usually means added expense. Moreover, if the Debtors were unable to propose a

new plan expeditiously, the threat of conversion would also be looming and the unrebutted

---

[407] *Juniper Dev. Grp. v. Kahn (In re Hemingway Transp., Inc.)*, 993 F.2d 915, 925 (1st Cir. 1993) (*citing* Fed. R.
Bankr. P. 3001(f)).

expert testimony is that the creditors are better off under the Fourth Amended Plan than they would be in Chapter 7.[408]

Additionally, the complexity of the litigation involved, added expense, and resulting delay all militate in favor of the settlement.  As previously indicated, this global settlement seeks to resolve four separate matters, which are complicated in and of themselves.  If the procedural history of this case is any gauge, one could expect the litigation of these matters to be incredibly protracted and expensive.  Here, the cost is also of particular concern because Haymarket's fees would be added to its claim.

Admittedly, I have little information before me from which I could measure the possibility of success on the merits of the pending litigations.  Haymarket denied the allegations of the Debtors' complaint in the adversary proceeding and asserted several affirmative defenses.  Still, given the uncertainty of the litigation, it is significant that the settlement already reduces Haymarket's claim by $1,000,000 and essentially subordinates it to all other creditors.  Although I owe no special deference to the Debtors' business judgment, I recognize that they, having a better estimation of their claims than I, believe this settlement is preferable to further litigation.  Even assuming that the Debtors could ultimately obtain a greater benefit by litigating these matters to conclusion, opting for the immediate benefit certainly cannot be said to fall below the lowest point in the range of reasonableness.

In closing, I note that the Franchisor asserts, with no elaboration, that these releases are overbroad and do not satisfy the standard set forth in *In re Quincy Med. Ctr., Inc.*[409]  I am reminded that the First Circuit has repeatedly warned that, "'[i]t is not enough merely to mention

---

[408] Trial Trans. January 17, 2012 at 125:25; 126:1-17.

[409] *In re Quincy Med. Ctr., Inc.*, 2011 WL 5592907 at *2.

a possible argument in the most skeletal way, leaving the court to do counsel's work, create the ossature for the argument, and put flesh on its bones.'"[410]  Notwithstanding inappropriateness of the Franchisor's perfunctory argument, I previously held in *In re Mahoney Hawkes, LLP*, that 11 U.S.C. § 524(e) does not prevent the issuance of third party releases and that I have the power under 11 U.S.C. § 105(a) to approve such releases when it is appropriate and necessary to carry out the plan.[411]  Recognizing that the First Circuit has cautioned that using 11 U.S.C. § 105(a) to enjoin a non-debtor third party involves an extraordinary exercise of discretion,[412] I adopted the multi-factor test summarized in *In re Master Mtg. Inv. Fund, Inc.*[413] to determine the necessity for such an injunction:

> (1) [A]n identity of interests between the debtor and the third-party, usually an indemnity relationship, such that a suit against the non-debtor is, in essence, a suit against the debtor or will deplete the assets of the estate;

> (2) The non-debtor has contributed substantial assets to the reorganization;

> (3) The injunction is essential to the reorganization . . . .;

> (4) A substantial majority of the creditors agree to such injunction, specifically, the impacted class, or classes, has 'overwhelmingly' voted to accept the proposed plan treatment;

> (5) The plan provides a mechanism for the payment of all, or substantially all, of the claims of the class or classes affected by the injunction.[414]

---

[410] *DiVittorio v. HSBC Bank USA, N.A. (In re DiVittorio)*, 670 F.3d 273, 288-289 (1st Cir. 2012) (*quoting United States v. Zannino*, 895 F.2d 1, 17 (1st Cir. 1990)).

[411] *In re Mahoney Hawkes, LLP*, 289 B.R. at 299-300.

[412] *In re G.S.F. Corp.*, 938 F.2d 1467, 1474 (1st Cir.1991), *abrogated in part on other grounds*, *Connecticut Nat'l Bank v. Germain*, 503 U.S. 249 (1992).

[413] *In re Master Mtg. Inv. Fund, Inc.*, 168 B.R. 930 (Bankr. W.D. Mo. 1994).

[414]*In re Mahoney Hawkes, LLP*, 289 B.R. at 297-298 (*quoting In re Master Mtg. Inv. Fund, Inc*., 168 B.R. at 935). *See In re M.J.H. Leasing, Inc.*, 328 B.R. 363, 369–71 (Bankr. D. Mass. 2005).

94

"These factors are neither exclusive nor conjunctive requirements, but simply provide guidance in the Court's determination of fairness."[415]

Applying these factors to the current releases, I find that the releases fall well within what has been approved in this district.  First, Haymarket and its related parties, namely, the Acquirer, Robert Buonoto, Wellesley Capital, Wellesley Building Company, LLC, Brandon Dunes, LLC, and Winged Foot, are supplying substantial consideration by way of assuming the obligations of the Acquired Entities, including the Haymarket debt.  While it does not appear that either Laird or his wife have contributed towards this reorganization in the same way, I note Haymarket has represented that it is unaware of any debt, liability or claim against them other than the guarantees of the Debtors' obligations which are being released.  In any event, this injunction is essential to the reorganization because neither Haymarket nor its related entities would go forward without it.  Additionally, the creditors are being paid in full with interest, and have all, with the exception of the Franchisor, voted to accept the Fourth Amended Plan with the contemplated releases.  Finally, I note that United States Trustee has not filed an objection to confirmation based on the breadth of these releases.

    D.  <u>Assumption of Franchisor Agreements</u>

        1.  Applicable Law

Section 365(a) permits a Chapter 11 debtor-in-possession to assume or reject any executory contract.[416]  Put simply, an executory contract is one "on which performance remains due to some extent on both sides."[417]  Moreover, a Chapter 11 debtor-in-possession may provide

---

[415] *In re Washington Mutual, Inc.*, 442 B.R. 314, 346 (Bankr. D. Del. 2011).

[416] 11 U.S.C. § 365(a).

[417] *N.L.R.B. v. Bildisco & Bildisco*, 465 U.S. 513, 522 n. 6, 104 (1984).

for the assumption and assignment of an executory contract in the plan.[418]   Nevertheless, a

debtor's ability to assume an executory contract is subject to several conditions.   First, if the

debtor defaulted on the executory contract, it may not be assumed unless: (1) the debtor promptly

cures all defaults; (2) the debtor compensates the counterparty for any actual pecuniary loss

suffered resulting from any defaults; and (3) the debtor provides adequate assurance of future

performance.[419]   Second, a debtor may not assume or assign any executory contract where

applicable law excuses the counterparty from accepting or rendering performance to an entity

other than the debtor and the counterparty does not consent to the assumption and assignment.[420]

### 2.   Assumption of the ADA

With respect to the ADA, the first question is whether it is, in fact, executory.   The

Franchisor says it is not, citing the termination notice sent to the Debtors on March 23, 2010.   It

is undisputed that cause existed to terminate the ADA on March 23, 2010, as Chicago

Investments failed to meet the development schedule set forth in the ADA.   It is also undisputed

that the Franchisor sent a second notice of termination on December 17, 2010.   The second

notice cited the termination of the PF Port, PF Bost, and PF Chel franchise agreements as

grounds for terminating the ADA, but since the Franchisor has stipulated that the prepetition

termination of the franchise agreements was ineffective, this notice was unfounded.

Under New Hampshire law, which governs the ADA, "[a] finding of waiver must be

based upon an intention expressed . . . to forego a right, or upon conduct under the circumstances

---

[418] 11 U.S.C. § 1123(b)(2).

[419] 11 U.S.C. § 365(b)(1).

[420] 11 U.S.C. § 365(c)(1).

justifying an inference of a relinquishment of it."[421]    Viewing the Franchisor's actions objectively, the transmission of the second termination notice nearly nine months later, asserting new grounds for termination of ADA, strongly suggests that the defaults identified in the first termination notice were ultimately waived.   This is also consistent with Laird's testimony that Grondahl told him that "the whole purpose [of the termination notice] was to squeeze Haymarket so they'd be out of this whole deal and we would be able to continue on with our agreement."[422] Therefore, I infer that the Franchisor waived the defaults identified in the termination notice dated March 23, 2010, and that the ADA is executory.

The next question is whether the ADA may be assumed.   Again, the Franchisor answers in the negative, arguing that the Debtors can neither cure the non-monetary defaults nor provide adequate assurance of future performance in light of their inability to comply with the development schedule.   As explained above, the development schedule requires Chicago Investments to open two new franchise locations for each year of the ADA's five year term.[423] Therefore, by January 30, 2013, Chicago Investments must have not less than ten franchises open and operating.[424]   In contrast, the Fourth Amended Plan actually divests Chicago Investments of four franchises, namely, the Acquired Entities, meaning that it would have to open eight franchises by January 30, 2013, to comply with the development schedule.

The Debtors contend, however, that the ADA was modified.   At trial, Laird testified that:

[Grondahl] told me that he wanted a 51 percent stake in the area development for Chicago Investments whereby he would put up the build-out money, the start-up

---

[421] *Renovest Co. v. Hodges Dev. Corp.*, 135 N.H. 72, 79, 600 A.2d 448 (1991).  *See North Country Envtl. Servs., Inc. v. Town of Bethlehem*, 146 N.H. 348, 772 A.2d 330 (2001).

[422] Trial Trans. January 17, 2012 at 57:23-25.

[423] Debtors' Ex. 1 at ¶ 2.

[424] *Id.*

capital, and the equipment finance, which all had to be repaid. And in return, Chicago Investments would run the new facilities in the Boston area and receive 49 percent. Along with that would come what he quoted was a drag-along, meaning when he had any type of public offering that he would do, he would drag these franchises into it so that we would get a higher multiple than if we tried to sell them on our own.[425]

Laird further testified that he and Grondahl came to "a verbal agreement that they would move forward with the 51/49" that was never reduced to writing.[426]

The Franchisor responds that, by its own terms, the ADA can only be modified by a written instrument.[427] To the contrary, under New Hampshire law,

[p]arties to a contract can not, even by an express provision in that contract, deprive themselves of the power to alter or vary or discharge it by subsequent agreement. An express provision in a written contract that no rescission or variation shall be valid unless it too is in writing is ineffective to invalidate a subsequent oral agreement to the contrary.[428]

Put simply, the parties to a contract may, notwithstanding the "in-writing provision," submit evidence from which a court could determine that they intended to waive that requirement.[429] Like before, "[t]he waiver of the in-writing clause . . . may itself be implied from the conduct of the parties."[430]

Unfortunately, even with the ability to waive the in-writing provision, the Debtors fall short of proving their case. Assuming, *arguendo*, that Laird and Grondahl agreed that the Franchisor would take a 51% stake in the area development in exchange for financing the new

---

[425] Trial Trans. January 17, 2012 at 55:5-14.

[426] *Id.* at 56:1-4.

[427] Debtors' Ex. 1 at ¶ 20.

[428] *Cin-Doo, Inc. v. 7-Eleven, Inc.*, 2005 WL 768592 *4 (D.N.H. April 6, 2005) (*quoting Prime Fin. Grp., Inc. v. Masters*, 141 N.H. at 37).

[429] *Prime Fin. Group, Inc. v. Masters*, 141 N.H. at 37.

[430] *Id.*

franchise locations, the agreement would run afoul of the statute of frauds.[431]   As explained by

the Supreme Court of New Hampshire:

> Our statute of frauds provides that '[n]o action shall be brought . . . upon any
> agreement . . . that is not to be performed within one year from the time of making
> it, unless such . . . agreement . . . is in writing and signed by the party to be
> charged.[432]

In February of 2010, there were still three years left on the term of the ADA, so Grondahl would

have had to have signed the modification for it to be enforceable against him.   Accordingly, I

find that the Debtors cannot provide adequate assurance of future performance under the ADA,

rendering it incapable of assumption.[433]   This, however, is not an impediment to confirmation of

the Fourth Amended Plan.

### 3.   Assumption of the Franchise Agreements

The Franchisor has stipulated that the franchise agreements are executory.   Also, by

virtue of the Transition Agreements, the Franchisor does not contest the Acquirer's ability to

provide adequate assurance of future performance.[434]   The Transition Agreements also provide

that the Acquirer will pay the Franchisor cure costs in the amount of $233,345.[435]   Therefore, I

find that the franchise agreements of the Acquired Entities may be assumed through the Fourth

Amended Plan.

With respect to the Retained Entities, the Fourth Amended Plan provides for the payment

of the Franchisor's cure claim in the event that I find the franchise agreements can be assumed.

---

[431] N.H. Rev. Stat. Ann. § 506:2.

[432] *Proctor v. MacDonald*, 141 N.H. 621, 624, 689 A.2d 1330 (1997) (*quoting* N.H. Rev. Stat. Ann. § 506:2).

[433] *See* 11 U.S.C. § 365(b)(1)(C).

[434] Transition Agreement, Docket No. 595 at Exhibit p. 2.

[435] *Id.* at p. 4.

Nevertheless, the Franchisor argues that the franchise agreements cannot be assumed because there are incurable non-monetary defaults under the PF Bost franchise agreement and that the Retained Entities have failed to prove that they can provide adequate assurance of future performance.

To start, the Franchisor professes that "[o]perations at PF Bost during the pendency of these cases caused irreparable harm to the Planet Fitness brand," resulting in incurable non-monetary defaults.[436]  In support, it relies on customer complaints that PF Bost was of "beyond poor quality" and asks that I draw an inference that its poor quality resulted in the 5,011 PF Bost members who cancelled their memberships during the post-petition period.  The problem with this argument is that the customer complaints were excluded as inadmissible hearsay, and therefore cannot be evidence of the matter asserted therein.  Furthermore, while I recognize that membership cancellations at PF Bost increased dramatically during the post-petition period, without more, I cannot draw any conclusions as to the cause.  Therefore, there is simply no evidence in the record of any incurable non-monetary defaults with respect to the PF Bost franchise agreement.

The Franchisor argues that the Retained Entities failed to demonstrate they can provide adequate assurance of future performance for three reasons.  First, the Franchisor declares that West is an unfit manager.  Among the justifications offered is the severe operational deficiencies during his tenure as post-petition manager, evidenced by the customer complaints and the number of membership cancellations.  I reiterate that this complaint is without merit for the same reasons stated in the preceding paragraph.  Moreover, the only substantive evidence regarding West's management of the Retained Entities was that he has systems in place for the regular

---

[436] Franchisor's Post-Trial Brief, Docket No. 593 at 5.

cleaning of each fitness center. Additionally, he routinely reviews customer complaints and, if necessary, takes action to resolve any issues. The only evidence of anything close to what might be called an "operational deficiency" is that PF Matt received two health code citations during his tenure. Indeed, the Franchisor notes that West conceded his ignorance of the applicable health regulations. While true, I do not find that two isolated citations for one facility, one of which I note was marked "non-critical,"[437] evidence his unfitness.[438] Admittedly, West violated both the Capital Leases and the franchise agreements by moving eight treadmills from one Operating Debtor to another, but again, I am hardly convinced that this one incident evidences a complete failure by the Retained Entities to provide adequate assurance of future performance.

Second, the Franchisor asserts that, as a matter of law, Erickson may not be a manager under the franchise agreements. I disagree. The Franchisor's position is almost entirely premised on a faulty reading of its own franchise agreements. As explained above, Erickson will be retained as the managing director of Chicago Investments, while Chicago Investments remains the Managing Owner under the franchise agreements. Most of the Franchisor's problem is that there has never been strict compliance with paragraph 2.3 of the franchise agreements, which requires the Managing Owner to be an individual.[439] Despite that requirement, on each Appendix A, Chicago Investments was expressly designated the Managing Owner and Grondahl signed anyway.[440] Accordingly, the Retained Entities argue that nothing is changing under the Fourth Amended Plan. Frankly, I agree. Erickson is being retained as the managing director of

---

[437] Franchisor's Ex. 8.

[438] I also do not accept the Franchisor's invitation to draw an inference that there were likely other health code violations that were not discovered.

[439] Debtors' Exs. 2-7 at ¶ 2.3.

[440] *Id.* at Appx. A.

the Managing Owner, and the franchise agreements expressly state that the owner "is solely responsible for all employment decisions with respect to its personnel."[441]   Accordingly, it is irrelevant that Erickson is not an equity owner, has not completed the managerial training, or is employed by another fitness company, because he is simply an employee of the Managing Owner and not subject to any of those requirements.

The Franchisor's third and final argument is there is insufficient evidence that PF Port will remain viable after the Effective Date.  The Franchisor's first point is that immediately following confirmation, PF Port would be on the brink of insolvency because it will only have about $27,000 in cash on hand, which Bloom testified is light, and will only have $1,389 cash on hand by the end of May.[442]   While those facts are accurate, Bloom nonetheless testified that, in his expert opinion, there would be sufficient working capital for PF Port to emerge from bankruptcy because it will maintain a positive cash balance that will grow in time.[443] Additionally, Debtors' further point out that upon the Effective Date, the $600,000 will be distributed to the Retained Entities, which Chicago Investments has the discretion to allocate however it wants.

Next, the Franchisor urges that uncontroverted evidence shows that PF Port faces a priority tax claim in the amount of $13,488.66, which, according to Jalbert's expert testimony, would render its cash flow negative if it had to pay the claim within the first five months of 2012.[444]   The Retained Entities respond that Debtors' counsel made an offer of proof that witnesses could testify that PF Port was neither open nor had employees in 2008, and as such, it

---

[441] *Id.* at ¶ 10.8.

[442] Trial Trans. January 17, 2012 at 99:1-3; 100:1-6.

[443] *Id.* at 99:16-21.

[444] *Id.* at 133:1-3.

was likely that the payroll tax claim for the year 2008 would be resolved without the need for

payment.[445]   Although the Franchisor did not object to the proffer, it nonetheless insists that I

disregard it because there is no other evidence to support it.  I disagree.  Federal Rule Evidence

611(a) affords the court control over the mode and order of presenting evidence so as to achieve

an effective and efficient trial.[446]   It is common-place in the bankruptcy court for proffers to be

made and accepted regarding undisputed matters so as to expedite proceedings, particularly in

the case of Chapter 11 confirmation hearings.[447]   Therefore, to the extent that the Franchisor did

not object to the proffer nor seek to cross-examine the Debtors' witnesses, it is accepted.

The Franchisor's next several assertions are that there are flaws inherent in the Retained

Entities' projections, rendering them neither reasonable nor reliable.   First, the Franchisor

contends that Bloom has no experience in the fitness industry to justifying his prediction that

increased advertising would increase.  Admittedly, Bloom does not have any experience in the

fitness industry, but he testified that, based upon his vast experience with other companies,

marketing expenditures drive revenue.[448]   Bloom further testified that his assumptions were

based, in part, on the fact that the Franchisor would not require their centers to spend money on

advertising unless it would generate some kind of return.[449]   As such, I do not find this

assumption so unreasonable to cast serious doubt on the projections. Second, the Franchisor

argues that Bloom's estimated maintenance figures are unfounded because he made them

without knowing how many machines were located at PF Port or what expenditure was

---

[445] Trial Trans. January 18, 2012 at 16:7-17.

[446] See Fed. R. Evid. 611(a).

[447] *See, e.g., In re Miraj & Sons, Inc.*, 197 B.R. 737, 738 (Bankr. D. Mass. 1996).

[448] Trial Trans. January 17, 2012 at 101:2-4; 102:1-11.

[449] *Id.* at 101:8-13.

appropriate for annual maintenance.  At trial, Bloom testified that the maintenance figures were

estimated based on historical expenditures and discussions with management.[450]  I find that these

are perfectly rational bases for the projections regardless of whether he personally knows how

many machines are located in the PF Port facility.  In closing, the Franchisor argues that Bloom's

estimates of the reorganization costs, which have not been revised since the summer, are

unreasonable because they do not reflect the protracted litigation that has since occurred.  This

point seems to be premised on the Franchisor's assertion that its legal fees, which are purported

to be in the range of $400,000, must be included in its claim.  As will be discussed in the next

section, however, the Franchisor has not filed a proof of claim seeking attorney's fees and there

is absolutely no evidence of the Franchisor's legal fees anywhere in the record.  That said,

Bloom testified that he estimated a little over $30,000 for legal expenses for January and

February of 2012.[451]  There is no evidence in the record that this estimate was insufficient.

In sum, the unrebutted expert testimony of both Bloom and Jalbert is that the projections

are reasonable.  Indeed, Jalbert testified that he performed a sensitivity analysis with respect to

the projections versus historical, comparing the figures from 2011 and 2012, and concluded that

both would have a positive cash flow in 2012.[452]  Accordingly, I find that based upon the expert

testimony, PF Port will remain viable post-confirmation.  Therefore, I find that the Retained

Entities have provided adequate assurance of future performance under the franchise agreements

and may assume them in conjunction with the Fourth Amended Plan.

---

[450] *Id.* at 101:12-24.

[451] *Id.* at 100:7-14.

[452] *Id.* at 121:14-17; 124:11-18.

E.  Estimation of the Franchisor's Claim

Section 502(c) of the Bankruptcy Code provides, in relevant part, that:

(c) There shall be estimated for purpose of allowance under this section—

>  (1) any contingent or unliquidated claim, the fixing or liquidation of which, as the case may be, would unduly delay the administration of the case . . . [453]

Estimation of claims is designed to avoid delay by estimating the likely outcome of lawsuits to determine liability and "to promote a fair distribution to creditors through a realistic assessment of uncertain claims."[454]  As observed by Judge Gerber in *In re Chemtura Corp.*:

>  Claims estimation under Section 502(c)(1), . . . can be used for a variety of purposes, including determining voting rights on a reorganization plan, gauging plan feasibility, determining the likely aggregate amount of a related series of claims, setting claim distribution reserves, or (though this is less commonly wise) allowing claims. As I explained in my 2003 decision in [*In re Adelphia Business Solutions*, 341 B.R. 415, 424 (Bankr. S.D.N.Y. 2003)], "[e]stimation, authorized under section 502(c) of the Code, provides a means for a bankruptcy court to achieve reorganization, and/or distributions on claims, without awaiting the results of legal proceedings that could take a very long time to determine." Bankruptcy courts have employed a wide variety of methods to estimate claims, including summary trial, a full-blown evidentiary hearing, and a review of pleadings and briefs followed by oral argument of counsel.[455]

In the present case, the Debtors sought estimation of the Franchisor's claim in order to avoid a prolonged dispute with the Franchisor with respect to the ultimate amount of its claim, which would delay the Debtors' reorganization.  As I noted above, the Franchisor's claims are contingent on, *inter alia*, the rejection or assumption of the franchise agreements.  Therefore, I

---

[453] 11 U.S.C. § 502(c)(1).

[454] *O'Neill v. Cont'l Airlines, Inc. (In re Cont'l Airlines)*, 981 F.2d 1450, 1461 (5th Cir. 1993) (*citing First City Beaumont v. Durkay (In re Ford)*, 967 F.2d 1047, 1053 (5th Cir. 1992)).

[455] *In re Chemtura Corp.*, 448 B.R. 635, 649-650 (Bankr. S.D.N.Y. 2011) (footnotes omitted).

find that estimation is appropriate to gauge the feasibility of the Fourth Amended Plan and determine voting rights.[456]

The Bankruptcy Code does not establish a method for estimating contingent and unliquidated claims, but courts have consistently found that the court should use whatever method is best suited to the circumstances of the case.[457]  In present case, I scheduled the Motion to Estimate in conjunction with the evidentiary hearing on confirmation to afford the parties an opportunity to submit evidence.  Curiously, neither party did.  Nevertheless, I find that I have sufficient information to estimate the Franchisor's claim based upon my rulings contained within this memorandum and the ten proofs of claim filed.

Eight out of ten proofs of claim filed by the Franchisor sought payment of lost future royalties and advertising contributions on account of the prepetition termination of the franchise agreements.  Needless to say, those claims have no merit because the Franchisor stipulated that the prepetition termination of the franchise agreements was invalid.

As explained above, the ADA did not terminate prepetition, but Debtors' cannot assume it.  Therefore, the Franchisor would be entitled to rejection damages.  Through Claim 20-1, however, the Franchisor simply reserves the right to assert damages on account of the prepetition termination of the ADA.  Because the Franchisor offered no evidence from which I could quantify its rejection damages, assuming it had any, I have no choice but to estimate the value of this claim at $0.00.

---

[456] *In re Chemtura Corp.*, 448 B.R. 649.

[457] *See, e.g., Addison v. Langston (In re Brints Cotton Mktg., Inc.)*, 737 F.2d 1338, 1341 (5th Cir. 1984); *Bittner v. Borne Chem. Co., Inc.*, 691 F.2d 134, 136 (3rd Cir. 1982); *In re Chemtura Corp.*, 448 B.R. at 649; *In re Mona Lisa at Celebration*, LLC, 410 B.R. 710, 716 (Bankr. M.D. Fla. 2009).

Next, having previously concluded that the Debtors may assume the franchise agreements, I note that the Franchisor is not entitled to rejection damages on account of the franchise agreements. Nevertheless, it is entitled to its cure costs. As discussed above, the Franchisor's proofs of claim also contain an amount for "pre-petition invoices" totaling $71,861.23. The Debtors' contend the cure cost to be only $56,034.67, asserting that the cure costs for PF Port are no more than $8,343.00, rather than the $24,459.70 claimed. No evidence was adduced at trial in support of such a reduction. On the other hand, the Franchisor has maintained that its claim includes substantial attorney's fees, somewhere in the neighborhood of $400,000, but none of its proofs of claim include a claim for attorney's fees and the Franchisor offered no evidence in support.[458] Accordingly, I estimate the Franchisor's cure costs with respect to the franchise agreements to be $71,861.23.

F. <u>Confirmation of the Fourth Amended Plan</u>

"A plan proponent has the burden of proving by a preponderance of the evidence, that the plan satisfies the 14 applicable requirements for confirmation of a plan as set forth in § 1129(a) of the Bankruptcy Code."[459] It is customary in this district as a case management procedure under Fed. R. Evid. 611(a) for plan proponents to submit an affidavit in support of confirmation in lieu of direct testimony so long as the affiant is present in the courtroom at the confirmation hearing for any cross-examination.[460] The benefit of this approach is aptly explained by the bankruptcy court in *In re Michelson*:

---

[458] *See Bittner v. Borne Chem. Co.*, Inc., 691 F.2d at 134 (finding bankruptcy court did not abuse discretion by estimating the claim at zero where claimant failed to prove its case by a preponderance of the evidence).

[459] *In re SW Boston Hotel Venture, LLC*, 460 B.R. at 65; *In re Salem Suede, Inc.*, 219 B.R. 922, 932 (Bankr. D. Mass. 1998).

[460] *Haseotes v. Cumberland Farms, Inc.*, 216 B.R. 690, 694 (D. Mass. 1997) ("Several courts have cited FRE 611(a) as authority for bankruptcy courts to allow the submission of direct testimony by written affidavit at trial provided

107

Effective use of rules of evidence and civil procedure enable the court to assure that its special obligations can be fulfilled efficiently (especially on an uncontested plan). The court can require that evidence be produced in the first instance by affidavit under its power to exercise reasonable control over the mode of presenting evidence so as to avoid needless consumption of time. Fed. R. Evid. 611(a)(2). In addition, it can require affidavits under the applicable rules of procedure. Fed. R. Civ. P. 43(e); Fed. R. Bankr. P. 9017. If such opportunities are exploited, the confirmation hearing may be used to focus on loose ends.[461]

Here, the Debtors filed the Rider Affidavit in support of confirmation of the Fourth Amended Plan and made him available for cross-examination at trial. The Franchisor declined to call him as a witness. Still, the Court has an independent duty to review Chapter 11 plans and ensure compliance with the Bankruptcy Code.[462] Therefore, I will briefly address each element.

1. 11 U.S.C. § 1129(a)(1)

Section 1129(a)(1) of the Bankruptcy Code simply requires that the plan comply with the provisions of the Bankruptcy Code. I find that it does, and incorporate my findings up to this point by reference in support.

2. 11 U.S.C. § 1129(a)(2)

Section 1129(a)(2) of the Bankruptcy Code requires that, as a precondition for confirmation, "[t]he proponent of the plan complies with the applicable provisions of this title."[463] In the Rider Affidavit, Rider avers that, to the best of his knowledge and belief, "the Debtors have complied with the applicable provisions of the Bankruptcy Code, including

---

the witnesses are present at the trial for cross-examination and redirect examination."). *See, e.g., In re Miraj & Sons, Inc.*, 197 B.R. at 737.

[461] *Official Committee of Unsecured Creditors v. Michelson (In re Michelson)*, 141 B.R. 715, 722 (Bankr. E.D. Cal. 1992).

[462] *In re Salem Suede, Inc.*, 219 B.R. at 932. *See* 11 U.S.C. § 1129(a)(1), requiring as a precondition for confirmation, "[t]he plan complies with the applicable provisions of this title."

[463] 11 U.S.C. § 1129(a)(2).

sections 1125 and 1126 regarding disclosure and plan solicitation."[464]   As no party has contested

this assertion, I find that the Debtors have complied with the provisions of this title.

### 3.   11 U.S.C. § 1129(a)(3)

Pursuant to 11 U.S.C. § 1129(a)(3), the Debtors must demonstrate that the plan "has been

proposed in good faith and not by any means forbidden by law."   In *In re SW Boston Hotel*

*Venture, LLC*, Judge Feeney of this district observed:

> The term "good faith" is not defined in the Bankruptcy Code, but has been
> construed to mean honesty in purpose and full disclosure of relevant facts. See J.
> Feeney and N. Dreher, Bankruptcy Law Manual at § 11:63. "[T]he term is
> generally interpreted to mean that there exists a reasonable likelihood that the plan
> will achieve a result consistent with the objective and purposes of the Bankruptcy
> Code." *In re Weber*, 209 B.R. 793, 797 (Bankr. D. Mass. 1997) (citations
> omitted). An unwarranted and discriminatory treatment of insiders' claims that
> favors those claims over those of creditors may preclude a finding of good faith.
> *See In re Future Energy Corp.*, 83 B.R. 470, 487 (Bankr. S.D. Ohio 1988). For
> purposes of confirming a Chapter 11 plan, "the Court must determine whether the
> Plans, given the totality of the Debtors' circumstances, satisfy the purposes
> underlying Chapter 11 . . . [namely] . . . 'the preservation of businesses as going
> concerns, and the maximization of the assets recoverable to satisfy unsecured
> claims.' " *In re Trenton Ridge Investors, LLC*, [Nos. 09-62570, 09-63160,] 2011
> WL 4442270 at *16 [Bankr. S.D. Ohio June 23, 2011)].[465]

In the Rider Affidavit, he avers that "[t]he Plan is proposed with the appropriate purpose of

restructuring the obligations of the Debtors . . . paying Allowed Claims, and effectuating a

successful reorganization.  The Plan is the result of arm's-length negotiations."[466]

Under the Plan, the Debtors are restructuring, allowing operations of the fitness centers to

continue, and all creditors are being paid in full with interest.  This will be effectuated by a

transfer of the equity interests of four of the Operating Debtors to the Acquirer, a designee of

---

[464] Rider Affidavit, Docket No. 575 at ¶ 5.

[465] *In re SW Boston Hotel Venture, LLC*, 460 B.R. at 66.

[466] Rider Affidavit, Docket No. 575 at ¶ 6.

Haymarket, who will then assume all of the obligations for those Acquired Entities, including the voluntarily reduced $8,500,000 allowed secured claim of Haymarket.  To ensure payment of all other creditors with interest, Haymarket will only receive monthly installments payments of the lesser of any available surplus cash flow after the payment of all other obligations, including those to other creditors under the plan, or the interest then accrued from the Effective Date. Haymarket has voluntary subordinated its lien in the Acquired Entities Assets to both Life Fitness and Danversbank.  Meanwhile, Chicago Investments will continue to own and operate PF Port and PF Bost, while the intermediate holding company, PF Group, will be dissolved.   In further consideration of this agreement, Haymarket and its related entities and the Retained Entities and their principals will exchange mutual releases.

In sum, I find that the purpose of the Plan is not to impermissibly favor insiders and the that the Debtors have satisfied the good faith requirement set forth in 11 U.S.C. § 1129(a)(3).

### 4.  11 U.S.C. § 1129(a)(4)

Section 1129(a)(4) of the Bankruptcy Code provides that, as a condition to confirmation,

> [a]ny payment made or to be made by the proponent, by the debtor, or by a person issuing securities or acquiring property under the plan, for services or for costs and expenses in or in connection with the case, or in connection with the plan and incident to the case, has been approved by, or is subject to the approval of, the court as reasonable.[467]

In the Rider Affidavit, he affirms that I have previously approved any payment made by the Debtors for services, including all fees and expenses incurred by any professionals, and that the Debtors will seek approval for any additional fees incurred through the Effective Date.[468]   No

---

[467] 11 U.S.C. § 1129(a)(4).

[468] Rider Affidavit, Docket No. 575 at ¶ 7.

party having contested this representation, I find that the Debtors have satisfied 11 U.S.C. § 1129(a)(4).

### 5.   11 U.S.C. § 1129(a)(5)

Section 1129(a)(5) of the Bankruptcy Code generally requires the plan proponent to disclose the identity and affiliations of any individual proposed to serve as an officer or director of the debtor after confirmation of the plan and that such appointment be consistent with the interests of creditors.[469]   Additionally, the plan proponent must disclose the identity of any insider that will be employed or retained by the reorganized debtor and describe the nature of any compensation.[470]

In the present case, the Fourth Amended Plan and Disclosure Statement have adequately disclosed the post-confirmation management of the Debtors.  Erickson will be installed as the managing director of Chicago Investments upon the Effective Date, while West will remain the operating manager of PF Bost and PF Port.  Laird will remain as a consultant on an interim basis only, and will transition out within six months of the Effective Date.   In the Disclosure Statement, the Debtors indicated that Laird has been paid approximately $216,000 per year. Accordingly, the Debtors have satisfied 11 U.S.C. § 1129(a)(5).

### 6.   11 U.S.C. § 1129(a)(6)

Pursuant to 11 U.S.C. § 1129(a)(6), "[a]ny governmental regulatory commission with jurisdiction . . . over the rates of the debtor" must approve "any rate change provided for in the plan, or such rate change is expressly conditioned on such approval."[471]   The Debtors have

---

[469] 11 U.S.C. § 1129(a)(5)(A).

[470] 11 U.S.C. § 1129(a)(5)(B).

[471] 11 U.S.C. § 1129(a)(6).

satisfied this requirement because the Fourth Amended Plan does not provide for any change in rates over which a governmental entity has jurisdiction.

> 7.  11 U.S.C. § 1129(a)(7)

As explained by Judge Feeney of this district in *In re SW Boston Hotel Venture, LLC*:

> In order for a Chapter 11 plan to be confirmed, 11 U.S.C. § 1129(a)(7) requires that each nonaccepting holder of an impaired class of claims or interests will retain or receive property of a value as of the effective date in an amount that is not less than the amount such holder would receive or retain if the debtor were liquidated under Chapter 7 of the Bankruptcy Code. . . .

> Section 1129(a)(7) requires only that the present value of the distribution under the plan, which must account for the time value of money, must be no less than a dividend upon liquidation. *See* N. Dreher and J. Feeney, Bankruptcy Law Manual § 11:63 (West 2011). "The best interests valuation is to be based on evidence not assumptions, but it is not an exact science." *In re Multiut Corp.*, 449 B.R. 323, 344 (Bankr. N.D. Ill. 2011) (citations omitted).[472]

In the present case, the only creditor to cast a ballot to reject the Fourth Amended Plan was the Franchisor.  Because the Debtors intend to assume the franchise agreements and pay the cure claim in full on the Effective Date, the Franchisor does not hold a classified claim entitling it to vote to accept or reject the Fourth Amended Plan.  Therefore, all holders of a claim in an impaired class have voted to accept the Fourth Amended Plan, satisfying 11 U.S.C. § 1129(a)(7)(A)(i).  Alternatively, because the Franchisor's cure claim will be paid in full on the Effective Date, the Debtors have satisfied 11 U.S.C. § 1129(a)(7)(A)(ii).

> 8.  11 U.S.C. § 1129(a)(8)

Section 1129(a)(8) of the Bankruptcy Code requires that, "[w]ith respect to each class of claims or interests . . . such class has accepted the plan . . . or such class is not impaired under the plan."[473]  As previously explained, the Franchisor is the only creditor to have cast a ballot

---

[472] *In re SW Boston Hotel Venture, LLC*, 460 B.R. at 65.

[473] 11 U.S.C. § 1129(a)(8).

rejecting the Fourth Amended Plan, but is not actually entitled to vote because it does not hold a

classified claim.    Therefore, its vote is a nullity, and the Debtors have satisfied 11 U.S.C. §

1129(a)(8).

> 9.   11 U.S.C. § 1129(a)(9)

Section 1129(a)(9) provides

> Except to the extent that the holder of a particular claim has agreed to a different
> treatment of such claim, the plan provides that—
>> (A) with respect to a claim of a kind specified in section 507(a)(2) or
>> 507(a)(3) of this title, on the effective date of the plan, the holder of such
>> claim will receive on account of such claim cash equal to the allowed
>> amount of such claim;
>> (B) with respect to a class of claims of a kind specified in section
>> 507(a)(1), 507(a)(4), 507(a)(5), 507(a)(6), or 507(a)(7) of this title, each
>> holder of a claim of such class will receive--
>>> (i) if such class has accepted the plan, deferred cash payments of a
>>> value, as of the effective date of the plan, equal to the allowed
>>> amount of such claim; or
>>> (ii) if such class has not accepted the plan, cash on the effective
>>> date of the plan equal to the allowed amount of such claim;
>> (C) with respect to a claim of a kind specified in section 507(a)(8) of this
>> title, the holder of such claim will receive on account of such claim regular
>> installment payments in cash--
>>> (i) of a total value, as of the effective date of the plan, equal to the
>>> allowed amount of such claim;
>>> (ii) over a period ending not later than 5 years after the date of the
>>> order for relief under section 301, 302, or 303; and
>>> (iii) in a manner not less favorable than the most favored
>>> nonpriority unsecured claim provided for by the plan (other than
>>> cash payments made to a class of creditors under section 1122(b));
>>> and
>> (D) with respect to a secured claim which would otherwise meet the
>> description of an unsecured claim of a governmental unit under section
>> 507(a)(8), but for the secured status of that claim, the holder of that claim
>> will receive on account of that claim, cash payments, in the same manner
>> and over the same period, as prescribed in subparagraph (C).[474]

In the Rider Affidavit, Rider asserts that the Debtors have satisfied the requirements of 11 U.S.C.

§ 1129(a)(9) because, except to the extent that the holder of a particular claim has agreed to

---

[474] 11 U.S.C. § 1129(a)(9).

different treatment, the Fourth Amended Plan provides that allowed administrative expense claims, priority claims, and priority tax claims will be treated in accordance with 11 U.S.C. § 1129(a)(9).[475]   Having reviewed the Fourth Amended Plan, I agree and find that it satisfies the requirements of this section.

### 10. 11 U.S.C. § 1129(a)(10)

Under 11 U.S.C. § 1129(a)(10), if the plan contains an impaired class of claims, "at least one class of claims that is impaired under the plan has accepted the plan, determined without including any acceptance of the plan by any insider."[476]   Here, all impaired classes have voted to accept the Fourth Amened Plan.  Thus, 11 U.S.C. § 1129(a)(10) is satisfied.

### 11. 11 U.S.C. § 1129(a)(11)

Judge Feeney recently explained the requirements of 11 U.S.C. § 1129(a)(11) in *In re SW Boston Hotel Venture, LLC*:

> Section 1129(a)(11) of the Bankruptcy Code provides that a plan may only be confirmed if confirmation is not likely to be followed by liquidation, or the need for further financial reorganization. 11 U.S.C. § 1129(a)(11). Commonly referred to as the feasibility requirement, the purpose of this test is to ensure that the plan is not a "visionary scheme." *See In re Merrimack Valley Oil Co., Inc.*, 32 B.R. 485, 488 (Bankr. D. Mass. 1983). Stated another way, "[t]he purpose of the feasibility test is to determine whether there is a reasonable probability that creditors will receive the payments provided for in the plan." *In re Trenton Ridge Investors, LLC*, 461 B.R. 440, 478 (Bankr. S.D. Ohio. 2011) (citations omitted). A plan proponent need not guarantee the success of the plan, but rather must introduce evidence that its plan is realistic. *In re Brice Road Devs., LLC.*, 392 B.R. at 283. Courts consider the following factors in assessing feasibility:
>
> > (1) the adequacy of the capital structure; (2) the earning power of the business; (3) economic conditions; (4) the ability of management; (5) the probability of the continuation of the same management; and (6) any other related matter which determines the prospects of a sufficiently successful operation to enable performance of the provisions of the plan.

---

[475] Rider Affidavit, Docket No. 575 at ¶ 13.

[476] 11 U.S.C. § 1129(a)(10).

*In re Trenton Ridge Investors, LLC*, 2011 WL 4442270 at *25 (footnote omitted) (*citing In re U.S. Truck Co., Inc.*, 800 F.2d 581, 589 (6th Cir. 1986)). *See also In re Orfa Corp. of Phil.*, 129 B.R. 404, 411 (Bankr. E.D. Pa. 1991).[477]

The unrebutted testimony of both expert witnesses is that the Fourth Amended Plan is feasible. Bloom testified that, in his expert opinion, the projections, which included adequate provisions for professional fees, plan payments, and capital expenditures, were reasonable and achievable.[478] Based on the projections for both Retained Entities which indicate that they have, and will maintain post-bankruptcy, a positive cash flow that will increase in time, he concluded that PF Port and PF Bost would have sufficient working capital upon emerging from bankruptcy to continue operations.[479] Bloom testified that he therefore believed the Fourth Amended Plan is feasible.[480] Similarly, Jalbert testified that he performed a comparison of the Debtors' budgets to actual performance that revealed the Debtors had a higher cash flow and lower expenses than were budgeted, lending credence to the reliability of the projections.[481] Next, he completed a sensitivity analysis on the projections and, like Bloom, opined that PF Port and PF Bost would have sufficient working capital post-bankruptcy.[482]

Therefore, I find that the Fourth Amended Plan is feasible and satisfies the requirement of 11 U.S.C. § 1129(a)(11).

---

[477] *In re SW Boston Hotel Venture, LLC*, 460 B.R. at 58-59.

[478] Trial Trans. January 17, 2012 at 92:14-16

[479] *Id.* at 97:1; 99:16-21.

[480] *Id.* at 94:5-9.

[481] *Id.* at 121:1-16; 120:2-13. See Debtors' Ex. 14.

[482] Trial Trans. January 17, 2012 at 124:11-18; 125:20-23.

### 12. 11 U.S.C. § 1129(a)(12)

Section 1129(a)(12) of the Bankruptcy Code requires that "[a]ll fees payable under section 1930 of title 28 . . . have been paid or the plan provides for the payment of all such fees on the effective date of the plan."[483]  This is precisely what the Fourth Amended Plan states and I find that this requirement has been satisfied.

### 13. 11 U.S.C. § 1129(d)

Pursuant to 11 U.S.C. § 1129(d) "the court may not confirm a plan if the principal purpose of the plan is the avoidance of taxes or the avoidance of the application of section 5 of the Securities Act of 1933."  No governmental unit has filed an objection to the confirmation of the Fourth Amended Plan and in the Rider Affidavit, he swears that the Fourth Amended Plan has not been filed for the purpose of avoiding taxes.  Accordingly, I find that the Fourth Amended Plan was not filed for the purpose of avoiding taxes.

---

[483] 11 U.S.C. § 1129(a)(12).

## V. **CONCLUSION**

In light of the foregoing, I will enter an order:

1.  Overruling the Omnibus Objection;

2.  Granting the Motion to Assume;

3.  Granting the Motion to Estimate;

4.  Granting the Motion to Strike;

5.  Overruling the Objection to Confirmation; and

6.  Directing the Debtors to submit a proposed confirmation order consistent with this

memorandum within five business days.

_____
William C. Hillman
United States Bankruptcy Judge

Dated: April 24, 2012


Counsel Appearing:

Charles R. Bennett, Jr., Andrew G. Lizotte, Christopher M. Condon, John C. Elstad,
   Murphy & King, P.C., Boston, MA,
   for the Debtors
Richard C. Pedone, Arthur L. Pressman, Nixon Peabody LLP, Boston, MA,
   for Pla-Fit Franchise, LLC
John J. Monaghan, Lynne B. Xerras, Diane Rallis, Nicole Prairie,
   Holland & Knight, LLP, Boston, MA,
   for Haymarket Capital, LLC
Jennifer L. Hertz, Office of the United States Trustee, Boston, MA,
   for the United States Trustee